1    **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2    Name ___Snider_____James_____L._____
         (Last)              (First)            (Initial)

3    Prisoner Number _____D-38950_____

4    Institutional Address ___Box 689    F-330U___

5    ___Soledad, CA 93960-0689___

         **FILED** E-filing (PR)

         JUL - 9 2008

         RICHARD W. WIEKING
6        CLERK U.S. DISTRICT COURT
         NORTHERN DISTRICT OF CALIFORNIA

         *MHP*

7                    **UNITED STATES DISTRICT COURT**
                    **NORTHERN DISTRICT OF CALIFORNIA**

8    JAMES L. SNIDER                    CV  08   3312

     (Enter the full name of plaintiff in this action.)

9                                        )
10                    vs.                )    Case No. _____
                                         )    (To be provided by the clerk of court)
     BEN CURRY, Warden                   )
11   _____           )    **PETITION FOR A WRIT**
                                         )    **OF HABEAS CORPUS**
12   _____           )
                                         )
13   _____           )
                                         )
14   (Enter the full name of respondent(s) or jailor in this action)  )
15   _____           )

16              **Read Comments Carefully Before Filling In**

17   **When and Where to File**

18          You should file in the Northern District if you were convicted and sentenced in one of these

19   counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20   San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21   this district if you are challenging the manner in which your sentence is being executed, such as loss of

22   good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23          If you are challenging your conviction or sentence and you were **not** convicted and sentenced in

24   one of the above-named fifteen counties, your petition will likely be transferred to the United States

25   District Court for the district in which the state court that convicted and sentenced you is located. If

26   you are challenging the execution of your sentence and you are not in prison in one of these counties,

27   your petition will likely be transferred to the district court for the district that includes the institution

28   where you are confined. Habeas L.R. 2254-3(b).

     PET. FOR WRIT OF HAB. CORPUS          - 1 -

1  <u>Who to Name as Respondent</u>

2        You must name the person in whose actual custody you are. This usually means the Warden or

3  jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4  you are imprisoned or by whom you were convicted and sentenced. These are not proper

5  respondents.

6        If you are not presently in custody pursuant to the state judgment against which you seek relief

7  but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8  custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9  was entered.

10  <u>A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE</u>

11       1. What sentence are you challenging in this petition?

12          (a)    Name and location of court that imposed sentence (for example; Alameda

13                 County Superior Court, Oakland):

14           <u>Santa Barbara Superior Court</u>    <u>Santa Maria, CA</u>

15           Court                       Location

                             SM47998

16          (b)    Case number, if known _____

17          (c)    Date and terms of sentence ___<u>9/8/85, 15 years to life +9 years</u>

18          (d)    Are you now in custody serving this term? (Custody means being in jail, on

19                 parole or probation, etc.)        Yes <u>X</u>    No _____

20                 Where?

21                 Name of Institution: __<u>California State prison, Soledad</u>

22                 Address: __<u>Box 689, Soledad, CA 93960-0689</u>

23       2. For what crime were you given this sentence? (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known. If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26  <u>Murder in the second degree (P.C. §187), Petitioner is challenging the</u>

27  <u>Parole Board's suitability denial .</u>

28  _____

1    3.  Did you have any of the following?

2         Arraignment:                                Yes _N/A_      No _____

3         Preliminary Hearing:                        Yes _N/A_      No _____

4         Motion to Suppress:                         Yes _N/A_      No _____

5    4.  How did you plead?

6         Guilty _____    Not Guilty _X_    Nolo Contendere _____

7         Any other plea (specify) __None_____

8    5.  If you went to trial, what kind of trial did you have?

9         Jury _X_    Judge alone _____    Judge alone on a transcript _____

10   6.  Did you testify at your trial?                Yes _N/A_      No _____

11   7.  Did you have an attorney at the following proceedings?      N/A

12        (a)   Arraignment                            Yes _____      No _____

13        (b)   Preliminary hearing                    Yes _N/A_      No _____

14        (c)   Time of plea                           Yes _N/A_      No _____

15        (d)   Trial                                  Yes _N/A_      No _____

16        (e)   Sentencing                             Yes _N/A_      No _____

17        (f)   Appeal                                 Yes _N/A_      No _____

18        (g)   Other post-conviction proceeding       Yes _N/A_      No _____

19   8.  Did you appeal your conviction?               Yes _N/A_      No _____

20        (a)   If you did, to what court(s) did you appeal?

21              Court of Appeal                        Yes _N/A_      No _____

22              Year: _1987_      Result: _Denied_____

23              Supreme Court of California            Yes _N/A_      No _____

24              Year: _1987_      Result: _Denied_____

25              Any other court                        Yes _N/A_      No _____

26              Year: _N/A_       Result: _N/A_____

27

28        (b)   If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS        - 3 -

1        petition?                                                                    Yes __N/A__    No____

2        (c)   Was there an opinion?                                     Yes __N/A__    No____

3        (d)   Did you seek permission to file a late appeal under Rule 31(a)?

4                                                                                      Yes __N/A__    No____

5        If you did, give the name of the court and the result:

6        Does not apply to this instant petition.

7        _____ // _____

8    9.  Other than appeals, have you previously filed any petitions, applications or motions with respect to

9    this conviction in any court, state or federal?                          Yes ____  X    No____

10       [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11   challenged the same conviction you are challenging now and if that petition was denied or dismissed

12   with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13   for an order authorizing the district court to consider this petition.  You may not file a second or

14   subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit.  28

15   U.S.C. §§ 2244(b).]

16       (a)   If you sought relief in any proceeding other than an appeal, answer the following

17       questions for each proceeding.  Attach extra paper if you need more space.

18       I.   Name of Court: __Santa Barbara Superior Court__

19       Type of Proceeding: ___Habeas Corpus___

20       Grounds raised (Be brief but specific):

21       a. __Wrongful sentence__

22       b._____

23       c._____

24       d._____

25       Result: __Denied__                 Date of Result: __N/A__

26       II.   Name of Court: __Second Appellate Court of California__

27       Type of Proceeding: __Habeas Corpus__

28       Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS        - 4 -

1    a. **Wrongful sentence** _____

2    b. _____

3    c. _____

4    d. _____

5    Result: **Denied** _____ Date of Result: N/A _____

6    III.  Name of Court: __**California Supreme Court**__

7    Type of Proceeding: __**Habeas Corpus**__

8    Grounds raised (Be brief but specific):

9    a. **Wrongful sentence** _____

10   b. _____

11   c. _____

12   d. _____

13   Result: **Denied** _____ Date of Result: N/A _____

14   IV.  Name of Court: __**U.S. District Court, Central District**__

15   Type of Proceeding: __**Habeas Corpus**__

16   Grounds raised (Be brief but specific):

17   a. **Wrongful sentence** _____

18   b. _____

19   c. _____

20   d. _____

21   Result: **Denied** _____ Date of Result: N/A _____

22   (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                                   Yes __X__    No_____

24   Name and location of court: __**U.S. Court of Appeals, Ninth Circuit**__

25   B. GROUNDS FOR RELIEF

26   State briefly every reason that you believe you are being confined unlawfully. Give facts to

27   support each claim. For example, what legal right or privilege were you denied? What happened?

28   Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS          - 5 -

1   need more space. Answer the same questions for each claim

2        [Note. You must present ALL your claims in your first federal habeas petition. Subsequent

3   petitions may be dismissed without review on the merits. 28 U.S.C §§ 2244(b); McCleskey v. Zant,

4   499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5        Claim One: _____ **See attached habeas petition** _____

6        _____ // _____

7        Supporting Facts: _____ // _____

8        _____ // _____

9        _____ // _____

10       _____ // _____

11       Claim Two: _____ // _____

12       _____ // _____

13       Supporting Facts: _____ // _____

14       _____ // _____

15       _____ // _____

16       _____ // _____

17       Claim Three: _____ // _____

18       _____ // _____

19       Supporting Facts: _____ // _____

20       _____ // _____

21       _____ // _____

22       _____ // _____

23       If any of these grounds was not previously presented to any other court, state briefly which

24   grounds were not presented and why:

25       _____ **None, does not apply to this petition** _____

26       _____ " _____

27       _____ " _____

28       _____ " _____

PET. FOR WRIT OF HAB. CORPUS          - 6 -

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3    of these cases:

     **See attached habeas petition**

4    _____

5    _____

6    _____

7    Do you have an attorney for this petition?                    Yes_____    No__X__

8    If you do, give the name and address of your attorney:

9    **None**_____

10    WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11    this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13    Executed on __6/8/2008__                    _James J. Smith_

14                    Date                              Signature of Petitioner

15

16

17

18

19

20    (Rev. 6/02)

21

22

23

24

25

26

27

28

     PET. FOR WRIT OF HAB. CORPUS          - 7 -

Court of Appeal, Second Appellate District, Div. 6 - No. B206190
**S161914**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re JAMES L. SNIDER on Habeas Corpus

The petition for review is denied.

SUPREME COURT
**FILED**

MAY 1 4 2008

Frederick K. Ohlrich Clerk

Deputy

**GEORGE**
Chief Justice

PETITION FOR REVIEW

IN THE

SUPREME COURT OF CALIFORNIA

Comes now, James L. Snider, Petitioner in pro se, and through this verified Petition for Review requests this Honorable Court to review and adjudicate the claims raised, thus reviewing the denial(s) from the Appellate and Superior Courts (attached hereto), as both of these courts decisions are without a "reasoned opinion", semi post card denials.

Petitioner contends that, the denial by the Superior Court was a miscarriage of the intent of the habeas corpus act, as the Superior Court's obvious biased and form/rote language was directly recited from the Board's decision and thus arbitrary.

As this Court will discover upon a full and fair reading of the enclosed documents for review, the lower courts were obligated to consider "all" issues/claims presented before them. The courts failed to consider the facts of the petition and supporting material and relied on the Board's form/rote language in denying Petitioner's habeas corpus action, apparently without even reading the petition.

In the case of city of Aburn v. Quest Corp., 260 F.3d 1160 (9th Cir. 2001): Under the Supremacy clause, the state courts are obligated to apply and adjudicate federal claims that were fairly presented to them.

Respectfully submitted,

James L. Snider

Dated: March 18, 2008

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
## SECOND APPELLATE DISTRICT
### DIVISION: 6

DATE: March 13, 2008

James L. Snider
CDC:D-38950
California State Prison
P.O. Box 689
Soledad, CA 93960-0689

In re JAMES L. SNIDER on Habeas Corpus.

B206190
Santa Barbara County No. SM47998

THE COURT:

The petition for writ of habeas corpus, filed on March 5, 2008, is DENIED.

cc: File

CALIFORNIA COURT OF APPEALS

SECOND APPELLATE DISTRICT OF CALIFORNIA

Petitioner James L. Snider, herein appeals to the Honorable Second Appellate District Court of Appeals, the Ruling made by the Superior Court of California for the County of Santa Barbara. Case No. 1280216, on Petitioner's fourth (4th) parole suitability hearing.

**********

The Superior Court stated, at p.1:

"Nevertheless, some evidence supports the Board's decision that petitioner continues to pose a unreasonable risk of danger to the public based on the particular circumstances of commitment offense beyond those minimally necessary to sustain the second degree murder conviction, as articulated by the Board during the August 17, 2007, parole suitability hearing."

First, Petitioner contends that, the Superior Court's decision was not a "reasoned opinion", and appears to have only reiterated the same form/rote language in the Board's denial, which was unsupported by the 'some evidence' standard.

Second, what did the Board or State Court say about Petitioner's commitment offense that makes him a current risk to society? Nothing. What did the Board or State Court say about how or why the recited offense adjectives still make Petitioner a current public safety risk if paroled? Nothing. They merely recited immutable offense factors without explaining how those factors still serve to establish that Petitioner is a public safety risk if paroled. The "some evidence" standard of review provides protection against more than fabricated charges or bureaucratic mistakes and the 'some evidence' standard of review protects against arbitrary decisions. See, Superintendent v. Hill, 472 U.S. at 454-455, 457.

The Board or State Court did not properly consider the gravity of Petitioner's commitment offense, as the circumstances of this offense are well established in the record. The victim, his wife and Petitioner got into a heated argument,

1

which turned into a fight and then turned deadly. The circumstances of Petitioner's commitment offense were not beyond minimally necessary to sustain a second degree conviction. Petitioner has expressed his remorse for that awful night and will never forget it.

**********

The Superior Court stated, at p.1:

"And while the circumstances of the offense become a less valid predictor of a prisoner's current dangerousness as time passes, courts have recognized that continued reliance on this factor at least prior to the expiration of the prisoner's term, as here, violates due process. (See, e.g., Irons v. Carey (II) (9th Cir. 2007) 479 F.3d 658, 664-665.) Petitioner has served 22 years of his 24-years-to-life term."

First, the State Court did not fully evaluate the continued use of a prisoner's commitment offense over a long period of time.

Three Ninth Circuit cases provide the guideposts for applying the Superintendent v. Hill 'some evidence' standard on this point: Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003), Sass, 461 F.3d 1123, and Irons v. Carey, 479 F.3d 658 (9th Cir. 2007). Biggs explained that the value of the criminal offense fades over time as a predictor of parole suitability: "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered... A continued reliance in the future on an unchanging factor, the circumstances of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs, 334 F.3d at 916-17. Biggs upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that over time..., should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs offense and prior

2

conduct would raise serious questions involving his liberty interest in parole."

This was Petitioner's fourth (4th) parole suitability hearing, and he was denied parole based primarily on his commitment offense, of which deprives Petitioner of his liberty interest afforded by the U.S. Supreme Court, and should be considered a violation of Petitioner's due process rights.

Second, the Court erred in assessing Petitioner's prison term of confinement. Petitioner was sentenced to consecutive terms of, 15 years to life for second degree murder plus two (2) years for a gun enhancement. Also, a seven (7) year term for the attempted murder. Petitioner served (completed) the determinate term of nine (9) years (2 + 7 years) from 1985 to 1991. It is prescribed by law to complete the determinate term before the life term. The record establishes (See, Parole Hearing Transcripts) that Petitioner started serving his 15 years to life sentence in 1991. Thus, as of the date of Petitioner's parole suitability hearing, August 17, 2007, Petitioner has served 16 years of his 15 years to life sentence. Beyond the 'minimum' term contemplated in Biggs, Sass and Irons.

Third, The Ninth Circuit stated in HAYWARD v. MARSHALL, 2008 DJDAR 93, at p.97: "Though Hayward was arrested many times before he committed the murder in this case, these arrests occurred thirty or more years ago and also do not support a conclusion that Hayward currently poses any threat to public safety."

Petitioner asserts that, his past criminal convictions were more than two decades ago (20 years) and he has never committed a prior violent act.

**********

The Superior Court stated, at p.2:

"Additionally, some evidence supports the Board's decision that petitioner poses an unreasonable risk of present danger to the public based on his threat to abuse alcohol on parole."

Petitioner asserts that, the record establishes that he has been in control of his alcohol addiction for two decades (20 years), and will continue to abstain

from alcohol for the rest of his life.

Furthermore, in the case of Sass v. California Board of Prison Terms (9th Cir. 2006) 461 F.3d 1123 (3): "Even if Sass's alcoholism had made his offense egregious at the time it was committed, whether on the basis of extreme "callousness" or one of the other factors listed in the parole regulations, it would not constitute "some evidence" that he was a current danger to public safety."

"As discussed above, the rationale employed by the Board and approved by the state court would allow the Board to deny parole to any person who was once an active alcoholic, regardless of the extent of his rehabilitation. To permanently deprive Sass, or any other inmate, his liberty simply because he was an active alcoholic at the time of the offense, and alcoholics are deemed to be in a perpetual state of recovery, is an untenable result. It is also a violation of due process. The Supreme Court has made clear that an individual cannot be punished on the basis of status alone, including the status of being afflicted with an addiction, see Robinson v. California, 370 U.S. 660 (1962), yet that is precisely what the Board practices, at least as applied in Sass's case, does. Sass has finished serving the sentence he would have served but for the Board's finding of present dangerousness -- a finding based solely on the fact that many years earlier he committed a crime as a result of his state of active alcoholism. That finding constitutes a quintessentially arbitrary state action -- it relies solely on the biases of the Board, rather than on any objective justifications, and it permits the permanent imprisonment of Sass solely for the reason that he was once an active alcoholic." "Second, even if an inmate's active addiction to alcohol at the time of the offense could provide a basis for an adverse suitability determination in cases in which the record contains "some evidence" that the prisoner presently presents a danger to society, that is not the case with Sass. The record is devoid of any evidence that supports the Board's finding that Sass,

4

well over a decade after he last abused alcohol, constitutes a present threat to society. The Board's decision relies exclusively on the fact that Sass was an active alcoholic at the time of his offense of imprisonment and on his prior DUI's. Beyond that, it offers no evidence -- not a single action on Sass's part since his imprisonment, not a medical or psychological report discussing the dangerousness or recidivism amongst recovering alcoholics generally or of Sass specifically -- to support its conclusion that Sass was, at the time of the parole hearing, a danger to public safety. The Board's failure to offer any evidence linking Sass's past active alcoholism to a state of present dangerousness renders its decision completely without support and thus "arbitrary". Indeed, there is simply nothing in the record that provides any evidence that Sass is unsuitable for parole."

"Because status as an alcoholic alone cannot constitute the basis for determining that an inmate is unsuitable for parole, and because the record here is completely devoid of any evidence showing that Sass's active alcoholism numerous years ago makes him a present threat to public safety, the Board's suitability decision, which depended entirely on Sass's alcoholism, is "arbitrary."

Petitioner asserts that, the Board and State Court are applying the same arbitrary conclusions in his case as they did in the above Sass case. This action by the Board and State Court is in violation of Petitioner's due process and equal protection rights afforded to him by the United States, and, California Constitutions.

Thus, the evidence relied upon by the Board and/or state court fails to support any of the unsuitability factors and fully supports suitability for parole. Additionally, there is absolutely no evidence to support a finding that Petitioner would currently pose an unreasonable risk of danger to the public if paroled. The Board's conclusions fail to support such a determination, considering Petitioner's outstanding programming of 18 years of disciplinary free behavior,

5

his devotion to studying the Bible and living by its principles, his application of the Overcomers 12 Step Program, his excellent work reports, his acquisition of strong vocational skills (Computers), his employable skills he has learned while in prison as a plumber, painter and glazier, and his two (2) very positive Psychological Evaluations, of which support that Petitioner's release from prison will not endanger public safety. In fact, Petitioner's latest Psychological Evaluation (2006) (See, Petitioner's instant habeas petition Ex. "B". at p.4) stating that: "...he poses no more risk to society than the average citizen in the community."

The Ninth Circuit Court of Appeals stated in Ronald Hayward (9th Cir. 2008), supra, "Even though these suitability and unsuitability factors are helpful in analyzing whether a prisoner should be granted parole, California courts have made clear that the "findings that are necessary to deem a prisoner unsuitable for parole", Irons, 2007 WL2927359, at *3, are not that a particular factor or factors indicating unsuitability exist, but that a prisoner's release will unreasonably endanger public safety." In re Dannenberg, No. H030031, 2007 WL3408290, at *9 (Cal. Ct. App. Nov. 16, 2007), modified, 2007 WL4227229, (Cal. Ct. App. Dec. 3, 2007); In re Lee, 143 Cal.App.4th 1400, 1408 (Cal. Ct. App. 2006); In re Scott, 133 Cal.App.4th 573, 595 (Cal. Ct. App. 2005). The fact is, there is nothing in the record to support that Petitioner is a danger or risk to public safety.

CONCLUSION

The Board's decision is arbitrary and without merit, as nothing in the record can support their unsuitability determination. The State Court's "reasoned opinion", was nothing more than a recitation of the Board's rote/form language that is applied in virtually all suitability hearings, and was contrary to or an unreasonable application of the U.S. Supreme Court's holding. See, Carey v. Musladin, 127 S.Ct. 649, 653 (206); Williams v. Taylor, 529 U.S. 362, 410-21

6

(2000).

Petitioner's commitment offense and past alcoholism has been repeatedly relied upon to deny parole notwithstanding the extensive evidence on the other side of the scale. There is positive evidence of excellent behavior and rehabilitation in prison (18 years) and the state's own mental health (forensic) professionals who examined Petitioner have stated in the (2006) report (See, Petitioner's instant habeas petition Ex. "B", at p.4) that, "...his risk level is undoubtedly lower than the average citizen in the community."

Under the established information in the record, the Board and State Court's reliance on the commitment offense and past alcoholism to find Petitioner unsuitable for parole, and the fact that Petitioner has served over 16 years into his 15 years to life sentence was arbitrary and therefore does not comport with the "some evidence" standard espoused in Hill, and has violated Petitioner's due process rights under the California and U.S. Constitutions. (Citations omitted).

DECLARATION

I declare under penalty of perjury that the foregoing is true and correct, executed this 27 day of February, 2008, at Soledad, California.

Respectfully submitted,

James L. Snider

1

2        SUPERIOR COURT OF THE STATE OF CALIFORNIA

3            FOR THE COUNTY OF SANTA BARBARA

4

5    JAMES SNIDER,                         )   Case No.: 1280216
                                           )
                                           )   Denial of Petition for Habeas Corpus
6        Petitioner on Habeas Corpus,      )
                                           )         **F I L E D**
7    vs.                                   )   SUPERIOR COURT of CALIFORNIA
                                           )      COUNTY OF SANTA BARBARA
8    BEN CURRY, WARDEN, et al.,            )
                                           )         FEB **0 6** 2008
9        Respondent.                       )
                                           )   GARY M. BLAIR, EXEC. OFFICER
10   _____   )
                                               By _____
11                                                ALICIA ALCOCER, Deputy Clerk.

12        Petitioner was sentenced to 24-years-to-life for second degree murder, with a gun

13   enhancement, and attempted murder. He was committed to the Department of Corrections and

14   Rehabilitation in 1986. Petitioner claims the Board of Parole Hearings abused its discretion

15   when it denied parole for the fourth time following the August 17, 2007, parole suitability

16   hearing.

17        The pro per Petition for Writ of Habeas Corpus, filed on December 24, 2007, is denied

18   for failure to state facts on which relief can be granted. (*People v. Duval* (1995) 9 Cal.4th 464,

19   474.) This court is required to apply a deferential "some evidence" test when reviewing the

20   Board's decision. (*In re Rosenkrantz* (2002) 29 Cal 4th 616.) Petitioner continues to make

21   positive strides and is urged to continue in this endeavor. Nevertheless, some evidence supports

22   the Board's decision that petitioner continues to pose an unreasonable risk of danger to the

23   public based on the particular circumstances of commitment offense beyond those minimally

24   necessary to sustain the second degree murder conviction, as articulated by the Board during the

25   August 17, 2007, parole suitability hearing. (See, e.g., *In re Dannenberg* (2005) 34 Cal.4th

26   1061, 1098 ) And while the circumstances of the offense become a less valid predictor of a

27   prisoner's current dangerousness as time passes, courts have recognized the continuing relevance

28   of this factor at least prior to the expiration of the prisoner's prison term, as here. (*See, e.g.,*

*Irons v. Carey (II)* (9th Cir. 2007) 479 F.3d 658, 664-665.)  Petitioner has served 22 years of his 24-year-to-life term.

Additionally, some evidence supports the Board's decision that petitioner poses an unreasonable risk of present danger to the public based on his threat to abuse alcohol on parole. (*In re Smith* (2003) 114 Cal.App.4th 343, 372.)  The Panel was concerned that petitioner's exclusive focus on self-help while in prison was insufficient by itself to address his alcoholism upon release.  Petitioner was 35 when he committed the triggering offenses and has a substantial criminal background, caused in large part due to alcohol consumption.  Self-help measures are commendable; they arguably go only so far, however, when a prisoner, outside prison walls, will inevitably be confronted with new and unanticipated stresses.  As the Panel's decision involved due consideration of all relevant factors attendant to petitioner's individual situation under existing legal standards, no constitutional violation appears evident.

DATED: February 6, 2007

_____
JAMES RIGALI
Judge of the Superior Court

-2-

STATE OF CALIFORNIA                                          DEPARTMENT OF CORRECTIONS

LEGAL STATUS

| CDC NUMBER | ALPHA ID | NAME | | TERM STARTS | ETHNIC |
|---|---|---|---|---|---|
| D-38950 | | SNIDER, JAMES LEVI | | 9-18-86 | W HFI Black |

| MAX. RELEASE DATE | MIN. RELEASE DATE | MIN. ADJ. RELEASE DATE GT CR LOST/AT LARGE/BAIL | PAROLE PERIOD |
|---|---|---|---|
| To be Determined | MEPD: ~~01 07 2005~~ ~~00~~ | 3-28-2001 | Life |

BASE TERM  15-Life  + ENHANCEMENTS  ~~14 00~~ 9 -00  = TOTAL TERM  15-Life pls

GOOD TIME CREDITS AVAILABLE (2931 PC) (PC  839 574  BC  ~~2518~~ 1721 ) = ~~3357~~ 2295

PRE PRISON CREDITS:        CASE NO.  SB SM 47998

| | |
|---|---|
| 2900.5 PC | 349 |
| 1202.03 PC | |
| 2900.1 PC | |
| CRC | |
| Mental Health | |
| 4019 PC | 174 |
| 2931 PC | |
| Post Sentence | 26 |

Hearings:

DOC: ~~1/98~~  3/94  2/97
INIT: ~~12/2003~~  2-2000
      8/2000
      2/2000

5 year Enh
Reversed
appeal

TOTAL PRE PRISON CREDITS (DAYS)  549

Notification ~~REGISTRATION~~ REQUIRED PER  3058.10 and 290.2

| DATE REC'D | CO. CASE NO. | CT. | CODE & OFFENSE | TYPE WPN. | DATE OF OFFENSE | SENTENCE DATE |
|---|---|---|---|---|---|---|
| | | | CONTROLLING PRINCIPAL AND CONSECUTIVE (INCLUDING ENHANCEMENT) OFFENSE(S): | | | |
| 9-18-86 | SB SM47998 ~~01 PFC~~ | 01 | P 187 Murder 2nd 15-Life P 12022.5 Use of a fire- arm | handgun | 9-8-85 | 8-22-86 |
| | | 02 | P 664/187 Att Murder CS | | | |

Defense Attorney:  W. Davis, PD
Investigating Agency:  Lompoc Police Dept.

| NAME | | | | | |
|---|---|---|---|---|---|
| | SNIDER | D-38950 | LPU | 10-29-86 10/21/86 | PM PM:hr |

CDC 188C (1/81)

Comes now, James L. Snider, Petitioner in pro se, and hereby petitions this Honorable Court for a writ of habeas corpus on Petitioner's parole suitability hearing, held on August 17, 2007.

## TABLE OF CONTENTS

STATE AND FEDERAL CLAIM NUMBER ONE (I)
CALIFORNIA PENAL CODE §3041(a)(b) CREATES A PROTECTABLE LIBERTY INTEREST AT A PAROLE SUITABILITY HEARING, AND A "REASONABLE" EXPECTATION OF A RELEASE DATE. THE COMMANDING WORD "SHALL" CLEARLY ESTABLISHES THIS EXPECTATION.    **1**

STATE AND FEDERAL CLAIM NUMBER TWO (II)
THE BOARD (BPH) VIOLATED PETITIONER'S DUE PROCESS AND EQUAL PROTECTION RIGHTS UNDER THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION AND CALIFORNIA CONSTITUTION ARTICLE I, Sec. 7(a), BY THE CONTINUOUS USE OF UNCHANGING FACTORS TO DENY PAROLE, AND, BY INCORRECTLY APPLYING THE TERMS "ESPECIALLY (VERY) CRUEL AND (VERY) CALLOUS MANNER AND DISREGARD FOR HUMAN SUFFERING."    **2**

OFFENSE WAS TRIVIAL    **10**

PSYCHOLOGICAL EVALUATION, June, 2006    **11**

PSYCHOLOGICAL EVALUATION, October, 2000    **13**

SELF-HELP    **13**

PAROLE PLANS    **14**

RECIDIVISM STUDY    **14**

CONCLUSION    **17**

PRAYER    **19**

//

//

//

TABLE OF AUTHORITIES

Allen, 482 U.S. at 378 — 1

Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003) — 1,4,6

Greenholtz, 442 U.S. at 12 — 1

Hending v. Smith, 781 F.2d 850 (11th Cir. 1986) — 16

In re Bernard John Weider, 145 Cal.App.4th 570 — 8

In re Burns, 136 Cal.App.4th 1318, at pp.1327-1328 (2006) — 8

In re Cooper, 153 Cal.App.4th 1043 — 14

In re Dannenberg, 34 Cal.4th 1061, 1082-1083, 1100 (2005) — 8

In re Deluna, 126 Cal.App.4th 585 (2005) — 8

In re Jeffrey D. Elkins, 144 Cal.App.4th 475 (2006) — 7

In re Lowe, 130 Cal.App.4th 1405 — 8

In re McClendon, 113 Cal.App.4th 315, at pp.321-322 (2003) — 8

In re Morrall, 102 Cal.App.4th 280 (2002) — 8

In re Ramirez, 94 Cal.App.4th 549, 570 (2001) — 8

In re Van Houten, 116 Cal.App.4th 339 (2004) — 3,8

Irons v. Carey, 479 F.3d 658 (9th Cir. 2007) — 1,6

Irons v. Warden, 358 F.Supp.2d 936, 947 & fn.2 (E.D. Cal. 2005) — 4,6

Martin v. Marshall, 431 F.Supp.2d at pp.1040-1042 (N.D. Cal. 2006) — 6

McQuillion v. Duncan, 306 F.3d 895, 903 (9th Cir. 2002) — 1

Rosenkrantz, 29 Cal.4th 616 (2002) — 5

Rosenkrantz v. Marshall, 444 F.Supp.2d 1063, 1065, 1070 (C.D. Cal. 2006) — 6,16

Sass V. Calif. Bd. of Prison Terms, 461 F.3d 1123 (9th Cir. 2006) — 1,2

In re Scott, 119 Cal.App.4th at p.892 (2004) — 3,4,8,10,11

In re Richard Shaputis, 37 Cal.Rptr.3d 324 (2005) — 3

In re Smith, 109 Cal.App.4th 489, 505 — 5

In re Smith, 114 Cal.App.4th 343 (2003) — 3,4

Wen Lee, 49 Cal.Rptr.3d 931 — 8

Willis v. Kane, 485 F.Supp.2d 1126 (N.D. Cal. 2007)                    6

REGULATIONS

15 C.C.R. §2281(c)(1)(E)                                               11

15 C.C.R. §2282                                                        3

15 C.C.R. §§2400-2411                                                  1

15 C.C.R. §2402(a)(1)(D)                                               9

15 C.C.R. §2402(c)(1)(A)(B)(D)                                         9

15 C.C.R. §2402 (c)(1)(B)                                              9

15 C.C.R. §2402(c)(3)                                                  4


STATUTES

Penal Code §190.2(a)(14)                                              3

Penal Code §3041(a)                                                   10

Penal Code §3041(b)                                                   7,19

Penal Code §3041(a)(b)                                                1,19

California Evidence Code §115                                          7


CONSTITUTIONAL PROVISIONS

California Constitution Article I, Sec. 7(a)                          2

United States Constitution, Fifth and Fourteenth Amendments          1,2,7

//

//

//

1

2

3

STATE AND FEDERAL CLAIM NUMBER ONE (I)
CALIFORNIA PENAL CODE §3041(a)(b) CREATES A PROTECTABLE
LIBERTY INTEREST AT A PAROLE SUITABILITY HEARING, AND A
"REASONABLE" EXPECTATION OF A RELEASE DATE. THE COMMANDING
WORD "SHALL" CLEARLY ESTABLISHES THIS EXPECTATION.

4    Under California law, a convicted person sentenced to a term of 15/25 years

5  'to life' shall be released on parole unless his release would pose an

6  unreasonable risk to public safety or unreasonable risk to society if released

7  from prison. Cal. P.C. §3041(a)(b); Cal. Code of Regs., Title 15, §§2400-2411.

8                              DUE PROCESS IN THE PAROLE CONTEXT

9    The Fifth and Fourteenth Amendments prohibit the government from depriving

10  an inmate of life, liberty, or property without due process of law. United States

11  Constitutional Amendments, V, XIV.

12    It is now settled that California parole scheme, codified in California

13  Penal Code section §3041, vests all "prisoners whose sentences provide for the

14  possibility of parole with a constitutionally protected liberty interest in the

15  receipt of a parole release date, a liberty interest that is protected by the

16  procedural safeguards of the Due Process Clause." Irons v. Carey, 479 F.3d 658,

17  662 (9th Cir. 2007) (citing Sass v. California Board of Prison Terms, 461 F.3d

18  1123, 1128 (9th Cir. 2006); Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003);

19  McQuillon v. Duncan, 306 F.3d 895, 903 (9th Cir. 2002)).

20    Under the "clearly established" framework of Greenholtz and Allen, we hold

21  that California's parole scheme gives rise to a cognizable liberty interest on

22  parole. The scheme "creates a presumption that parole release will be granted"

23  unless the statutorily defined determinations are made." Allen, 482 at 378

24  (quoting Greenholtz, 442 U.S. at 12). In, In re Deluna, 126 Cal.App.4th 585,

25  24 Cal.Rptr.3d 643 (2005), held that under Rosenkrantz and McQuillon, parole

26  applicants continue to have a "liberty interest" in parole release.

27                                      //

28                                      //

-1-

STATE AND FEDERAL CLAIM NUMBER TWO · II

THE BOARD (BPH) VIOLATED PETITIONER'S DUE PROCESS AND EQUAL PROTECTION RIGHTS UNDER THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION AND CALIFORNIA CONSTITUTION ARTICLE I, Sec. 7(a), BY THE CONTINUOUS USE OF UNCHANGING FACTORS TO DENY PAROLE, AND, BY INCORRECTLY APPLYING THE TERMS "ESPECIALLY (VERY) CRUEL AND (VERY) CALLOUS MANNER AND DISREGARD FOR HUMAN SUFFERING."

Petitioner will herein establish that the Board of Parole Hearings, herein after (Board), has no legal standing to deny parole to Petitioner. Petitioner has a right to parole under a "Protected Liberty Interest" and the Board must establish, by some evidence in the record, that Petitioner is a current risk or threat to society. This is Petitioner's fourth (4th) parole suitability hearing. Petitioner has been incarcerated for over 22 years (29 years with one-third good time earned credits), and he is 57 years of age.

### COMMITMENT OFFENSE

Petitioner's constitutional rights of due process and equal protection under the Fourteenth Amendment of the U.S. Constitution are continuing to be violated, by denying parole to Petitioner on the commitment offense and other unchanging factors. (See Parole Board Transcripts Exhibit "A").

Petitioner contends that, the Board's opinion and threat assessment of Petitioner's crime is arbitrary and capricious as they implied Petitioner tortured the victim. The Board stated that Petitioner's crime was very cruel, very callous and demonstrated a disregard for human suffering. The use of this language demonstrates that the Board does not have a clear understanding of California Penal Code laws, and where this language is applied.

In the case of Brian Sass, (2006) 461 F.3d 1123, U.S. Court of Appeals for the Ninth (9th) Circuit:

> "That Sass committed his offense of imprisonment due to his alcoholism simply does not constitute "some evidence" that his offense "was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering", and it certainly does not show that his offense was carried out in a manner that is more callous than most second degree

-2-

murders. Sass's influence of alcohol – does not even begin to approach the examples offered in the parole regulations of conduct which constitutes "exceptionally (very) callous disregard for human suffering." Those examples include:

"Torture" as where the [v]ictim was subject to the prolonged infliction of physical pain through the use of non-deadly force prior to the act resulting in death", and "severe trauma", as where [d]eath resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim." In re Scott, 119 Cal.App.4th at p.892 (quoting 15 Cal. Code Regs. §2282). The type of criminal high standard is illustrated in In re Van Houten, 116 Cal.App.4th 339 (2004). (Emphasis added).

The Board is in error when they applied specific language to Petitioner's offense. Petitioner's commitment offense was not more violent or vicious than minimally necessary to convict him of the offense for which he is confined.

Therefore, the Board's determination with their use of the language very callous, very cruel, and a disregard for human suffering is arbitrary and capricious at the least, as Petitioner's commitment offense, as tragic as it was, in no way was it committed as the Board describes.

Petitioner contends that, the California Court of Appeals for the Fourth District has held that the Board's findings characterizing the crime as "exceptionally or especially (very) cruel and (very) callous manner, disregard for human suffering", were unsupported by any evidence in the record. Petitioner requests Judicial Notice of, In re Richard Shaputis, (2005) 37 Cal.Rptr.3d 324, California Court of Appeals, Fourth District. The court relied to a large extent on the reasoning in In re Smith, (2003) 114 Cal.App.4th 343, and In re Scott, (2004) 119 Cal.App.4th 871, 884, (Scott) stating:

[T]here is no evidence Shaputis "tormented, terrorized, or injured [his victim] before deciding to shoot [her]; or that he gratuitously increased or unnecessarily prolonged her pain and suffering ... Was the crime callous? Yes. However, are the facts of the crime some evidence that [Shaputis] acted with exceptionally callous disregard for [the victim's] suffering; or do the facts distinguish this crime from other second degree murders as exceptionally callous? No. "[Citation.]"· (I.d. at p.367).

Regarding the findings that Shaputis crime was "dispassionate or calculated", the court found:

> The BPT's findings that Shaputis acted in a dispassionate and calculated manner, in addition to being inconsistent with the jury's verdict acquitting him of first degree murder (cf. Scott, supra, 119 Cal.App.4th at pp.889-890, is unsupported by (and indeed may be irreconcilable with) the evidence on which the BPT purported to rely. Accordingly, the BPT's reliance on this factor was arbitrary and capricious. (Scott, at pp.891-892).

Additionally, the court found that the Board's reliance on the unsuitability factor "unstable tumultuous relationships" (Calif. Code of Regs., Title 15, §2402(c)(3)), to deny parole cannot justify a finding of unsuitability unless the inmate CURRENTLY poses an unreasonable threat to others based on some evidence of a current inability to maintain sobriety. The court stated:

> We are similarly convinced the BPT's reliance on Shaputis former alcoholism - related violence toward his marital partner, the sole evidence conceivably supporting the findings he had "unstable of tumultuous relationships" with other persons, cannot justify a finding that Shaputis CURRENTLY poses an unreasonable threat to others if released on parole absent some evidence there is a CURRENT likelihood Shaputis will be unable to maintain his sobriety on the parole. (In re Smith, supra, 114 Cal.App.4th at p.372; Cf. Biggs v. Terhune, (9th Cir. 2003) 334 F.3d 910, 916 [although reliance on conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law, where the inmate over time continues to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of prior conduct would raise serious questions involving his liberty interest in parole]; accord, Irons v. Warden of California State Prison - Solano (E.D. Cal. 2005) 358 F.Supp.2d 936, 947 and fn.2).

Under the holdings of Smith (Second District), Scott I and II (First District), and Shaputis (Fourth District), the Board's boilerplate findings that every crime, regardless of the facts, shows an "exceptionally (very) callous disregard for human suffering" and/or was committed in a "dispassionate and/or calculated" manner cannot be sustained.

These labels, placed on virtually every crime by the Board's rote/form language, cannot be rubber stamped simply because any life crime is an offensive, antisocial act. The facts must be analyzed carefully before the above aggravated

findings can be made.

Utilizing both Smith and Shaputis, the Board's reliance on an individual's former lifestyle, including alcohol addiction, certainly may be argued to be arbitrary in cases where no evidence suggests a CURRENT inability to maintain sobriety. As the Shaputis court observed:

> [T]he BPT's conclusion Shaputis remained a danger to society, to the extent it was premised on a former lifestyle that all of the evidence showed was a historical relic, is so lacking in any medical, psychological or behavioral evidentiary support that it is arbitrary and capricious, within the differential standards articulated by Rosenkrantz, 29 Cal.4th 616.

The Board's determination of Petitioner's past alcohol problem is arbitrary and capricious at the least. Petitioner has proven that alcohol is not even a consideration in his life. This is well established in Petitioner's Psychological Evaluation of June, 2006 and October, 2000 (See, Exhibits "B" and "C") and by his conduct while incarcerated for over 22 years.

Furthermore, Petitioner believes that the Board does not have a realistic understanding of life in prison. A person, in prison, has to deal with stress levels much higher than in society. If a person can cope with the day to day stressors and pressures of prison life and maintain sobriety, as Petitioner has demonstrated for over 22 years, this should be taken seriously in that Petitioner will maintain the same sobriety when he is paroled into society as he does now.

A prisoner's prior use of drugs is not appropriate consideration in determining parole suitability. See, In re Smith, 109 Cal.App.4th 489, 505.

The First, Second and Fourth District Courts of Appeal have now published cases chipping away at the foundation of the Board's policy of denying parole on the rote generalizations and boilerplate findings. Ironically, in spite of these courts decisions the Board seems just as resolute as ever to deny parole based on the crime, criminal priors, any type of ancient social history involving alcohol. The Board still refuses to recognize the Biggs, supra, principles,

familiar to the courts as a due process denial when the crime and other unchanging
factors are repeatedly used as a basis to deny parole in light of strong evidence
of rehabilitation.

In the case of Rosenkrantz v. Marshall, (C.D. Cal. 2006) 444 F.Supp.2d 1063,
1065, 1070. The court reasoned in pertinent part:

> "While relying upon petitioner's crime as an indicator of his
> dangerousness may be reasonable for some period of time, in this case,
> continued reliance on such unchanging circumstances – after nearly two
> decades of incarceration and a half dozen parole suitability hearings
> – violates due process because petitioner's commitment offense has become
> such an unreliable predictor of his present and future dangerousness
> that it does not satisfy the 'some evidence' standard. After nearly
> twenty years of rehabilitation, the ability to predict a prisoner's
> future dangerousnes based simply on the circumstances of his or her
> crime is nil." (Id. at p.1084). See also, Willis v. Kane, 485 F.Supp.2d
> 1126 (N.D. Cal. 2007); Martin v. Marshall, 431 F.Supp.2d at pp.1040-1042,
> (N.D. Cal. 2006), of which, this case involved multiple victims; Biggs
> v. Terhune, 334 F.3d 910 (9th Cir. 2003).

Petitioner contends that, even if his commitment offense could be deemed
aggravated, the courts have recognized that the predictive value of an offense
declines over time (In re Elkins, 144 Cal.App.4th at p.496), and although it is
true to a certain point, that, "the circumstances of the crime and motivation
for it may indicate a petitioner's instability, impulsiveness, violent tendencies,
and the like, after fifteen or so years in the caldron of prison life, not exactly
an ideal therapeutic environment to say the least, and after repeated
demonstrations that despite the recognized hardships of prison, this petitioner
does not possess those attributes, the predictive ability of the circumstances
of the crime is near zero." (Irons v. Warden (E.D. Cal. 2005) 358 F.Supp.2d 936,
947, fn.2, revd. Irons v. Carrey (9th Cir. 2007) 479 F.3d 658.)

Furthermore, the circumstance of Petitioner's commitment offense should
reasonably be considered no more aggravated or violent than the minimum necessary
to sustain a conviction of second degree murder.

Petitioner re-iterates that, this is his fourth (4th) parole suitability
consideration hearing, and he has been incarcerated for over 22 years, he has

-6-

a very good record, also, Petitioner has applied his rehabilitative goals in a very positive manner. To continuously use Petitioner's commitment offense and conduct prior to prison against him to deny parole is a violation of due process.

In the case of In re Jeffrey David Elkins, 144 Cal.App.4th 475, Elkins beat his victim to death with a baseball bat then robbed him:

> "And Mr. Elkins actions after the murder demonstrated those of a cold-blooded, dispassionate killer." As described in a 1980 letter from the Alameda County District Attorney's office to the probation office, after the murder, Mr. Elkins placed Mr. Ecklund's body in the trunk of his car, went back into his friend's house, took a shower, and went many miles into the mountains, located a desolated area, and dumped Mr. Ecklund's body down a steep grade."

> "Rather, the decision concludes that Elkin's "actions after the murder demonstrate those of a cold-blooded, dispassionate killer." It cites Elkins going ahead to take Ecklund's wallet, money and drugs, driving the body to Donner Pass the next day and dumping it down a steep grade, stealing from Ecklund's storage unit and his girlfriend's residence over the next several days, and then fleeing the state."

> The court concluded, "Given the lapse of 26 years and the exemplary rehabilitative gains made by Elkins over that time, continued reliance on these aggravating factors of the crime no longer amount to "some evidence" supporting denial of parole." (Emphasis added).

Petitioner contends that, although his offense, tragic as it was, it is not of the same severity as that of Elkin's, but the Board continues to use the aggravating factors of Petitioner's commitment offense, after over 22 years of positive rehabilitative gains, to deny him parole.

Petitioner asserts that, as with Elkin's, the aggravating factors of the offense no longer amount to "some evidence" to support denial of parole. No nexus has been established in the record, supported by the "some evidence", or, "modicum of evidence", or, "preponderance of evidence" standard required by California Evidence Code §115, to support the denial of suitability for release on parole within the intent of P.C. §3041(b) and a current 'unreasonable' risk or threat to public safety or society.

Furthermore, Petitioner's offense is no more callous, heinous, atrocious or cruel than the following recent cases from the Appellate Courts of California.

-7-

In the decision by the Second Appellate Court, Division Eight, in the case of <u>WEN LEE</u>, 49 Cal.Rptr.3d 931:

> Lee went armed with a gun and a box of ammunition. He had decided that if Soong refused to pay, he would kill Soong and then himself. Lee drove 15 minutes to the restaurant and asked Soong for his money. Soong shook his head and said he did not have time to talk. Lee pulled out his gun and fired five times before the gun jammed. He hit Soong twice, who survived the shooting, but one of the bullet's hit Soong's wife in the head, killing her. (Note* Two (2) victims and five (5) shots fired). Lee was sentenced to second degree murder.

> At pp.937-938, the Court stated that: "...they were not "atrocious" or at least were no more atrocious than whenever one human being kills another - and were not committed in an especially heinous, atrocious or cruel manner." The measure of atrociousness is not general notions of common decency or social norms, for by that yardstick all murder are atrocious. (See, <u>In re Scott</u>, supra, 119 Cal.App.4th at p.891, "All second degree murders by definition involve some callousness - i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings, and suffering of others.") Rather, the inquiry is whether among murders, the one committed by Lee was particularly heinous, atrocious or cruel. (<u>In re Ramirez</u>, (2001), 94 Cal.App.4th 549, 570, disapproved on another point by <u>In re Dannenberg</u>, (2005), 34 Cal.4th 1061, 1082-1083, 1100). By that measure, "Lee's crimes were more commonplace than egregious."

> "Comparing Lee to defendants for whom the Board or governor properly denied parole because the defendants crimes were atrocious is illuminating." <u>Rosenkrantz</u>, 29 Cal.4th at p.678; <u>In re Dannenberg</u>, supra, 34 Cal.4th at p.1095; <u>In re McClendon</u>, (2003) 113 Cal.App.4th 315, at pp.321-322; <u>In re Burns</u>, (2006) 136 Cal.App.4th 1318, at pp.1327-1328; <u>In re Van Houten</u>, (2004) 116 Cal.App.4th 339, at pp.346, 351, 366; <u>In re DeLuna</u>, (2005) 126 Cal.App.4th 585 at p.593; <u>In re Lowe</u>, 130 Cal.App.4th 1405, at p.1414; <u>In re Morrall</u>, (2002) 102 Cal.App.4th 280.

Petitioner contends that, in the above case of <u>Wen Lee</u> and the following case of <u>Weider</u>, the State of California has established what offenses and their circumstances constitutes the terminology of "especially or exceptionally callous, particularly egregious, heinous, atrocious or cruel." Wen Lee or Weider <u>did not</u> fall under these categories and neither does Petitioner's commitment offense.

The Sixth Appellate District Court, in, <u>In re Bernard John Weider</u>, 145 Cal.App.4th 570, decision was based on the same subject matter as Petitioner, in that Weider was denied parole based on the Board's determination that the offense was carried out in an especially (very) cruel and callous manner:

"Weider and his wife Susan separated and she moved in with a man named George Laird. Two years after the separation Weider stopped at a restaurant to get something to eat. Weider's wife Susan and Laird were there and an argument issued. Weider went to his car and retrieved a .380 caliber handgun and returned to the restaurant, where Weider fired the gun twice at Laird and missed. Laird ran behind the bar and Susan wrestled with Weider. Laird came back to the front of the restaurant, grabbed a bottle from the bar, and hit Weider over the head. "Laird grabbed the gun and he and Weider struggled over it. Patrons of the bar started to help Laird, and as Weider and Laird struggled on the floor, several shots were fired. Laird received two shots, one a contact wound, at close range and died. Two other patrons were shot, one twice."

Weider was convicted of second degree murder and two counts of assault with a firearm. He was sentenced to an indeterminate prison term of 15 years to life:

"The only remaining factual basis for the Board's 2005 decision is its conclusion that the commitment offense was carried out in an especially cruel and callous manner in that there were multiple victims, the crime was carried out in a "dispassionate and calculated manner", and, "showed a callous disregard if nothing else, for your community." (§2402, subd. (c)(1)(A)(B)(D).)

"We first note that appellant rightly does not attempt to justify the Board's finding that the crime was committed in a manner that showed a callous disregard or lack of respect for the "community". The standard is whether the crime was committed in a manner that showed, exceptionally callous disregard for human suffering. (§2402, subd. (a)(1)(D).) There is no evidence of that here."

"The Board's finding that the crime was "dispassionate" and "calculated" does not conform to the appropriate standard either. The finding was based upon evidence that Weider "took a weapon into a bar, into a public place." But in deciding whether the crime was particularly heinous, atrocious, or cruel, the Board is to consider whether "(t)he offense was carried out in a dispassionate and calculated manner, such as an execution-style murder." (§2402, subd. (c)(1)(B).) The murder the Board describes is not at all like an execution-style murder. The fatal wound was delivered during the struggle over the gun. And there was no evidence that Weider conducted himself dispassionately. To the contrary, the evidence shows that he was angry or distraught."

Petitioner contends that, his commitment offense of second degree murder was no more cruel, callous or dispassionate than that of Rosenkrantz, Wen Lee or Weider. Furthermore, Wen Lee and Weider both had multiple victims in their offenses.

At no time during Petitioner's parole consideration hearing did the Board compare Petitioner's offense to other second degree murder offenses, as is

established under P.C. §3041(a) uniformity of terms. It is common practice in that the courts in California compare the severity of one offense to another, but it seems that the Board is exempt from the penal code laws of California.

Petitioner does understand that each parole consideration hearing is to be by individualized consideration, but when the Board sets a parole date to an inmate whose second degree murder offense is more severe than the inmate with a less severe second degree murder offense and is denied, it seems that it is the luck of the draw, the spin of the wheel, as to which panel an inmate appears before.

Furthermore, Petitioner did not have any violence in his past prior to his commitment offense.

There is not even a modicum of evidence to support the Board's arbitrary and capricious conclusions of Petitioner's commitment offense.

Petitioner contends that, in Exhibit "A" and the trial transcripts, it is established that a heated argument and fight occurred at the time of Petitioner's commitment offense. Also, the Board failed to read into the record that Petitioner was, in stature, 5 foot 7 inches tall and weighed 150 pounds, while the victim was 6 feet 4 inches tall and weighed 270 pounds, of which, played a crucial role in what transpired that tragic evening.

## OFFENSE WAS TRIVIAL

It is an established fact that Petitioner and the victim got into a heated argument that resulted in a fight and Petitioner shot the victim and he died immediately.

As was observed in Scott I, 119 Cal.App.4th at p.892:

> "An 'inexplicable' or 'trivial' motive, as we understand it, is one that is unexplained or unintelligible, as where the commitment offense does not appear to be related to the conduct of the victim(s) and has no other discernible purpose. A person whose motive for a criminal act cannot be explained or is unintelligible is therefore unusually unpredictable and dangerous." (Id. at p.893).

The court further discussed "trivial motive"; similarly, the record

does not indicate that Barker's motive was "very trivial in relationship to [his] offense." (§2281(c)(1)(E).) "The offense committed by most prisoners serving life terms is, of course, murder. Given the high value our society places upon life, there is no motive for unlawfully taking the life of another human being that could not reasonably be deemed 'trivial'. The Legislature has foreclosed that approach, by declaring that murderers with life sentences must 'normally' be given release dates when they approach their minimum eligible parole dates... (Scott I, 119 Cal.App.4th at p.893).

"The reference in the Board's regulations to motives that are "very trivial" in relationship to the offense" therefore require comparison. To fit the regulatory description, the motive must be materially less significant (or more "trivial") than those which conventionally drive people to commit the offense in question, and therefore more indicative of a risk of danger to society if the prisoner is released than is ordinarily presented." (In re Scott I, supra, 119 Cal.App.4th at p.893).

The Board gave no reference to Petitioner's remorse for what happened that tragic evening, or the fact that Petitioner has taken full responsibility for what took place that awful night. Petitioner has expressed, to the Board and 'both' Clinical Psychologists, his sorrow and deep regret for his actions that caused so much pain and anguish to all persons involved in the tragedy.

### PSYCHOLOGICAL EVALUATION, JUNE, 2006

### (Exhibit "B", at pp.3-4)

### ASSESSMENT OF DANGEROUSNESS

"A. In considering potential for dangerous behavior in the institution, Mr. Snider has remained free from any disciplinaries since 1989. He has never been involved in institutional riots, possesion of weapons, assaults on others or other aggressive activities since that time. He stated that at the time, he gave his life to Christ and his life changed dramatically in a positive way. At this point in time, compared to other inmates, potential for dangerous behavior is below average." (Emphasis added).

"B. In considering potential for dangerous behavior when released to the community, Mr. Snider does have a pre-conviction history of driving under the influence of alcohol, as well as two acts of crime, one a burglary and one a robbery, while under the influence of alcohol. He stated that he was an entirely

-11-

different person at that time in his life before he accepted Christ as Savior and began living a Christian life. At this point in time, he has aged over the years, grown in maturity, self-control, insight and awareness and greater understanding. He is determined to please God by his good behavior and to get along with his fellow men, not doing injury to anyone, but only being a blessing to them. In order to determine <u>current</u> risk level on parole, the Level of Service Inventory-Revised was administered. This is an actuarial measure that assesses criminal history (in this case significant), substance abuse history, current attitudes, and achievements in prison in order to determine current risk level on parole. He obtained a score of 6.6 cumulative frequency for prison inmates. This score means that <u>if 100 men released on parole, he would be expected to do better on parole than 93.4 of them.</u> This risk level is primarily based upon his criminal arrest record. However, this actuarial measure does not account for the maturity and social awareness that comes with age. These factors would decrease his risk level below the figures noted above. As a result, <u>he poses no more risk to society than the average citizen in the community.</u> In fact, based upon his maturity, strongly held Christian values and commitment to lead a life that is honoring God and man, <u>his risk level is undoubtedly lower than the average citizen in the community.</u>" (Emphasis added).

"C. There are no significant risk factors at this time."

### CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS

"There are no mental or emotional problem in this case that would interfere with routine release planning. Mr. Snider has vocational skills that will enable him to secure and maintain employment in the community upon his release. Mr. Snider has a very strong work ethic. He has worked throughout his lifetime, and he will continue to work when he is released on parole. He has written to several halfway houses and Christian programs for residence and employment in the San Diego community, where he has lived most of his life. <u>The prognosis for successful</u>

-12-

adjustment in the community is excellent." (Emphasis added).

## PSYCHOLOGICAL EVALUATION, OCTOBER, 2000

### (Exhibit "C")

### ASSESSMENT OF DANGEROUSNESS

"This inmate has had a very good record within the Dept. of Corr., having received no CDC-115 violations since 1989. If released to the community, he should continue the same behavior. His potential for violence is presently far below that of the average inmate when compared to this Level II inmate population."

### CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS

Inmate Snider has made some profound changes in his life. He is a very devoted Christian now. It is unlikely that he will ever again engage in violence. His desire now is to be released so that he can become a useful and productive citizen.

Petitioner contends that, the above reports were written by persons that are experts in their fields. These State Certified Clinical Psychologists, Mr. Macomber Ph.D., and, Mr. Bakeman Ph.D., applied the same information as the Board members were privy to. In fact, there is no evidence in the record that the Board members have the same or equivalent professional credentials.

Petitioner's Psychological Evaluations, administered by professional Psychologists, came to the opposite conclusions as that of the Board members.

Furthermore, the same professional, Mr. Macomber Ph.D., stated to Petitioner that before becoming a Psychologist/Psychiatrist he was a California Parole Agent. Therefore, Mr. Macomber Ph.D. is more than qualified to assess that Petitioner would not pose a danger to society if released on parole.

### PETITIONER'S SELF-HELP

Petitioner stated at his Board Hearing and Psychological Evaluations that he has strong Biblical values, as he studies the Bible daily, and he also studies the principles of the Overcomer's 12-Step Program (See, Exhibit "D"). Petitioner is currently studying a one year correspondence course "Walking The 12 STEPS

(Alcoholics Anonymous) With Jesus Christ." Petitioner will always believe that it is his belief system that has dramatically changed his life.

Petitioner has completed a two year Vocational Data Processing class offered by the Department of Corrections. This will also enable him in seeking employment.

### PAROLE PLANS

Petitioner has no family in California as they have all passed away since his incarceration of 22 years. Petitioner submitted realistic parole plans to the Board (See, Exhibit "E"), with numerous halfway houses he had written to for housing, Alcoholics Anonymous and Overcomers Outreach. Petitioner also has contacted a family in Bakersfield, California, that will do their utmost to help Petitioner secure employment. (See, Exhibit "E"). But, it is inconceivable for Petitioner to believe that the State of California has no provisions for a person in his situation. In fact, Petitioner does know that the State of California makes provisions for inmates like Petitioner. In 2007, In re Cooper, 153 Cal.App.4th 1043, serving an indeterminate sentence of 16 years to life, was released on parole with no residence or employment. He had parole plans for out of state, and the State of California provided a motel room for 30 days until he could transfer.

Petitioner has been employed since he was 16 years old, and knows fully well that if the State of California would treat him in a like manner as 'Cooper' Petitioner would be self-sufficient and as asset to the community within 30 days.

Furthermore, the Board did not read into the record that while Petitioner has been incarcerated he has worked as a plumber, painter, glazier (window repair), and a cook, of which, all of these can be considered 'marketable skills/trades'.

### RECIDIVISM STUDIES

"Studies of parole success repeatedly indicate that those who commit murder are among the best parole risks." Allen, Eldridge and Latessa, Vito, Probation and Parole in America, p.254, 1985, citing Niethercut, 1972. Both with regard to the commission of felonies in general and the crime of homicide, no other

-14-

offender has such a low rate of recidivism. Bedau, Hugo Adams, The Death Penalty in America, 3rd Ed., p.180, n.3, 1980. "Paroled murderers actually present some of the best parole risks." Bedau, Hugo Adams, The Death Penalty in America, 3rd Ed., p.180, n.3, 1980, citing NCCD newsletter, Uniform Parole Reports, 1972, p.2. "Compared with other groups, murderers are actually the best parole risks." Bedau, Hugo Adams, The Death Penalty in America, 3rd Ed., p.180, n.3, citing Stanton p.149, 1969. Two studies indicated that only three (3) in 10,000 and six (6) in 10,000 convicted of murder commit another crime. Bedau, Hugo Adams, The Death Penalty in America, 3rd Ed., pp.176-179, 1980. After conducting a study for the California Board of Prison Terms (1983-1987) it was concluded that no one released after committing a murder had been returned to prison for murder. Ellwood, Eldridge T., PH.D., Research Projects On Life Prisoners, p.3, April 1989, California BPT. "As a matter of statistical probability, murderers released from a prison are far less likely to commit a new crime than any other category of offender." Orland, Leonard, Justice, Punishment, Treatment, p.425, 1973. "Many murderers could be released immediately after conviction with little likelihood of offending again." Von Hirsh, Andrew, Doing Justice, Report On The Committee For The Study Of Incarceration, p.126, 1976. These authorities, from some of the most respected sociologists in our country, reveal the fallacy of assumptions regarding the dangerousness of those convicted of murder.

As of January 1, 2007, there are approximately 10,000 life prisoners eligible for parole at this present time. 'If' the Board were to parole 100 per month, starting now, it would take 9 years to parole all of those that have met their minimum terms without consideration for the ongoing multitude of inmates that would become eligible after January 1, 2007.

With the current prison over crowding, and, the current mentality of the Parole Board and Governor, with their no parole policy, runs contrary to the findings of expert sociologists studies of recidivism, yet, countless thousands

-15-

of released inmates, on parole for non murder commitment offenses continue at or near a rate of 70% to return through the revolving door with 'new' crimes against society. The studies above establish that murderers are not the real danger to society, especially after serving 20, 30 or 40 years of one's life without the possibility of another chance to re-enter society.

In reference to a murder offense: Hending v. Smith, 781 F.2d 850 (11th Cir. 1986) ["I]t is a matter of general knowledge that except for professional killers, few people commit more than one murder in a life time. It is a crime involving a specific interpersonal crisis, and not a habitual offense."]; Rosenkrantz, 444 F.Supp.2d 1063, 2006 WL2327085 at *12-17).

//
//
//

## CONCLUSION

There is not even a modicum of evidence in the record to support the Board's conclusion that Petitioner still poses an unreasonable (current) risk to society if released on supervised parole. The Board appears to have recited rote/form language without regard to the facts and evidence before it and with disregard for his right to individualized consideration, due process/equal protection rights.

The Board did not weigh all the evidence before them and plainly chose to disregard evidence. Therefore the Board is not applying U.S. Supreme Court authorities established in Greenholtz and Allen's language of due process rights to a fair, impartial and meaningful hearing that was not pre-determined.

Petitioner has been diligently devoted to self-help improvement while incarcerated, he reads the Bible daily and lives by its moral code, he has marketable skills and has realistic parole plans. The record provides no reasonable grounds to reject, or even challenge, the findings and conclusions of the State's own Psychologists concerning Petitioner's level of dangerousness.

There is nothing in the record that the Board made any effort to compare Petitioner's offense to others, as is established under Penal Code §3041(a) 'uniformity of terms'. Since parole is the rule and not the exception, the Board is constitutionally required to weigh the inmate's criminal conduct not against ordinary social norms, but against other instances of the same offense(s).

Petitioner's years of positive programming, model behavior demonstrates that he has done nearly everything possible under the circumstances, everything society can expect, for an opportunity to parole and demonstrate his rehabilitation.

The record establishes that, in Petitioner's "Psychological Evaluation", Petitioner would be a benefit to the public and not a danger.

Respectfully submitted,

*James L. Snider*

James L. Snider

1

## DECLARATION

2      I, James L. Snider, declare under penalty of perjury that the foregoing is

3   true and correct. Executed this _8_ day of ___June___, 2008, at Soledad State

4   Prison, Soledad, California.

5

6

7                              James L. Snider

8                              //

9                              //

10                             //

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

## PRAYER

3

    Wherefore, Petitioner respectfully requests that this Honorable Court

4

declare/order that:

5

    1). Penal Code §3041(a)(b) does create a protectable liberty interest at

6

a parole suitability hearing for an expectant release date:

7

    2). There is no evidence in the record to support the decision that Petitioner

8

is a 'current' risk to society:

9

    3). There is no evidence in the record that Petitioner is unsuitable for

10

parole and a parole release date must be set:

11

    4). The Board's conclusions are arbitrary and capricious against Petitioner:

12

    5) If the Board does not set a parole release date for Petitioner, that this

13

Honorable Court, under U.S. Supreme Court's constitutional grant of power, issue

14

and order for Petitioner's release on parole forthwith:

15

    6). Respondents show cause why Petitioner is not entitled to the relief

16

requested:

17

                  //

18

                  //

19

                  //

20

21

22

23

24

25

26

27

28

# EXHIBIT A

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

**INMATE COPY**

| | | |
|---|---|---|
| In the matter of the Life | ) | |
| Term Parole Consideration | ) | |
| Hearing of: | ) | CDC Number D-38950 |
| | ) | |
| JAMES SNIDER | ) | |
| | ) | |

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

AUGUST 17, 2007

9:12 A.M.

PANEL PRESENT:

Janice Eng, Presiding Commissioner
Ramon Estrada, Deputy Commissioner

OTHERS PRESENT:

James Snider, Inmate
Gertrude Akpenyi, Attorney for Inmate
Jerry Lulejian, Deputy District Attorney
Correctional Officer(s) Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

| | | |
|---|---|---|
| _____ | No | See Review of Hearing |
| _____ | Yes | Transcript Memorandum |

**PHYLLIS SULLIVAN**

**FOOTHILL TRANSCRIPTION COMPANY, INC.**

INDEX

Page

Proceedings ............................................... 1

Case Factors ............................................. 10

Pre-Commitment Factors ................................... 16

Post-Commitment Factors .................................. 28

Parole Plans ............................................. 42

Closing Statements ....................................... 66

Recess ................................................... 77

Decision ................................................. 78

Adjournment .............................................. 86

Transcriber Certification ................................ 87

--oOo--

1

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | **DEPUTY COMMISSIONER ESTRADA:**  We're on. |
| 3 | **PRESIDING COMMISSIONER ENG:**  Good morning, |
| 4 | everyone.  This is a subsequent parole consideration |
| 5 | hearing for James Snider, CDC number D38950.  Today's |
| 6 | date is August 17, 2007, and the time is 9:12 in the |
| 7 | morning.  We are located at CTF-Soledad.  The inmate |
| 8 | was received on September 18, 1986 from Santa Barbara |
| 9 | County.  His life term began on March 29, 1991, and his |
| 10 | minimum eligible parole date was March 28, 2001.  The |
| 11 | controlling offense for which the inmate has been |
| 12 | committed is Murder Two with Use of a Firearm, Case |
| 13 | number SM47998, count one, Penal Code 187 and Penal |
| 14 | Code 12022.5; count two, Penal Code 664/187, Attempted |
| 15 | Murder.  The inmate received a total term of 15 to life |
| 16 | plus nine.  This hearing is being recorded, so for the |
| 17 | purpose of voice identification, each of us will be |
| 18 | required to state our first and last names, spelling |
| 19 | out our last name.  So Mr. Snider, when it comes to |
| 20 | your turn, after you spell your last name, please |
| 21 | provide us with your CDC number.  So I'll begin and |
| 22 | we'll move around the room to my left.  My name is |
| 23 | Janice Eng, E-N-G, Commissioner. |
| 24 | **DEPUTY COMMISSIONER ESTRADA:**  R. Estrada, E-S-T- |
| 25 | R-A-D-A, Deputy Commissioner, Board of Parole Hearings. |

2

1          **PRESIDING COMMISSIONER ENG:** Mr. Lulejian?

2          **DEPUTY DISTRICT ATTORNEY LULEJIAN:** Yes.  Jerry

3     Lulejian, that's L-U-L-E-J-I-A-N, Senior Deputy

4     District Attorney, Santa Barbara County.

5          **ATTORNEY AKPENYI:** Gertrude Akpenyi, A-K-P-E-N-

6     Y-I, attorney for Mr. Snider.

7          **INMATE SNIDER:** James L. Snider, D38950.

8          **PRESIDING COMMISSIONER ENG:** Spell your last

9     name?

10         **INMATE SNIDER:** Snider, S-N-I-D-E-R.

11         **PRESIDING COMMISSIONER ENG:** Thank you.  For the

12    record, we also have two correctional officers present

13    for security reasons, and they will not be

14    participating in the hearing.  Before we go any

15    further, sir, I'm going to ask if you would kindly read

16    aloud the ADA statement that's in front of you?

17         **INMATE SNIDER:**

18              "The Americans with Disability Act, ADA,

19              is a law to help people with

20              disabilities.  Disabilities are problems

21              that make it harder for some people to

22              see, hear, breathe, talk, walk, learn,

23              think, work or take care of themselves

24              than it is for others.  Nobody can be

25              kept out of public places or activities

1          because of a disability. If you have a
2          disability, you have the right to ask
3          for help to get ready for your BPT
4          Hearing, get to the hearing, talk, read
5          forms and papers and understand the
6          hearing process. BPT will look at what
7          you ask for to make sure that you have a
8          disability that is covered by the ADA
9          and that you have asked for the right
10         kind of help. If you do not get help or
11         if you don't think you got the kind of
12         help you need, ask for a BPT 1074
13         grievance form. You can also get help
14         to fill it out."

15    **PRESIDING COMMISSIONER ENG:** All right, thank
16    you, sir. In general, do you understand what your
17    rights are under the ADA?

18         **INMATE SNIDER:** Yes, ma'am.

19    **PRESIDING COMMISSIONER ENG:** Okay. Just to be
20    sure, we're going to go over a few more things. For
21    the record, I see that you did sign a BPT 1073 back on
22    3/7/07. Sir, that form's a Reasonable Accommodation
23    Notice and Request, according to the provisions of the
24    ADA, and all that means is that form is what you use to
25    identify if you have any of the disabilities as defined

1    under ADA.  And you did notate on this form that you do

2    not.  You also noted that you didn't need any help

3    for the hearing and that you do appear to understand

4    what your rights are.  So am I to assume that this is

5    current and correct?

6            **INMATE SNIDER:**  Yes, ma'am.

7            **PRESIDING COMMISSIONER ENG:**  Sir, do you have

8    any problems walking up or down stairs or for distances

9    of 100 yards or more?

10           **INMATE SNIDER:**  No.

11           **PRESIDING COMMISSIONER ENG:**  And I see that you

12   do have glasses.  Are those strictly for reading?

13           **INMATE SNIDER:**  Yes.

14           **PRESIDING COMMISSIONER ENG:**  So will those be

15   adequate for you to get through the hearing today if

16   you have to look at any documents?

17           **INMATE SNIDER:**  Yes, ma'am.

18           **PRESIDING COMMISSIONER ENG:**  Do you have any

19   hearing impairments?

20           **INMATE SNIDER:**  No.

21           **PRESIDING COMMISSIONER ENG:**  Have you ever been

22   included in the CCCMS or EOP programs?

23           **INMATE SNIDER:**  No, ma'am.

24           **PRESIDING COMMISSIONER ENG:**  And do you know

25   what those are?

1          **INMATE SNIDER:**  Yes.

2          **PRESIDING COMMISSIONER ENG:**  Have you taken any

3    psychotropic medications, either in prison or on the

4    streets?

5          **INMATE SNIDER:**  (Inaudible).

6          **PRESIDING COMMISSIONER ENG:**  And how far did you

7    get in school?

8          **INMATE SNIDER:**  I've got a GED.

9          **PRESIDING COMMISSIONER ENG:**  But when you were

10   going?

11         **INMATE SNIDER:**  10th grade.

12         **PRESIDING COMMISSIONER ENG:**  10th grade?  Okay.

13   Do you recall if you were ever enrolled in any special

14   education classes while you were growing up?

15         **INMATE SNIDER:**  No.

16         **PRESIDING COMMISSIONER ENG:**  So do you suffer

17   from any disability that would prevent you from

18   participating in the hearing today?

19         **INMATE SNIDER:**  No.

20         **PRESIDING COMMISSIONER ENG:**  Thank you.  Miss

21   Akpenyi, are there any ADA issues that you believe need

22   further discussion?

23         **ATTORNEY AKPENYI:**  No.

24         **PRESIDING COMMISSIONER ENG:**  Sir, this hearing

25   is being conducted pursuant to the Penal Code and the

1    rules and regulations of the Board of Parole hearings
2    governing parole consideration hearings for life
3    inmates.  So the purpose of the hearing today is to
4    once again to consider your suitability for parole, and
5    in doing so, we'll be considering the number and nature
6    of the crimes for which your were committed, your prior
7    criminal and social history, your behavior in
8    programming since your commitment, and your plans if
9    released.  So we've already had an opportunity to
10   review your Central File, and you will also be given a
11   chance to make any corrections or clarify the record
12   for us.  We will consider your counselor's reports and
13   your mental health evaluations, and your progress since
14   your commitment; however, we will focus on your
15   progress and any new reports since your last hearing.
16   So if you've had any changes to your parole plans or
17   anything else, you should bring that to our attention
18   when we address those areas during the hearing.  Sir,
19   we will reach a decision today and inform you whether
20   or not we find you suitable for parole and of course,
21   the reasons for our decision.  So if you are found
22   suitable for parole, the length of your confinement
23   will be explained to you at that time.
24            **INMATE SNIDER:**  Yes, ma'am.
25            **PRESIDING COMMISSIONER ENG:**  Before we take a

7

1       recess for deliberations, the District Attorney's
2       representative who's present with us via video, your
3       attorney and you yourself will all have an opportunity
4       to make a final statement regarding parole suitability
5       to this Panel.  You don't have to make a statement.
6       You can reset with whatever your legal counsel states;
7       however, if you choose to a final statement, you should
8       focus only on why you believe you are suitable for
9       parole today.  After that, we'll go ahead and take a
10      recess.  We'll clear the room and we'll begin our
11      deliberations.  Once we complete those, we'll resume
12      the hearing and announce our decision.  The California
13      Code of Regulations states that regardless of time
14      served, a life inmate shall be found unsuitable for and
15      denied parole if in the judgment of the Panel the
16      inmate would pose an unreasonable risk of danger to
17      society if released from prison. Sir, you do have
18      certain rights.  Those rights include the right to a
19      timely notice of this hearing, the right to review your
20      Central File, and the right to present relevant
21      documents.  Ms. Akpenyi, so far have your client's
22      rights been met?

23               **ATTORNEY AKPENYI:**  Yes.

24               **PRESIDING COMMISSIONER ENG:**  Thank you.  Sir,
25      you have the additional right to be heard by an

8

1    impartial Panel.  So you have been introduced to this

2    Panel.  Do you have any objections?

3        **INMATE SNIDER:**  No, ma'am.

4        **PRESIDING COMMISSIONER ENG:**  Miss Akpenyi, any

5    objections to the Panel?

6        **ATTORNEY AKPENYI:**  No.

7    **PRESIDING COMMISSIONER ENG:**  Sir, you will

8    receive a copy of our written tentative decision today.

9    That decision does become final within approximately

10   120 days.  So a copy of the final decision and a copy

11   of the hearing transcript will be sent to you later on.

12   Please do note, that on May 1, 2004, the regulations

13   regarding your right to appeal a decision made at this

14   hearing were repealed.  You basically have to go to

15   court, so if you have any questions about that policy,

16   you should discuss that with your legal counsel or see

17   if you can review that at the prison law library.  Sir,

18   you are not required to admit to or discuss your

19   offense, but this Panel does accept as true the

20   findings of the court.  So do you understand what that

21   means?

22       **INMATE SNIDER:**  Yes, I do.

23       **PRESIDING COMMISSIONER ENG:**  Okay.  Commissioner

24   Estrada, is there any confidential material in the

25   file, and if so, will we be using it today?

1        **DEPUTY COMMISSIONER ESTRADA:**  There is

2    confidential information in the inmate's file, but it

3    will not be used today.

4        **PRESIDING COMMISSIONER ENG:**  Okay, thank you.  I

5    passed the hearing checklist over to your legal

6    counsel, and I've discussed with our Deputy District

7    Attorney, and we've all located.  This is marked

8    Exhibit 1.  We do this to make sure that all of us are

9    operating off the same set of documents for your

10   hearing, so that goes in with the rest of the

11   paperwork.  Miss Akpenyi, are there any additional

12   documents to be presented to the Panel today?

13       **ATTORNEY AKPENYI:**  Yes, his parole plans.

14       **PRESIDING COMMISSIONER ENG:**  All right.  Any

15   preliminary objections?

16       **ATTORNEY AKPENYI:**  Yes, object to the July 6,

17   2007 letter from the City of Lompoc Police Department

18   as not being timely.

19       **PRESIDING COMMISSIONER ENG:**  All right.  Panel

20   notes your objection, but we overrule it.  Anything

21   else?

22       **INMATE SNIDER:**  No.

23       **PRESIDING COMMISSIONER ENG:**  And will your

24   client be speaking with the Panel today?

25       **INMATE SNIDER:**  He will not be speaking about

10

1    the commitment offense and his prior history.

2        **PRESIDING COMMISSIONER ENG:**  Mr. Snider, I'll

3    still have to swear you in, so please raise your right

4    hand. Do you solemnly swear or affirm that the

5    testimony that you give at this hearing will be the

6    truth, the whole truth, and nothing but the truth?

7        **INMATE SNIDER:**  I do.

8        **PRESIDING COMMISSIONER ENG:**  All right.  What

9    I'm going to do first is read into the record the

10   statement of facts that you're familiar with, that we

11   usually do this.  I'm going to take that from the

12   probation officer's report in the legal section of our

13   packets.  It starts on page 2 and goes to the end of

14   page 3, and this sates under the Offense that:

15            "On September 8, 1985, at about 2:00

16            a.m., Lompoc Police officers received a

17            call that a woman was screaming at the

18            Motel 6 in Lompoc and that shots had

19            been fired.  It was reported to the

20            officers that the suspect left the area

21            driving a yellow Dodge pickup

22            southbound on Highway 1 from Highway

23            246.  At about 2:17 a.m., a Santa

24            Barbara County Sheriff's Unit stopped

25            the vehicle about four miles away from

11

1           the Motel 6.  The driver of the vehicle

2           was the defendant, James Levi Snider.

3           As Snider got out of the vehicle, he

4           stated, 'Somebody shot my brother; I'm

5           trying to find a hospital.  Someone

6           climbed in the window and started

7           shooting.'  Highway patrol officers and

8           sheriff's deputies searched the roadway

9           looking for a weapon, but were unable

10          to find one.  The officers interviewed

11          several occupants of the rooms at Motel

12          6.  Glenn Martin, who was in the room

13          next door to where the shooting

14          occurred, said that he was awakened by

15          a loud noise, which he later realized

16          was gunfire.  He then heard a time

17          lapse of about two seconds, and then

18          two more shots were fired.  He said he

19          laid down on he floor of his motel room

20          and heard four more shots fired.  He

21          then heard a woman scream, 'He shot my

22          dog and he shot me.'  He heard the

23          woman yell out, 'Bill,' and 'He shot

24          Bill.'  He said the woman kept

25          screaming for help, stating, 'I'm

12

1          shot.'  When he heard a vehicle leave

2          the Motel 6 parking lot, many of the

3          other motel guests began coming out of

4          their rooms to see what happened.  He

5          then heard the female victim, Teresa

6          Brauninger, B-R-A-U-N-I-N-G-E-R, say

7          that her husband and the defendant had

8          been friends for 15 years.  Another

9          motel room occupant heard Miss

10         Brauninger say, 'He killed my husband.'

11         When asked who did it, she responded,

12         'My roommate.'  When police officers

13         entered the Motel 6 room, they found

14         James Brauninger lying on his back on

15         the floor.  The police officers were

16         unable to find any signs of life.

17         While ambulance personnel were

18         performing CPR on James Brauninger,

19         Teresa Brauninger was interviewed by

20         the police officers.  She said that Mr.

21         Brauninger and Mr. Snider argued about

22         Snider's drinking and behavior, and Mr.

23         Brauninger told Mr. Snider to pack his

24         belongings and leave.  He said Snider

25         began packing his clothes, then started

1              shooting at Mr. Brauninger, Mrs.
2              Brauninger and their pet dog, Easter,
3              who was also in the room.  When asked
4              how Snider had left the motel,
5              Ms. Brauninger stated that he had taken
6              Mr. Brauninger's Dodge pickup truck.
7              At Lompoc Hospital, James Brauninger
8              was pronounced dead, and Miss
9              Brauninger was operated on due to the
10             numerous wounds she sustained.  An
11             autopsy was performed on the
12             Brauninger's dog, Easter, who died of a
13             gunshot wound."
14  And because Mr. Snider has chosen not to discuss the
15  Life Crime, which is his right, I'm going to read into
16  the record his most recent version of the Life Crime.
17  And I was going to take that from; I believe it's the
18  June 2006 Board report, unless there's objections by
19  counsel?
20        **ATTORNEY AKPENYI:**  Yes, yes, I've seen that.
21  That's current.
22        **PRESIDING COMMISSIONER ENG:**  So this is on the
23  second page of the June 2006 Board report, and this
24  states:
25             "Snider told the probation officer that

1          on the day of the offense, he went to a
2          company picnic and did not know where
3          the Brauningers had gone that day.
4          Snider had drunk 13 to 14 glasses of
5          beer at the picnic, and came back to
6          the motel between 1800 and 1900 hours.
7          The victims were leaving to go to the
8          movies.  After showering and changing
9          clothes, Snider went to get something
10         to eat, then went to La Parisian Inn,
11         where he shot pool before returning to
12         the motel.  He had consumed three
13         bourbon and 7-Up cocktails while at the
14         Inn.  At the motel, he laid down and
15         fell asleep.  The next thing he knew,
16         he heard shots, woke up and saw a man
17         in the doorway.  Snider stated he ran
18         out the door.  He said Terry Brauninger
19         ran the other way, then she said that
20         Snider had shot her husband.  When
21         asked if he was indeed innocent, why
22         would Mrs. Brauninger accuse him of
23         murder, he stated, 'In my eyes, she'd
24         accuse anyone of anything.  She is the
25         type of person that would do what she

15

1          had to to get her way, and maybe she

2          did it for the insurance money.'  When

3          asked why he ran from the motel when

4          his friend of 15 years had just been

5          shot, Snider stated, 'I just came out

6          of a sleep and was not thinking.  I was

7          scared to death and left for that

8          reason.'  He denied ever stopping in

9          the truck to pick up the tailgate, or

10         that he had anything to do with the

11         murder.  He stated that when he

12         returned to the motel, it was 2200 or

13         2300 hours, and the Brauningers were

14         not there when he went to bed.  Snider

15         also stated that he probably should

16         have gotten his own room after Terry

17         Brauninger came to Lompoc.  He said Mr.

18         and Mrs. Brauninger started fighting

19         about anything, and in particular they

20         would fight when Mr. Brauninger was

21         drinking.  He explained that he had no

22         problems with Jim Brauninger, although

23         once in a while they had an argument

24         because they were around each other 24

25         hours a day.  He said their arguments

1                would only last a minute or so.  He

2                said it was the first time he'd ever

3                shared a motel room with Mr. Brauninger

4                when his wife was present, and he

5                denies ever having an affair with

6                Teresa Brauninger."

7    And again, the source document was the probation

8    officer's report.

9         **ATTORNEY AKPENYI:**  Commissioner, I apologize for

10   that.  I should have asked you to read from the psych

11   report.  I apologize for that.

12        **PRESIDING COMMISSIONER ENG:**  The 6/27/06 psych

13   report?

14        **ATTORNEY AKPENYI:**  Yes.

15        **PRESIDING COMMISSIONER ENG:**  The first paragraph

16   on Review of Life Crime?

17        **ATTORNEY AKPENYI:**  That's correct.

18        **PRESIDING COMMISSIONER ENG:**  All right, I'll go

19   ahead.  I generally don't do that.  Again, this is on

20   page 3 of the 6/27/06 psychological evaluation, that it

21   does state that:

22               "Mr. Snider accepts full responsibility

23               for the commitment offense.  He stated

24               that both the victim and himself had

25               been drinking at the time.  He stated

1           that they got involved in a verbal
2           argument that escalated due to their
3           intoxicated condition.  He stated that
4           their argument became totally out of
5           control.  In the midst of this
6           argument, he stated that he shot the
7           victim and the victim's wife.  He also
8           shot the dog when the dog attacked him.
9           He said that he takes full
10          responsibility for his actions.  He
11          stated that this was all his fault.  He
12          should have handled it differently.  He
13          stated that, 'There's no justification
14          for what I did.  I took a human life,
15          and there's no excuse for that.'
16  Which is quite different from what I just read.
17          **ATTORNEY AKPENYI:**  Thank you.
18          **PRESIDING COMMISSIONER ENG:**  Let's go on and
19  take a look at Mr. Snider's prior record.  And I just
20  want to clarify, sir, did you have any contact with law
21  enforcement at all as a juvenile?
22          **INMATE SNIDER:**  No.
23          **PRESIDING COMMISSIONER ENG:**  I just wanted to
24  double-check that, because it does state here that
25  there isn't any, but I don't have enough details.

18

1        **INMATE SNIDER:**  Not until I was about 21.

2        **PRESIDING COMMISSIONER ENG:**  All right.  I do

3    see that -- I want to double-check.  Again, I don't

4    have a CI&I, so I just want to double-check what we

5    have here.  So I'm looking at the June 2006 Board

6    report.  It does state that -- it looks like your first

7    arrest was with the Hawthorne Police Department,

8    September 1973 for drunk driving.  You were convicted

9    by the court and fined, and then right after that, in

10    November '74, Nassau County, New York Police

11    Department, drunk driving.  And I see that then '79,

12    San Diego, drunk driving in January; and then August

13    '79, drunk driving; then September '83, drunk driving.

14    Well, this is out of order.  So those were all the

15    drunk driving.  Did you ever get your license pulled

16    because of all this drunk driving arrests?

17        **INMATE SNIDER:**  Yes.

18        **PRESIDING COMMISSIONER ENG:**  But it didn't stop

19    you?

20        **INMATE SNIDER:**  Apparently not, ma'am.

21        **PRESIDING COMMISSIONER ENG:**  Then I see that in

22    May 1980 back in Nassau County -- when were you back in

23    New York?  When did you go back to New York after the

24    San Diego arrest?  You were arrested in '79 in San

25    Diego?

1          **INMATE SNIDER:**  I was in New York in '74.

2     That's when I had a drunk driving, in '74.

3          **PRESIDING COMMISSIONER ENG:**  Right, I see that,

4     but then I see in 1980, Nassau County, a burglary, 3rd

5     degree, a felony?

6          **INMATE SNIDER:**  It was in the back of a stolen

7     car.  That was what that was about.

8          **PRESIDING COMMISSIONER ENG:**  But that was back

9     in New York.  That's why I wanted to know that when you

10    returned?

11         **INMATE SNIDER:**  Yes.

12         **PRESIDING COMMISSIONER ENG:**  So in 1980, is that

13    when you're stating that you returned to New York?

14         **INMATE SNIDER:**  Yes, '79.

15         **PRESIDING COMMISSIONER ENG:**  Okay.  So that was

16    a felony.  You were convicted on a plea of guilty to

17    attempted conspiracy; placed on five years' probation;

18    60 days in County jail.  You were discharged early from

19    probation, 1984, is that correct?  Okay.  So that was

20    July 1984.  November 1984, it says, "On this date in

21    U.S. District Court in San Diego County, you were

22    convicted of a bank robbery."

23         **INMATE SNIDER:**  Yes, ma'am.

24         **PRESIDING COMMISSIONER ENG:**  When did that bank

25    robbery happen?

1          **INMATE SNIDER:**  In 1984.

2          **PRESIDING COMMISSIONER ENG:**  Well, I know it was

3     in 1984, but was it -- I want to know -- I mean, you

4     were convicted in November, so did you actually -- you

5     did the bank robbery earlier?

6          **INMATE SNIDER:**  Six months earlier.

7          **PRESIDING COMMISSIONER ENG:**  So if it was six

8     months earlier, you were still on probation; correct?

9     Your probation wasn't discharged until end of July

10    1984.  That's why I was asking when that happened?

11         **INMATE SNIDER:**  Yes, I was.

12         **PRESIDING COMMISSIONER ENG:**  So you ended up

13    being placed on five years' federal probation, and did

14    you serve 179 days in the Metro Federal Correctional

15    Center?

16         **INMATE SNIDER:**  Yes, ma'am.

17         **PRESIDING COMMISSIONER ENG:**  So that was your

18    first time in prison?

19         **INMATE SNIDER:**  Yes.

20         **PRESIDING COMMISSIONER ENG:**  Okay.  So it states

21    here that you'd been drinking?

22         **INMATE SNIDER:**  Yes.

23         **PRESIDING COMMISSIONER ENG:**  And you were broke?

24         **INMATE SNIDER:**  Yes, ma'am.

25         **PRESIDING COMMISSIONER ENG:**  So you robbed a

1    bank.   And then we had -- so how long had you been out

2    of prison when you did this?

3          **INMATE SNIDER:**  Six months.

4          **PRESIDING COMMISSIONER ENG:**  Six months, because

5    that brought us right up to the Life Crime, in

6    September '85.  Did I miss anything?

7          **INMATE SNIDER:**  No, ma'am.

8          **PRESIDING COMMISSIONER ENG:**  Had you ever been

9    in any type of a substance abuse program?  Were you

10   ever ordered by the court?

11         **INMATE SNIDER:**  No.

12         **PRESIDING COMMISSIONER ENG:**  When you think back

13   to then, did you think that you had a drinking problem?

14         **INMATE SNIDER:**  Yes, ma'am.

15         **PRESIDING COMMISSIONER ENG:**  But you didn't

16   really want to do anything about it?

17         **INMATE SNIDER:**  No.  I let problems get the best

18   of me, so I drank my way through them.

19         **PRESIDING COMMISSIONER ENG:**  Okay.  I'll look at

20   Mr. Snider's personal history; born on 2/2/50 in Kansas

21   City, Missouri.

22         **INMATE SNIDER:**  Yes.

23         **PRESIDING COMMISSIONER ENG:**  So you were 35 at

24   the time of this Life Crime?

25         **INMATE SNIDER:**  Yes, ma'am.

22

1          **PRESIDING COMMISSIONER ENG:**  And you're now 57;
2    is that correct?

3          **INMATE SNIDER:**  Yes, ma'am.

4          **PRESIDING COMMISSIONER ENG:**  So is it true -- it
5    says here that you had actually lived in California for
6    about 30 years?  So you moved here when you were very
7    young, to California?

8          **INMATE SNIDER:**  Five years old.

9          **PRESIDING COMMISSIONER ENG:**   But you'd only
10   been in Santa Barbara County for about three weeks
11   prior to this happening?

12         **INMATE SNIDER:**  Yes.

13         **PRESIDING COMMISSIONER ENG:**  Is that why you
14   were living in this Motel 6 temporarily?

15         **INMATE SNIDER:**  Yes.

16         **PRESIDING COMMISSIONER ENG:**  Where were you
17   living before that?

18         **INMATE SNIDER:**  In San Diego.

19         **PRESIDING COMMISSIONER ENG:**  Okay.  So do you
20   just have one sibling, the younger sister?

21         **INMATE SNIDER:**  Yes, I do.

22         **PRESIDING COMMISSIONER ENG:**  And where is she?

23         **INMATE SNIDER:**  Wisconsin, Milwaukee, Wisconsin.

24         **PRESIDING COMMISSIONER ENG:**  Are your parents
25   still alive?

1          **INMATE SNIDER:** No.

2          **PRESIDING COMMISSIONER ENG:** So was the family

3     pretty much intact when you were growing up?

4          **INMATE SNIDER:** Yes.

5          **PRESIDING COMMISSIONER ENG:** That was here in

6     California?

7          **INMATE SNIDER:** Yes, ma'am.

8          **PRESIDING COMMISSIONER ENG:** So you stated that

9     you dropped out of school in the 10th grade, and what'd

10    you do?

11         **INMATE SNIDER:** I got married, then I went to

12    work full-time.

13         **PRESIDING COMMISSIONER ENG:** It does state that

14    your first marriage was to Sue McGage in 1967, and you

15    divorced about four years later.

16         **INMATE SNIDER:** Yes, ma'am.

17         **PRESIDING COMMISSIONER ENG:** And I guess you

18    thought you were too young and your wife was pregnant

19    when they got married?

20         **INMATE SNIDER:** Yes.

21         **PRESIDING COMMISSIONER ENG:** So you had one

22    child?

23         **INMATE SNIDER:** Yes.

24         **PRESIDING COMMISSIONER ENG:** Boy or girl?

25         **INMATE SNIDER:** Boy.

1          **PRESIDING COMMISSIONER ENG:**  So you had a son at
2   that time, all right.

3          **INMATE SNIDER:**  Well, to clarify, we have two
4   sons.

5          **PRESIDING COMMISSIONER ENG:**  Okay, so in the
6   four years, you had two sons?

7          **INMATE SNIDER:**  Yes, ma'am.

8          **PRESIDING COMMISSIONER ENG:**  Okay.  And so that
9   was in the four-year marriage, right?

10         **INMATE SNIDER:**  Yes.

11         **PRESIDING COMMISSIONER ENG:**  And then you ended
12  up remarrying to Bonnie in 1975, and that lasted five
13  years?

14         **INMATE SNIDER:**  Yes.

15         **PRESIDING COMMISSIONER ENG:**  Oh, I see, you had
16  the two sons, Paul and Robert.

17         **INMATE SNIDER:**  Right.

18         **PRESIDING COMMISSIONER ENG:**  So I think this is
19  all messed up, okay.  So when you split up, did Sue
20  have custody of the two boys?

21         **INMATE SNIDER:**  Yes, she did.

22         **PRESIDING COMMISSIONER ENG:**  Were you involved
23  in their growing up at all?

24         **INMATE SNIDER:**  For a short time, till they were
25  four years old.

25

1          **PRESIDING COMMISSIONER ENG:**  Do you have any

2      contact with either boy?

3          **INMATE SNIDER:**  Not at this time, no.

4          **PRESIDING COMMISSIONER ENG:**  Have you ever?

5          **INMATE SNIDER:**  Yes.

6          **PRESIDING COMMISSIONER ENG:**  When did it stop?

7          **INMATE SNIDER:**  I don't know the reasons for it.

8      My son quit writing about six years ago.

9          **PRESIDING COMMISSIONER ENG:**  Do you ever talk to

10     them about whey you were here in prison?

11         **INMATE SNIDER:**  Yes, and the best I can make of

12     it, they're mad at me, so I understand that.

13         **PRESIDING COMMISSIONER ENG:**  Do you know if

14     either one of them had problems with law enforcement?

15         **INMATE SNIDER:**  No.

16         **PRESIDING COMMISSIONER ENG:**  How about drinking?

17         **INMATE SNIDER:**  No.

18         **PRESIDING COMMISSIONER ENG:**  Drugs?

19         **INMATE SNIDER:**  No.

20         **PRESIDING COMMISSIONER ENG:**  So when did you

21     start drinking, when you were about 17?

22         **INMATE SNIDER:**  Yes.

23         **PRESIDING COMMISSIONER ENG:**  Were either one of

24     your parents alcoholics?

25         **INMATE SNIDER:**  They drank.

1          **PRESIDING COMMISSIONER ENG:**  And it states here
2    -- when you were 17, is that when you really started
3    drinking every night?  Did it happen pretty quickly?
4          **INMATE SNIDER:**  That didn't happen till I was
5    close to 21.
6          **PRESIDING COMMISSIONER ENG:**  So you started
7    drinking every night.  Was it mostly beer, or was it
8    wine?
9          **INMATE SNIDER:**  A few beers a night.
10         **PRESIDING COMMISSIONER ENG:**  Just beers every
11   single night.
12         **INMATE SNIDER:**  Pretty much.
13         **PRESIDING COMMISSIONER ENG:**  But then it says
14   you got drunk about once a month, and it took about two
15   six packs and a half a pint of alcohol to get drunk.
16   Is that true?
17         **INMATE SNIDER:**  That was later on in life, yes.
18         **PRESIDING COMMISSIONER ENG:**  And here it says
19   that you thought your father was an alcoholic, but he
20   had stopped drinking?
21         **INMATE SNIDER:**  Yes.
22         **PRESIDING COMMISSIONER ENG:**  All right.  And you
23   described yourself at one point as a periodic
24   alcoholic?  Why?
25         **INMATE SNIDER:**  I would go on binges at times.

1    Later on in life I did.

2        **PRESIDING COMMISSIONER ENG:**  It says you

3    received alcohol treatment back in 1985, so you did try

4    it?  Oh, that's not true?

5        **INMATE SNIDER:**  Uhn-uhn.

6        **PRESIDING COMMISSIONER ENG:**  '85, weren't you in

7    federal prison?

8        **INMATE SNIDER:**  Mm-hmm.

9        **PRESIDING COMMISSIONER ENG:**  So did you spend

10   three weeks at Mesa Visa Hospital in San Diego?

11       **INMATE SNIDER:**  No.

12       **PRESIDING COMMISSIONER ENG:**  Okay.  So that --

13   it's right in this Board report, so we'll cross that

14   out, because I know you said that you never did.

15       **INMATE SNIDER:**  No.

16       **PRESIDING COMMISSIONER ENG:**  So what were you

17   doing in terms of work?

18       **INMATE SNIDER:**  I job shopped around the

19   country.  I was a technical writer on aircraft, and

20   when this happened I was working at Tilapia Vandenberg

21   Air Force Base on the Shuttle Program.  Most of my jobs

22   would last anywhere from six months to a year.  As they

23   call me in, they get a contract out.

24       **PRESIDING COMMISSIONER ENG:**  And you were able

25   to maintain that with all this drinking?

1          **INMATE SNIDER:**  Yes.  Basically I worked on an
2    average of 12 hours a day, six days a week.
3          **PRESIDING COMMISSIONER ENG:**  And then in the
4    evenings when you would get off, would you be drinking
5    a lot?
6          **INMATE SNIDER:**  I considered it periodic.  I
7    only drank about, one Saturday night, would be it.
8          **PRESIDING COMMISSIONER ENG:**  Okay.  Are you
9    married now?
10          **INMATE SNIDER:**  No, I'm not.
11          **PRESIDING COMMISSIONER ENG:**  Any family members
12    -- are you in touch with your sister?
13          **INMATE SNIDER:**  At times.
14          **PRESIDING COMMISSIONER ENG:**  So do you get any
15    visits from family here?
16          **INMATE SNIDER:**  No.  Haven't had a visit since
17    '87.
18          **PRESIDING COMMISSIONER ENG:**  Have I missed
19    anything in your prior record or your personal history
20    that you feel is pertinent that we should discuss or
21    add into the record?
22          **INMATE SNIDER:**  No, ma'am.
23          **PRESIDING COMMISSIONER ENG:**  Commissioner
24    Estrada is going to bring us up to date on what you've
25    been doing.

1          **DEPUTY COMMISSIONER ESTRADA:**  Good morning, Mr.
2     Snider.

3          **INMATE SNIDER:**  Good morning.

4          **DEPUTY COMMISSIONER ESTRADA:**  Document review
5     from post conviction information and to your Central
6     File, the Life Prisoner Evaluation report prepared for
7     the August 2007 calendar by correctional counselor Juan
8     Verdesoto?

9          **INMATE SNIDER:**  Yes, Verdesoto.

10         **DEPUTY COMMISSIONER ESTRADA:**  V-E-R-D-E-S-O-T-O.
11    Post conviction progress report during the period of
12    February 2006 to the present, report by CC Juan
13    Verdesoto and the psychological evaluation prepared for
14    the August 2000 calendar by Dr. MacComber.

15              "At the time of Mr. Snider's last
16              parole consideration hearing on
17              8/16/06, he was housed at CTF-Soledad.
18              The Board took action and denied parole
19              for one year, recommending that the
20              inmate stay disciplinary free, continue
21              in self-help, earn positive chronos and
22              finalize parole residence and plans."
23    Now, Mr. Snider, your classification score at your last
24    hearing was 19 and continues to be 19; correct?

25         **INMATE SNIDER:**  Yes.

1       **DEPUTY COMMISSIONER ESTRADA:**  Your prior custody
2   level at your last hearing was Medium-A and continues
3   to be Medium-A; correct?

4       **INMATE SNIDER:**  Yes, sir.

5       **DEPUTY COMMISSIONER ESTRADA:**  On review of your
6   Central File, I see that you did complete vocational
7   data or vocational information technology on 8/9/01;
8   correct?

9       **INMATE SNIDER:**  Yes.

10      **DEPUTY COMMISSIONER ESTRADA:**  You haven't
11  completed anything else since that time; correct?

12      **INMATE SNIDER:**  No, sir.

13      **DEPUTY COMMISSIONER ESTRADA:**  And I see that you
14  did complete your GED on 12/1/94; correct?

15      **INMATE SNIDER:**  Yes, sir.

16      **DEPUTY COMMISSIONER ESTRADA:**  Which is good.
17  Have you upgraded educationally since that time?

18      **INMATE SNIDER:**  No, sir.

19      **DEPUTY COMMISSIONER ESTRADA:**  And I see that
20  you've been working at -- help me out here -- Doca, D-
21  O-C-A Out Room?

22      **INMATE SNIDER:**  Yes, it's a kitchen, in the
23  culinary.

24      **DEPUTY COMMISSIONER ESTRADA:**  And I've been
25  looking at your work supervisor's reports, and they've

1    all been above average.  You continue to work there; is

2    that correct?

3           **INMATE SNIDER:**  Yes, sir.

4           **DEPUTY COMMISSIONER ESTRADA:**  It seems like

5    you've been working there for a little while; has it?

6           **INMATE SNIDER:**  Six years now.

7           **DEPUTY COMMISSIONER ESTRADA:**  Six years, because

8    the work supervisor's report indicates 10/6/05, but I

9    looked a little bit before that, seeing that you were

10   basically in the same area; correct?

11          **INMATE SNIDER:**  Yes, sir.

12          **DEPUTY COMMISSIONER ESTRADA:**  And you're still

13   there; right?

14          **INMATE SNIDER:**  Yes.

15          **DEPUTY COMMISSIONER ESTRADA:**  During this

16   reporting period, did you receive any psychiatric

17   treatment?

18          **INMATE SNIDER:**  No, sir.

19          **DEPUTY COMMISSIONER ESTRADA:**  Now, in regards to

20   self-help, I didn't see anything during this reporting

21   period?

22          **INMATE SNIDER:**  Self-help, I've been doing my

23   own self-help, from Overcomers Outreach, which is a

24   Christian -- it's the same as AA, but it deals on a

25   Christian basis.  If you want --

1              **DEPUTY COMMISSIONER ESTRADA:**  Yes.

2              **INMATE SNIDER:**  And this is a copy of

3       Overcomers.  It's my latest issue.

4              **DEPUTY COMMISSIONER ESTRADA:**  So the *Overcomers*

5       *Magazine.*  Is this yours?

6              **INMATE SNIDER:**  Yes.

7              **DEPUTY COMMISSIONER ESTRADA:**  The self-help, my

8       primary self-help is reading the state of the word of

9       God, the Bible, daily and applying it to my life.  So

10      what have you been doing?

11             **INMATE SNIDER:**  What I do is I read the Bible

12      every day, and I go by its teachings.  And I subscribe

13      to *Overcomers,* and then I'll read that two or three

14      times and I'll do a report on it, my own report on it.

15             **DEPUTY COMMISSIONER ESTRADA:**  And these are

16      reports that you've done?

17             **INMATE SNIDER:**  Yes.

18             **DEPUTY COMMISSIONER ESTRADA:**  They're dated

19      November 1, December 1, 1/1/07, 3/1/07, 5/1/07, and

20      6/1/07, and your last one, 8/1/07.  So you read the

21      Bible and then what do you do?

22             **INMATE SNIDER:**  That's basically what I do, and

23      I subscribe to *Overcomers.*  That's the self-help that

24      I've set up.

25             **DEPUTY COMMISSIONER ESTRADA:**  And you haven't

1    done anything else?

2           **INMATE SNIDER:**  No, sir.

3           **DEPUTY COMMISSIONER ESTRADA:**  Now, what's this

4    *Overcomer*?  What's this all about?

5           **INMATE SNIDER:**  It's the equivalent of AA, but

6    it's more of a Christian basis.

7           **DEPUTY COMMISSIONER ESTRADA:**  Do you have

8    meetings?

9           **INMATE SNIDER:**  No, not here at Soledad.  I get

10   it bimonthly.

11          **DEPUTY COMMISSIONER ESTRADA:**  So you get this

12   and you read this?

13          **INMATE SNIDER:**  Yes.

14          **DEPUTY COMMISSIONER ESTRADA:**  So for your self-

15   help, you read the Bible, you do your reports and then

16   you read this newsletter?

17          **INMATE SNIDER:**  Yes, sir.

18          **DEPUTY COMMISSIONER ESTRADA:**  Anything else?

19          **INMATE SNIDER:**  It's got a step in the back,

20   each subscription.

21          **DEPUTY COMMISSIONER ESTRADA:**  Anything else?

22          **INMATE SNIDER:**  No, sir.

23          **DEPUTY COMMISSIONER ESTRADA:**  You did receive

24   one laudatory chrono, and I did see that in the Central

25   File, dated 12/28/06, thanking you on behalf of the

1    Central Facility for your efforts and hard work and

2    ability and willingness to work when the facility went

3    on lockdown, first parts status on 11/23 and 11/24/06,

4    to make that Thanksgiving meal an enjoyable experience.

5    That was by B. Areias, A-R-E-I-A-S, correctional

6    supervisor Cook No. 2.  Now, since you've been in

7    prison, you have received one 115, and that was for a

8    fistfight, I guess you had in your cell?

9         **INMATE SNIDER:**  Yes.

10        **DEPUTY COMMISSIONER ESTRADA:**  So you haven't had

11   any 115s now for -- and that was on 1/2/89, so you have

12   not had any 115s now for about 18 years, seven months?

13        **INMATE SNIDER:**  Yes, sir.

14        **DEPUTY COMMISSIONER ESTRADA:**  That's a while.

15   That's good.  So since you've been in prison, you've

16   had one counseling chrono, and that was back on

17   8/13/92, because you were absent from work; correct?

18        **INMATE SNIDER:**  Yes, sir.

19        **DEPUTY COMMISSIONER ESTRADA:**  So you've only had

20   one, so that's about 15 years?

21        **INMATE SNIDER:**  Yes, sir.

22        **DEPUTY COMMISSIONER ESTRADA:**  Very good.

23        **INMATE SNIDER:**  Now, your CC-1, Verdesoto

24   indicates that prior to release, "the prisoner could

25   benefit from continuing to be disciplinary free and

1    participate in self-help and therapy programs."   Your
2    psychological evaluation by Dr. MacComber indicates a
3    diagnosis of Axis I, no mental disorder; Axis II, no
4    personality disorder; and you have a GAF score of 95.
5    In the report, you did indicate, openly admit that you
6    have a serious alcohol abuse problem at the time of the
7    commitment offense and that you were extremely
8    intoxicated, and it was directly related to his action
9    of the commitment offense.   In regards to Assessment of
10   Dangerousness, the Doctor indicates that

11           "At this point in time, compared to

12           other inmates, potential for dangerous

13           behavior is definitely below average.

14           Also, considering the potential for

15           dangerous behavior when released to the

16           community, based on your maturity,

17           strong Christian values and commitment

18           to lead a life that is honoring to God

19           and man, your risk level is undoubtedly

20           lower than the average citizen in the

21           community.   There are no significant

22           risk factors at this time."

23   Recommendations.   The Doctor indicated:

24           "There are no mental or emotional

25           problems in this case.   I would not

1          interfere with routine release

2          planning.  Mr. Snider has vocational

3          skills that will enable him to secure

4          and maintain employment in the

5          community upon his release.  Mr. Snider

6          has a very strong work ethic.  He has

7          worked throughout his life, and he will

8          continue to work when he is released on

9          parole.  He has written to several

10          halfway houses and Christian programs

11          for residence and employment in the

12          Sunnydale community where he has lived

13          most of his life.  The prognosis for

14          successful adjustment in the community

15          is excellent."

16   Okay, Mr. Snider, is there anything I may have missed?

17          **INMATE SNIDER:**  No, sir.

18          **DEPUTY COMMISSIONER ESTRADA:**  Counsel?

19          **ATTORNEY AKPENYI:**  No.

20          **DEPUTY COMMISSIONER ESTRADA:**  With that, I'll

21   return to the Chair.

22          **PRESIDING COMMISSIONER ENG:**  Okay, Commissioner.

23   Mr. Snider, let's talk about your future plans,

24   specifically parole plans.  The current Board report

25   refers back and states that -- actually refers us to

37

1    the prior Board report, saying that all relevant

2    documents remains the same; and in your June 2006 Board

3    report, it states that you do not have any means for

4    residence because you have no family in California.

5    And it states here that Mr. Snider expressed that the

6    State of California will have to provide a place to

7    live, like a halfway house.  You did provide us with

8    these parole plans; that you plan to reside at a

9    halfway house for six months or less; and that you've

10   attached a list of re-entry programs that you've

11   written to.  Those do include Turning Point in

12   Bakersfield; Victory Outreach in San Diego; Parole

13   Regional Headquarters, Re-entry Coordinator in Diamond

14   Bar -- what's the V-O-A San Diego?  What's that?

15        **INMATE SNIDER:**  It's a halfway house.

16        **DEPUTY COMMISSIONER ESTRADA:**  Volunteers of

17   America, San Diego.

18        **PRESIDING COMMISSIONER ENG:**  Thank you -- in San

19   Diego; W.M.B. Re-entry in San Diego; you've written to

20   Alcoholics Anonymous, a couple of different groups, one

21   in Bakersfield, one in San Diego, and then the

22   Overcomers Outreach.  Have you received anything back

23   from any of these halfway houses?

24        **INMATE SNIDER:**  No, I have not.

25        **PRESIDING COMMISSIONER ENG:**  Okay.

1       **INMATE SNIDER:**  It's my understanding from other
2   people that have written, unless you have a date, it's
3   using up their resources to try and find you
4   accommodations.

5       **PRESIDING COMMISSIONER ENG:**  But there are other
6   types of organizations or residential establishments
7   that you can write to that you have to pay for, because
8   I think that it's getting more and more difficult to
9   get into these halfway houses for free, basically, and
10  that there are quite a few of these residential-type
11  transitional facilities, that it might be in your best
12  interest to take a look at, that also they have a lot
13  of different type of programming that they offer, too;
14  because you're being incarcerated a long time.  It's
15  going to take quite a bit of time.  You're used to
16  having everything taken care of for you 24/7, so all of
17  a sudden, if you're on the outside, you're basically
18  all alone.  The last thing any Panel wants to think
19  about is that a lifer gets out and falls through the
20  cracks.

21      **INMATE SNIDER:**  I do have a family in
22  Bakersfield, and that's the closest I can come.  Ion
23  the State of California, I have no family.  They will
24  help me when I'm released.  They'll help me secure
25  employment.  I've talked to Mr. Luther, and he's pretty

1    much guaranteed that I will either -- I'm going to have
2    to do physical labor. It's either going to be in
3    construction or the oil fields.

4        **PRESIDING COMMISSIONER ENG:** Yes, we do have a
5    letter that you provided here, and it looks like it's
6    dated 7/25/07, signed by George and Edith Luther, but I
7    will have to tell you that it's a different print from
8    the last of the letter, the date on it. That's the
9    first thing I noticed. But their address is in
10   Bakersfield, California, and they did attach, looks
11   like this California All-Purpose Acknowledgement, that
12   it looks like their signatures were notarized. And it
13   also states that this happened in Kern County on
14   7/25/07, which is when the letter was dated, so I
15   appreciate that you did include that. This letter does
16   state:

17       "To Whom It May Concern: We certify that upon
18   release on parole of James Snider, we will do our best
19   to help and secure gainful employment for James. We
20   have many friends in the Bakersfield area that own and
21   operate businesses. We foresee no problem in finding
22   James employment so he can successfully re-enter
23   society. So how do you know the Luthers?

24       **INMATE SNIDER:** Just by mail. I received their
25   name from somebody else, but they do like to help

40

1    people out.

2         **PRESIDING COMMISSIONER ENG:**  You've never met

3    them?

4         **INMATE SNIDER:**  No, I have not.

5         **PRESIDING COMMISSIONER ENG:**  Have you met anyone

6    who they've actually helped out?

7         **INMATE SNIDER:**  No, I have not.

8         **PRESIDING COMMISSIONER ENG:**  So you really don't

9    know anything about these folks?

10        **INMATE SNIDER:**  I'm just trying to do the best I

11   can behind these walls.

12        **PRESIDING COMMISSIONER ENG:**  Very, very

13   difficult; we understand that.  Okay.  I appreciate

14   that you sort of made yourself and outline here, and

15   that you realized that you do have to find some sort of

16   a residential facility to take you in, and that you're

17   stating that your support plan is to find a Bible-based

18   church to attend, attend regularly Overcomers and AA,

19   and associate with people who are serious about their

20   walk with Jesus Christ.  Plan for employment, that you

21   will work diligently at your job in Bakersfield

22   provided by George Luther.  If you have to go to San

23   Diego, you'll contact the Mayor's Office of Community

24   Connection and Labor Ready.  You did the technical

25   writing; correct?

1          **INMATE SNIDER:** Yes, ma'am.

2          **PRESIDING COMMISSIONER ENG:** Have you stayed up

3      to date with that type of stuff? Do you think you'd be

4      able to get back into it?

5          **INMATE SNIDER:** Yes, I will. I used to teach

6      people how to do it.

7          **PRESIDING COMMISSIONER ENG:** Have you written to

8      any organizations or tried to continue then?

9          **INMATE SNIDER:** Some old employers I've written

10     to, but I haven't received anything back. In my line

11     of work, I don't know. In the State of California,

12     word gets out about people when something like this

13     happens, and they might take a bad respect to me. I

14     don't know. I'd have to wait till I got out and talk

15     to them face to face.

16          **PRESIDING COMMISSIONER ENG:** Well, I understand

17     what you're saying, but you could also be writing to

18     them, because as you probably recall -- I mean, you

19     were 35 when you came in, and I don't know if you

20     recall anything back then, but it's always been that

21     even if you didn't have a prison term and you had the

22     educational background and you had all the experience,

23     oftentimes when you're sending out resumes and letters

24     for employment, you get very, very few responses. So

25     it's not because you're in prison, but it would be in

1    your best interest to inundate as many folks out there

2    as you can to find out if they would even consider.

3        **INMATE SNIDER:**  I've written Continental Data

4    Graphics in Culver City and San Diego, but I haven't

5    receive a response.  They do all the Boeing and Douglas

6    projects.

7        **PRESIDING COMMISSIONER ENG:**  Were you ever in

8    the Service?

9        **INMATE SNIDER:**  No.

10       **PRESIDING COMMISSIONER ENG:**  So tell the Panel,

11   where's your first choice of going to?

12       **INMATE SNIDER:**  Bakersfield, because from my

13   conversations with them, I can pretty much secure a

14   job, and that's going to be the biggest thing, is

15   getting back on my feet.  To enter society, if I'm a

16   burden to it, then I'm no good to it.

17       **PRESIDING COMMISSIONER ENG:**  Okay, so what

18   specific job do you think you would do in Bakersfield?

19       **INMATE SNIDER:**  It would either be construction

20   drywall or out in the oil fields as a rustic

21   (inaudible).

22       **PRESIDING COMMISSIONER ENG:**  And you have

23   experience in either one of those?

24       **INMATE SNIDER:**  No, I don't.

25       **PRESIDING COMMISSIONER ENG:**  So how do you think

1    that you're going to get hired in either one of these,
2    and not to take away from anything.  You're 57 years
3    old today.  You're competing against a lot of young
4    guys.

5        **INMATE SNIDER:**  Well, I stay in pretty good
6    shape, and I do that because I'm not kidding myself.  I
7    know I'm going to have to do physical labor when I do
8    get back.

9        **PRESIDING COMMISSIONER ENG:**  Well, and again I
10   don't mean to take away.  What I'm trying to do is give
11   you a dose of reality, and reality is that employers
12   really don't -- everybody's going to say they're in
13   great shape, but statistics show that when you hit
14   certain ages, things start to break down, and employers
15   are going to take a look at the potential liability.
16   Now, if you're going to be competing against a 25-year-
17   old, what do you think they're going to do, because
18   what are the chances are that the 25-year-old's going
19   to have significant medical problems versus a 57 or 60-
20   year old?

21       **INMATE SNIDER:**  Yes.

22       **PRESIDING COMMISSIONER ENG:**  So I'm just trying
23   to be realistic with you to really think long and hard.
24   If you think that's going to be that easy, it won't,
25   and that you may want to be taking a look at other

1    areas where it won't be as physically grueling, where
2    it won't make a difference as much, in terms of
3    planning for your future.  So you can do whatever you
4    want to do, but I'm just trying to tell you what you're
5    going to be facing out there as much as possible.  And
6    again, these people can make all the claims they want,
7    but if they're not in a position to hire you, to offer
8    you a specific job at a specific pay scale, then that
9    letter -- I'm telling you, this Panel would not accept
10   that as any type of a viable plan whatsoever.  So if
11   you're not given a date today, I highly suggest that
12   any support letter where people are offering something,
13   it better be specific, laid out, and that if somebody
14   is going to hire you that they should be in a position
15   where they have the authority to hire and to offer you
16   a job, or even an interview.  Because we understand,
17   sir, it's difficult to actually get a solid job offer
18   while you're sitting in prison without knowing, but
19   even if -- if somebody were to write and state that
20   they are vice president or something of human
21   resources, or they're the hiring manager in this area
22   under this company, and that they have positions often
23   that are open, and these types of positions are a
24   forklift operator or an office clerk, and those types
25   of positions are generally 40 hours per week and the

1    pay scale is either hourly or salary, and that based on
2    what you have submitted to them, that you do have the
3    qualifications but they can't guarantee anything except
4    to talk with you -- something like that.  Does that
5    make sense to you?

6         **INMATE SNIDER:**  Yes.

7         **PRESIDING COMMISSIONER ENG:**  This also helps you
8    for you planning your future, because you want to have
9    some idea as to what people are going to expect.  Are
10   they going to be paying you $7 an hour, and you're only
11   going to be offered to work 15 hours a week?  That's
12   not going to be enough to help you get by.  So you're
13   going to want to know these things to figure out, am I
14   going to need to line up four jobs, or will I only need
15   one, et cetera?  So it's just food for thought, but I
16   think that you have the right idea, and to firm up your
17   plans so you have sort of a working document.

18        **INMATE SNIDER:**  Yes, ma'am.

19        **PRESIDING COMMISSIONER ENG:**  It's not
20   impossible.  We come across a lot of prisoners that
21   don't have any family in California whatsoever.
22   They're all alone, and a lot of them don't speak very
23   good English either, and yet they're able to pull
24   together some pretty decent plans.  I also highly
25   recommend again, if you're not given a date today, that

1    you have backup plans, backups to backups to backups,
2    because if something falls through, what are you going
3    to do?

4        **INMATE SNIDER:** Yes, ma'am.

5        **PRESIDING COMMISSIONER ENG:** Whether it be
6    residential or job, always have backups, and also you
7    may want to think about a relapse prevention plan,
8    because let's face facts, sir, you had a significant
9    substance abuse problem and history, and however you
10   want to deal with it -- but we're going to be taking a
11   good, hard look at it. Again, you may want to think
12   about how to set up safety nets for yourself back on
13   the outside. I still don't quite get what Overcomers
14   is. How does it help you?

15       **INMATE SNIDER:** It's the same as AA, but it's
16   more of a Christian background.

17       **PRESIDING COMMISSIONER ENG:** One of the biggest
18   complaints about AA from a lot of people is that it's
19   too religious, okay, so again -- I'm being honest with
20   you. That's what I hear all the time is that well, I
21   don't like the religious overtones about the AA. So
22   that's why I was surprised when you said, well, you
23   liked the Overcomers because it's more Christian-based.
24   And I was sitting there thinking, well, I thought
25   that's what AA was, too. But that's all right, because

1    you have to find what works for you.  So what

2    specifically -- oh, I'm sorry; I'm getting ahead of

3    myself.  But I see this in here, Overcomers and AA, and

4    I do see that you've written away.  We'll get into more

5    of the Overcomers later, after we finish talking about

6    the parole plans.  So have I missed anything?  Did I

7    miss any other letters?

8         **INMATE SNIDER:**  No, ma'am.

9         **PRESIDING COMMISSIONER ENG:**  And you did supply

10   it looks like a copy of a flyer from this Overcomers,

11   and then these are oil companies, list of oil

12   companies, smaller oil companies in and around southern

13   California.

14        **INMATE SNIDER:**  Yes, ma'am.

15        **PRESIDING COMMISSIONER ENG:**  Okay.  Why do you

16   feel you have to go back to San Diego County?

17        **INMATE SNIDER:**  Well, the last Board said that

18   was my last legal residence, and that's where I'd have

19   to go back to.

20        **PRESIDING COMMISSIONER ENG:**  Okay.

21        **INMATE SNIDER:**  But I'd like to go wherever it's

22   going to be best for me to secure parole.

23        **PRESIDING COMMISSIONER ENG:**  Exactly.

24        **INMATE SNIDER:**  That's the bottom line.

25        **PRESIDING COMMISSIONER ENG:**  I think that's the

48

1    right attitude, because a Panel can grant parole to a

2    different county if, if it's in the best interests of

3    the inmate in terms of success, community support,

4    everything.

5              **INMATE SNIDER:**  Yes.

6         **PRESIDING COMMISSIONER ENG:**  All right.  So is

7    there anything else that I missed that you want to

8    discuss regarding parole plans?

9              **INMATE SNIDER:**  No, ma'am.

10        **PRESIDING COMMISSIONER ENG:**  So we also send out

11   Penal Code Section 3042 notices.  Those notices do go

12   to agencies that have a direct interest in your case,

13   either agencies or individuals, and even though your

14   counsel did object to the July 6, 2007 City of Lompoc

15   Police Department's letter, one of the problems that we

16   often get into is that they're never distributed.  The

17   facility, the institution received them, but doesn't

18   give us the letters until the very last minute.

19   However, in your case, I believe this police department

20   generally sends a letter, and we do have another one

21   from a year before from them in the Central File.  So

22   this one basically states, this current one, again

23   dated 7/6/07, signed by Timothy Dabney, D-A-B-N-E-Y,

24   Chief of Police.  It just basically states that:

25              "Convict Snider is currently serving a

1        life sentence in State prison following
2        his 1986 conviction for the murder of
3        James Leroy Brauninger and the
4        attempted murder of Teresa Ann
5        Brauninger, which occurred on Sunday,
6        September 8.  The brutality of this
7        crime was evidenced by the fact that
8        the victims were shot repeatedly by
9        Snider, despite having known him as a
10       friend for many years.  In addition to
11       shooting the victims, James Snider also
12       shot and killed their dog and then
13       stole their vehicle in an attempt to
14       escape.  The position of the Lompoc
15       Police Department remains unchanged
16       from Snider's previous parole hearing
17       in 2001.  There is no doubt that James
18       Snider committed a murder.  Had it not
19       been for the prompt and competent
20       medical care provided to Teresa
21       Brauninger, he could have very likely
22       been responsible for two murders.
23       Police convey to the Board of Prison
24       Terms, I hope that they will consider
25       the heinous nature of this crime when

1           it meets on August 17 to decide if
2           James Snider is worthy of early
3           release.  I urge the Board to hold
4           Snider fully accountable for his
5           reprehensible actions by refusing his
6           parole requests and by making him serve
7           the life sentence he received."
8     So that's basically that.  We also have present with us
9     the representative from the District Attorney's Office
10    of Santa Barbara County who's present via video, who I'm
11    sure will be making a statement regarding parole
12    suitability prior to our taking a recess.  So on that,
13    we're going to go to the next phase, which is any
14    follow-up questions that the Panel will first have.  And
15    I do have some, but I'm going to ask Commissioner
16    Estrada if he has anything?
17          **DEPUTY COMMISSIONER ESTRADA:**  A red flag came up
18    in regards to AA, so you started it.  That was my main .
19    concern.
20          **PRESIDING COMMISSIONER ENG:**  So tell us specific
21    -- is this Overcomers, is it a Twelve Step program?
22          **INMATE SNIDER:**  Yes, it is.
23          **PRESIDING COMMISSIONER ENG:**  Okay.  '
24          **INMATE SNIDER:**  If you look in the back, it has
25    a Step on almost the last page, that you work.

1          **PRESIDING COMMISSIONER ENG:**  This one?

2          **INMATE SNIDER:**  Right there?

3          **DEPUTY COMMISSIONER ESTRADA:**  Oh, Step Ten?

4          **INMATE SNIDER:**  Yes.  It's the same as AA, but

5     it has more of a religious twist on it.

6          **PRESIDING COMMISSIONER ENG:**  All right.  So how

7     do you practice it and how do you get support?  Is all

8     you're getting are these newsletters, is that how it

9     operates?  You get newsletters?

10         **INMATE SNIDER:**  I basically get support from the

11    Word of God.  That's what I've lived by for the last 17

12    years.  I haven't drank in 17 years, and I never plan

13    on ever drinking again.  I'm never going to drink

14    again.

15         **PRESIDING COMMISSIONER ENG:**  Okay.  But again --

16    so it really is strictly based on prayer?

17         **INMATE SNIDER:**  Yes.

18         **PRESIDING COMMISSIONER ENG:**  And nothing else.

19         **INMATE SNIDER:**  And applying what you read, like

20    applying Galatians Chapter 5, Verses 22 and 23, "Of

21    love, joy, peace, patience, kindness, goodness and self

22    control."  And that's what I practice each and every

23    day.  If you drink, you have no control over what

24    you're doing.  Your thoughts are a mess, and I don't

25    believe that's the way to live.

1    **PRESIDING COMMISSIONER ENG:**  Okay.  So if

2    somehow you broke down one day and you got the real

3    urge or something --

4    **INMATE SNIDER:**  We have an urge to sin every

5    day.  It's just a matter of self-control.

6    **PRESIDING COMMISSIONER ENG:**  So do you have any

7    backup plan to this?

8    **INMATE SNIDER:**  I will be attending Overcomers.

9    I do know there is one in Bakersfield.

10   **PRESIDING COMMISSIONER ENG:**  So they do have

11   regular meetings?

12   **INMATE SNIDER:**  Just like AA.

13   **PRESIDING COMMISSIONER ENG:**  See, that's what I

14   was getting at.

15   **INMATE SNIDER:**  Oh, I didn't understand.

16   **PRESIDING COMMISSIONER ENG:**  I had the feeling

17   that all you're getting are these newsletters, and that

18   you're sitting there alone and reading the Bible and

19   praying.  So I want to know what type of people

20   interaction is this?

21   **INMATE SNIDER:**  They have daily meetings, just

22   like AA does.

23   **PRESIDING COMMISSIONER ENG:**  Okay.  All right.

24   That's what I wanted to know about.

25   **INMATE SNIDER:**  One of the pamphlets that you

1    have in my parole plan in Anaheim, that's who I'll
2    contact and find out where their nearest meeting is in
3    Bakersfield.

4        **PRESIDING COMMISSIONER ENG:** So do you have
5    sponsors also that you can call in emergency?

6        **INMATE SNIDER:** I imagine they do. I haven't
7    delved into that yet. I'll do all of that when I am
8    released and will be attending it.

9        **PRESIDING COMMISSIONER ENG:** Go ahead.

10       **DEPUTY COMMISSIONER ESTRADA:** But you don't go
11   to any meetings now?

12       **INMATE SNIDER:** No, I do not.

13       **DEPUTY COMMISSIONER ESTRADA:** There's no group
14   meetings?

15       **INMATE SNIDER:** No.

16       **DEPUTY COMMISSIONER ESTRADA:** You don't have a
17   prevention plan. (Inaudible) a prevention plan, or you
18   don't do that because --

19       **INMATE SNIDER:** It's up to the individual. A
20   person can go to all the meetings they want. They can
21   have ten different sponsors. If it's not in your heart
22   that you're going to do it, you're going to relapse.
23   You've got to make a point in your life at one point
24   say, "No, that's enough."

25       **DEPUTY COMMISSIONER ESTRADA:** But have you

1    developed any skills -- when that voice in your head

2    starts telling you, "It's time to have a drink."

3         **INMATE SNIDER:** I see what you're saying.

4         **DEPUTY COMMISSIONER ESTRADA:** What plans do you

5    have? There's people that work the Steps. What do you

6    do?

7         **INMATE SNIDER:** I trust in God and I trust in

8    the Bible.

9         **DEPUTY COMMISSIONER ESTRADA:** What are your

10   triggers?

11        **INMATE SNIDER:** My triggers?

12        **PRESIDING COMMISSIONER ENG:** The thing that will

13   get you going, that will get that voice in your had

14   going.

15        **INMATE SNIDER:** I don't ever have that any more.

16   No. I don't have the urge to drink and I don't think I

17   ever will have the urge to drink. And if I did --

18        **PRESIDING COMMISSIONER ENG:** And if you do have

19   the urge to drink, what step are you going to take?

20        **INMATE SNIDER:** I looked at my past and see how

21   it's really getting screwed up, then I don't want that

22   to be repeated again.

23        **PRESIDING COMMISSIONER ENG:** I think what we're

24   getting at, sir, is that we've got terrific concerns

25   here, all right? Because you can't get away from your

1    prior record. You've had at least five drunk driving

2    convictions. We don't know if you had more arrests

3    than that, or chances are pretty good that you were

4    drunk driving a lot more than five times.

5         **INMATE SNIDER:** Yes, ma'am.

6         **PRESIDING COMMISSIONER ENG:** Those are just the

7    times that you got caught, so you've got a significant

8    history, and you're lucky you didn't kill anybody or

9    maim anybody while you were behind the wheel of a

10   vehicle, totally inebriated. And then you ended up

11   taking the life of a friend of yours for 15 years, and

12   then almost taking the life of his wife. So we've got

13   a real history of drinking here, and you're going to be

14   facing -- if an when you're given a date, you're going

15   to be facing very, very different stressors in the

16   community than you've ever faced before.

17        **INMATE SNIDER:** Yes.

18        **PRESIDING COMMISSIONER ENG:** And chances are

19   pretty good, you're going to have a lot more

20   temptations to go back to the bottle than what you

21   realize.

22        **INMATE SNIDER:** Again, the individual's trying

23   to have -- like I said, in either AA -- I don't care

24   what group you're in, the individual has to make a

25   choice sometime in life. If you're fed up with it, if

1    you know what you've done, remorseful for what you've

2    done in life, you know that you made numerous past

3    mistakes, and you don't want to repeat them, you're not

4    going to. You're going to run so far away from them;

5    if you have to run away from it.

6         **PRESIDING COMMISSIONER ENG:** We·understand that,

7    and I do believe that you believe that and you mean it;

8    however, sometimes it's out of our control, and it's

9    human nature sometimes, to reach out or do whatever. I

10   mean, we do have weaknesses. What we're stating is

11   that what we want to see are safety nets. Should you

12   find yourself in a situation, what safety nets have you

13   set up for yourself, because humans -- you should know

14   from studying your Bible -- we are flawed; we're not

15   perfect. So we say and we believe and what we try to

16   follow that, but stuff happens. That's where we have

17   to be very concerned about public safety, because when

18   stuff happened with you in the past, it was pretty bad.

19        **INMATE SNIDER:** I was a different person them,

20   yes.

21        **PRESIDING COMMISSIONER ENG:** Well, we were

22   different people ten minutes ago, too, okay. So what

23   we're very concerned about is have you thought this

24   thing out thoroughly enough and what safety nets have

25   you put up for yourself for the worst-case scenario?

1          **INMATE SNIDER:** For 17 years I've done nothing
2     but dwell on it, and I've --

3          **PRESIDING COMMISSIONER ENG:** And like I stated
4     to another inmate earlier this week, I had a situation
5     where I had a heroine addict that had given it up over
6     20 years ago, and then all of a sudden he overdosed in
7     prison. So like I said, stuff happens, and one doesn't
8     ever know. And we see it happen with parolees all the
9     time where they have been off the booze and they go
10    right back out there and bam, drinking. So the
11    pressures -- because life is going to be different,
12    because now trying to find a job, number one, and then
13    when you do find a job, it may not pay you anywhere
14    close to what you think you deserve and what you were
15    even making a long time ago; yet, you need so much more
16    today because of the expenses. So there's a lot of
17    different things, a lot of -- that's what I meant about
18    different stresses that you're going to be faced with.
19    Go ahead.

20         **DEPUTY COMMISSIONER ESTRADA:** But to piggyback
21    on that, you have five convictions, your bank robbery,
22    it said that you had no money; you were drinking. They
23    placed you finally in federal probation and one of the
24    violations was that you were not attending alcohol
25    program. All that concerns us, and here you're doing

58

1   well.  You're doing well.  You're facing eviction.

2   When you go out there, you will have those stressors,

3   but I'm just saying what skills have you developed?

4   When that happens, what are you going to do?

5        **INMATE SNIDER:**  I'll stand on my moral

6   principles of what I've learned from the last 17 years,

7   and I'll be attending Overcomers.  There's other people

8   I can talk to, but I can always -- anybody can say I

9   don't ever foresee that's going to happen.  I mean,

10  anybody can say that, but I have a strong, strong

11  conviction.  It's not going to happen.  I don't -- if

12  I'm thrown in the gutter with nothing, it's still not

13  going to happen.  Believe me, it's not.  I will use the

14  principles I've learned in the Bible, and I will live

15  by it, not matter what.

16       **PRESIDING COMMISSIONER ENG:**  Which we're very

17  happy to hear that, sir, but you're asking Panels to

18  take a leap of faith, and quite frankly, with most of

19  the prisoners and the reasons why you are in prison

20  doing a life term has not been because you have been up

21  front and honest, okay, with yourselves or with anybody

22  else.  So again, we have to be very concerned about

23  documented evidence to support it and presenting the

24  best picture to the Panel as to your thought processes

25  and what you have set up to prevent it.  So just for

59

1    you to think about.  Just for you to think about how

2    you might want to do that.  Go ahead.

3         **DEPUTY COMMISSIONER ESTRADA:**  Have you completed

4    the Anger Management classes?

5         **INMATE SNIDER:**  No.

6         **DEPUTY COMMISSIONER ESTRADA:**  Any reason for

7    that?

8         **INMATE SNIDER:**  I don't have any anger.  I deal

9    with -- like I've said before, I deal with it by self

10   control.

11        **DEPUTY COMMISSIONER ESTRADA:**  I have no further.

12        **PRESIDING COMMISSIONER ENG:**  Well, I have to

13   follow up on that one.  And again, you don't have to

14   answer this, but it just begs this question, sir.  You

15   don't have any anger; why the heck did you kill your

16   friend?

17        **INMATE SNIDER:**  At this point in time, I don't.

18   I did then, yes.

19        **PRESIDING COMMISSIONER ENG:**  Okay.  So you

20   didn't deal with anger issues very effectively; correct

21        **INMATE SNIDER:**  No, that's what I've learned in

22   the past 17 years.  There has to be a starting point of

23   when you start learning and start changing or maturing,

24   and I have.

25        **PRESIDING COMMISSIONER ENG:**  Okay.  What

60

1    specifically, what type of tools have you learned, or
2    have you been able to identify what triggers anger in
3    you?

4         **INMATE SNIDER:**  Pride.

5         **PRESIDING COMMISSIONER ENG:**  Pride?

6         **INMATE SNIDER:**  Ninety percent of anger does
7    come from pride.

8         **PRESIDING COMMISSIONER ENG:**  What about pride?
9    How could somebody trigger your anger?

10        **INMATE SNIDER:**  If you let somebody -- like the
11   principle of what I use of what I wrote in the first
12   one there on Agape Love, it overlooks all that.  You
13   don't let people -- they may be having a bad day, or
14   they might say something snotty to you, or they might
15   say something really derogatory to you, you let it go.
16   You don't pay no attention to it.  You might want to go
17   up to them and ask them, "Is there some way I offended
18   you?"  But you do it on a civil manner.

19        **PRESIDING COMMISSIONER ENG:**  Okay, again, those
20   are great words, and the basic theory behind it is
21   fine.  The bottom line is people respond on any given
22   day at any time very differently, and sometimes it's
23   hard to control those emotions.  So you're just saying
24   that, and we could all sit here and say the same
25   things, but in terms of actions, we often don't follow

61

1    those because we react.  So what specific -- what about
2    you specifically do you think would trigger you to
3    start to get uptight and angry?

4            **INMATE SNIDER:**  I don't --

5            **PRESIDING COMMISSIONER ENG:**  How would somebody
6    -- you said pride.  If somebody said -- what could
7    somebody possibly say that in the past would have riled
8    you?

9            **INMATE SNIDER:**  Well, see, I have to go back
10   again.  For 17 years now, I've practiced a principle
11   that I don't let that happen.  I overlook other
12   peoples' problems.  I overlook, and I'll sit there and
13   talk to them about it.  Instead of taking action, I
14   talk to them about it.  I'll ask them if they're having
15   a bad day, they need something to talk about.  Is there
16   some problem they're going through.  That's the
17   principles I do now, and I've practiced for 17 years
18   now.

19           **PRESIDING COMMISSIONER ENG:**  How would you have
20   avoided this fist fighting yourself, back in '89?

21           **INMATE SNIDER:**  Again, I wasn't a Christian at
22   that time, either.  I didn't till 1990, and I was put
23   into a cell with a person back in Folsom in the '80s
24   which wasn't a very nice person.  I realize that you're
25   looking for an answer of the world's standards and how

62

1    the world lives.  I can't give you that answer.  I can

2    give you of what I've practiced for 17 years now, and

3    what I will practice for the rest of my life.

4        **PRESIDING COMMISSIONER ENG:**  Well, for 17 years,

5    you've been in a highly structure institution.  You've

6    been in prison around other prisoners.

7        **INMATE SNIDER:**  Around a lot of people that's

8    got a lot of problems.

9        **PRESIDING COMMISSIONER ENG:**  Right.

10       **INMATE SNIDER:**  And there's a lot of things said

11   in places like this.  This is not just a Sunday day

12   school.  I don't mean to be rude; it's not a Sunday day

13   school.

14       **PRESIDING COMMISSIONER ENG:**  That's true.

15   That's true.

16       **INMATE SNIDER:**  And you deal with the stress

17   factors every day.  Every day people's got problems.

18   Every day people decide, "I'm not going to do this," or

19   they want to try and bully somebody.  It happens in

20   here every day.  You got to learn to deal with it.

21   It's the same problems you're going to have on the

22   streets, too.

23       **PRESIDING COMMISSIONER ENG:**  Exactly, except

24   you're going to be out on even more stresses, because

25   you're not going to -- you're going to be responsible

63

1    for the roof over your head and the food and everything

2    else about you. You're not going to have your medical

3    just at your fingertips, when you get sick. You're not

4    going to be able to -- unless you decide to go rob a

5    bank again -- which is a concern, that if you don't

6    have enough money, that you're going to resort right

7    back to your old ways.

8         **INMATE SNIDER:** See, that's the point, I've

9    learned to deal with that over the years. That's what

10   a person has to do. That's what this is all about.

11   You have to learn to deal with it. How are you going

12   to approach it? You're going to look ahead. Like you

13   just said, those things are going to arise, but you

14   better learn now how you're going to deal with it

15   instead of that moment that you've got to decide how

16   I'm going to deal with it. Well, I've done that. I

17   know how I'm going to deal with it, and it's not going

18   to be in a destructive manner.

19        **PRESIDING COMMISSIONER ENG:** So what do you

20   think about when you hear your old friend's name,

21   James?

22        **INMATE SNIDER:** Sorrow. Sorrow. It was a fight

23   that got way out of control, and I didn't think. I

24   don't want to get back into the crime. The trial

25   transcripts speak for themselves, but I've dealt with

64

1    that at three other hearings.  This is the fourth one.

2    Granted, I should have handled it a different way, and

3    I realize now I should have.  It was a matter of

4    seconds, and I didn't react right.  And I agree, it was

5    alcohol played a big part in it, and that's why I will

6    never in my life touch alcohol again.

7         **PRESIDING COMMISSIONER ENG:**  Well, alcohol

8    allowed you to drop your inhibitions.

9         **INMATE SNIDER:**  It always you to --

10        **PRESIDING COMMISSIONER ENG:**  But it didn't cause

11   you to take a life.  You did that.  There's something

12   in your character, so what's changed in your basic

13   character?  A lot of people drink, sir.  A lot of

14   people get drunk.  A lot of people do drugs.  They

15   don't all go and take a life.

16        **INMATE SNIDER:**  Like I said, I --

17        **PRESIDING COMMISSIONER ENG:**  So what is it about

18   you?  What is it about your basic personality and your

19   characteristic that allowed you to take one life --

20   well, actually you took two lives.  You took a dog's

21   life and you took your friend's life and then you

22   almost took the life of his wife?

23        **INMATE SNIDER:**  I committed a sin that's beyond

24   reproach.  I took a human life.  You can't correct

25   that.

65

1          **PRESIDING COMMISSIONER ENG:** We know that, but
2     I'm asking you, what in your personality do you think
3     allowed you to do that?

4          **INMATE SNIDER:** As I go back to it again, pride.
5     Pride in the middle of an argument and fight. I let it
6     get the better of me, and it just got out of control.

7          **PRESIDING COMMISSIONER ENG:** But what have you
8     identified about you yourself versus for instance,
9     myself or anybody else in this room where we get angry,
10    but we don't pick up a gun and shoot somebody and kill
11    them? So what's the difference?

12         **INMATE SNIDER:** See, if I say any more about it,
13    I'm going to be getting back into the crime again.

14         **PRESIDING COMMISSIONER ENG:** No, we're not.
15    We're talking about a situation where what about you?
16    You said that you've gone through all these changes in
17    prison, and you'll never do it again, but how do you
18    know, because basically, there's something about you
19    that allowed yourself to take a life like that.

20         **INMATE SNIDER:** The way I believe now, I'd let
21    my life be taken before I took another one, and that's
22    the truth. That is the truth. I know it's maybe hard
23    for you to believe me, but that is the truth, and I
24    will never pick up a weapon again. I don't care if
25    it's a toothpick. It'll never happen again in my

66

1    lifetime.

2        **PRESIDING COMMISSIONER ENG:**  Do you have any
3    other questions?

4        **DEPUTY COMMISSIONER ESTRADA:**  I have no more
5    questions.

6        **PRESIDING COMMISSIONER ENG:**  Okay, all right.
7    Mr. Lulejian, do you have any questions that you would
8    like posed to Mr. Snider through the Panel?

9        **DEPUTY DISTRICT ATTORNEY LULEJIAN:**  Since there
10   is an invocation of the right not to speak about the
11   incident, I have no questions.

12       **PRESIDING COMMISSIONER ENG:**  Thank you.  Miss
13   Akpenyi, any follow-up questions to ask of your client?

14       **PRESIDING COMMISSIONER ENG:**  No, I have no
15   questions.

16       **PRESIDING COMMISSIONER ENG:**  Let's move into
17   final statements then.  Mr. Lulejian?

18       **DEPUTY DISTRICT ATTORNEY LULEJIAN:**  Thank you
19   very much for this opportunity.  There's two different
20   aspects of this that should be addressed.  First of
21   course, is the punishment aspects, and I don't want to
22   focus on that, but I don't think the number of years
23   he's been in prison really pays back for the crime
24   that's been committed.  Instead, I want to focus on the
25   public safety aspects of this, because I think that's

67

1    the most important aspect for this Panel to consider.
2    The problems that led to this crime, as far as I can
3    see from the material that's been I the files, and from
4    what I've seen from all the information that's
5    available to this Panel, there's never really been any
6    ascertainment of what caused this event.  Certainly
7    alcohol related to an underlying inhibition of
8    reduction, but it didn't display exactly why this
9    occurred.  There was a pattern of increasing violence
10   in the prisoner's background, but we don't know exactly
11   what it was that made all this happen.  As the Chairman
12   indicated, people drink and they don't always kill
13   people, so that we just don't understand what it was.
14   Therefore, we can say that it has not been addressed by
15   the inmate since the time of the crime.  That leaves
16   him in a position where he doesn't understand what it
17   was that caused it, and therefore he cannot be
18   rehabilitated from whatever it was that caused it.  We
19   also had no indication at all that Mr. Snider has
20   addressed that particular issue, and I think what we
21   see here is a very good and honest and sincere
22   conviction, but we also have a naïve reliance on his
23   intellect to be the basis for why he will not commit
24   another crime if released.  He's relying on his
25   intellect when it is in fact the emotional self that's

68

1    going to be the teller of the tale here as to whether

2    he does well out on parole or not.  The emotional self

3    has not been addressed at all.  He's naively relying on

4    his intellect to overcome what is a much more powerful

5    force in his life of anger and of drinking.  There's

6    also no indication that he's properly prepared himself

7    for a more stressful existence in society.  As

8    indicated by the Chairman's questions, he's not

9    provided for any relapse backup plans.  He's had no

10   anger management.  He has some sort of marginal

11   alcoholic rehabilitation, which even if followed, is

12   not going to be sufficient in and of itself.  He needs

13   a support group.  He needs people who are there to help

14   him, and he needs to know that they are there at all

15   times.  Mr. Snider would be walking essentially into a

16   society entirely unprepared to take care of himself.

17   He has no job waiting for him.  He has no housing or

18   family available in California as of this moment.  He's

19   a person if you could look at him, he's a person of

20   very good convictions.  He has a long time to have

21   thought about his crimes, but it's a little like taking

22   a child of eight years who cannot swim, and he's asking

23   you to throw him to the deep end of a pool.  He does

24   not realize what he's in for.  He really doesn't.  He's

25   not prepared for it.  He does admit that he is an

69

1    alcoholic.  That puts two strikes against him already

2    because of the tendency it's going to be to continue to

3    drink.  Where other people may have other ways to

4    relieve stress, he's always going to be tempted to

5    bring back alcohol as a basis for taking care of the

6    stressors that are going to be at him every minute as

7    he's out in the real world.  So there's more here than

8    the normal person.  He's not starting from square one;

9    he's starting from a position of being an alcoholic.

10   Also, if he were out on parole, it only takes a time

11   when he feels he's not going to be watched for a few

12   days where he could take that first drink, which is

13   always what leads to the second drink and the third and

14   so on and leads him back to his prior patterns of

15   alcoholism.  And we know that that's going to happen on

16   parole.  There will be times when he's just simply not

17   going to be watched for a day or three or four.  He

18   knows he can take that drink and never really be

19   discovered, if he takes that first one, and that's

20   what's going to lead him to the rest.  Of course, once

21   he starts drinking if he does, then he's going to be in

22   a position to where he knows that he's going back to

23   prison probably for the rest of his life, because he

24   can't be trusted out in the real world, and so his only

25   other real option would be to abscond.  I asked the

70

1    Panel specifically to consider that his very good
2    performance in prison is going to tend to mislead the
3    Panel into believing he's going to do well on the
4    outside world.  He's done well in a very controlled
5    environment, and so he's thinking in his own mind and
6    he's asking the Panel to also believe that's going to
7    translate out into real society.  He will not be in an
8    environment in real society in which alcohol does not
9    exist.  He's not going to have his basic needs met by
10   prison.  He's probably going to be very much,
11   unfortunately, in a position where he's not going to be
12   able to make enough money to even afford housing.  So
13   he's probably going to be in the ranks of the homeless
14   at some point in our society, and the stresses on those
15   people are greatly magnified to people who have housing
16   and have sufficient resources available.  So what we're
17   going to say by all that we're going to be giving if we
18   put him out on parole is he's going to significantly
19   increase his stress in life, and he's already an
20   existing alcoholic.  His alcohol has led to a heinous
21   crime in the past.  He has unfortunately a naïve idea
22   about how to deal with that.  So essentially, we're
23   setting him up for failure, and maybe a continued
24   pattern of escalating violent crime as he did before,
25   or alternatively a DUI homicide, which other people

71

1    were killed because his problem gets out of control and
2    he doesn't want to kill anybody else, but ultimately
3    does.  I would submit no that, your Honors.

4         **PRESIDING COMMISSIONER ENG:**  Thank you, sir.
5    Miss Akpenyi, final statement?

6         **ATTORNEY AKPENYI:**  Thank you.  I'm going to
7    start with his disciplinary record, which is
8    impeccable.  He has only one 115 rule violation for
9    fighting in 1989 and one negative chrono, 128 negative
10   chromo in 1992.  He has been free of any write-ups for
11   several years, and this is highly commendable.  Yes,
12   this is a highly structured institution, as
13   Commissioner noted, yet you see people constantly and
14   continuously get serious disciplinary issues and
15   serious 115s.  Prison has walls that are at the deep
16   end of the pool, as the D.A. indicated, but he's able
17   to survive that, based on his record.  If that was
18   otherwise, he would have more write-ups.  And he had a
19   serious alcohol addiction prior to incarceration.  Time
20   and time again I come before Panels who say, "What
21   about reports for the inmate?  Overcomers Outreach is a
22   prisoner's based self-help program.  He has provided a
23   book report.  If it wasn't taken that seriously, there
24   would not be any book report, and he's been able to
25   explain that.  He put out a Bible version.  Pruno is

72

1    here.   The temptation is there.  As the D.A. said, it's
2    not just on the street.  I don't know if he is aware of
3    that.  Pruno is available; we all know that.  People
4    get 115s for that, either manufacturing, selling,
5    consuming, but that's not what we have here.  He does
6    not have any 115, not a single one that we list as
7    alcohol or substance abuse.  There's stress in prison
8    as well.  He's been able to handle that.  He gets along
9    obviously well with management, with other inmates, so
10   I think he's prepared himself for any stressful
11   encounters that would be on the streets.  He's had a
12   very favorable psych report by Dr. MacComber that's
13   dated 6/27/06.  He does not have any personality
14   disorder.  His Global Assessment mental functioning is
15   95, very impressive.  That's almost a perfect score out
16   of 100.  Now, I'm going to read into the record part of
17   what the clinician noted.
18              "In order to determine current risk
19              level on parole, the level of seven is
20              inventory revised was administered.
21              This is a actual measure that assesses
22              criminal history.  In this case
23              (significant) meaning in his, based on
24              his history, 'substance abuse history,
25              current attitudes, achievements in

73

| | |
|---|---|
| 1 | prison in order to determine current |
| 2 | risk level on parole.'  He obtained a |
| 3 | score of 6.6 cumulative frequency for |
| 4 | prison inmates.  This scores means that |
| 5 | if 100 men were released on parole, he |
| 6 | would be expected to do better on |
| 7 | parole than 93.4 of them.  This risk |
| 8 | level is primarily based upon his |
| 9 | criminal arrest record; however, this |
| 10 | actual measure does not account for the |
| 11 | maturity and social awareness that |
| 12 | comes with age.  These factors would |
| 13 | decrease his risk level below the |
| 14 | figures noted above.  As a result, he |
| 15 | poses no more risk to society than the |
| 16 | average citizen in the community.  In |
| 17 | fact, based upon his maturity, strongly |
| 18 | self-preserved values and commitment to |
| 19 | lead a life that is honoring to God and |
| 20 | men, his first level is undoubtedly |
| 21 | lower than the average citizen in the |
| 22 | community. |
| 23 | And he concludes, stating that:  "The prognosis for |
| 24 | successful adjustment in the community is excellent." |
| 25 | Now, this is an expert psychologist appointed by the |

74

1    State who has looked at his criminal history and is
2    making this recommendation.  So obviously he's
3    considered his past criminal history, the current one,
4    any disciplinary issues that he has, and I think that
5    ought to be highly considered.  If you look at the
6    prior psych report, it was favorable as well.  This
7    pscyh report dated 10/20/00, and I quote under
8    Recommendations:

9              "Inmate Snider has made some profound
10             changes in his life.  He's a very
11             devoted Christian now.  It is unlikely
12             that he'll ever again engage in
13             violence.  His desire now is to be
14             released so that he can become a useful
15             and productive citizen."

16   This is now two experts working for the State, who have
17   examined this man, and that is their conclusion.  I
18   don't think it's based on what the D.A. says, that what
19   he's doing in here is naïve, or that the stress on the
20   street when somebody's paroled.  These experts
21   considered those as well, and I think their opinion
22   should weigh more than what the D.A. is saying.  We've
23   addressed his criminal behavior and criminal history.
24   He's remorseful.  It's stated in the psych report, and
25   again, he had a serious alcohol abuse problem.  He did

75

1    talk about pride, alcohol being factors, so I don't
2    think that no matter what is asked today of him, he
3    knows the causative factors. He's addressed that.
4    He's tried to explain it to the best of his ability,
5    the best way that he can. He has expressed remorse,
6    and again, like he said in the past, when one has an
7    issue, if substance abuse or alcohol, you just don't
8    express the remorse verbally, your actions also
9    demonstrate the remorse. In this case, he's been sober
10   for several years, and that is remorse in itself, and
11   he discussed that today. He will never do that again.
12   It's not just by his words, saying it to you, but
13   actions. He has not even turned back. He has been
14   committed to sobriety since incarceration. There's no
15   115 on record, saying that he's gone back on that.
16   Parole plans, he's done an excellent job in my opinion.
17   He hasn't come before the Board to say, "I have no
18   family here," but he put that together. That was
19   impressive, and in that, even the D.A. talks about
20   realized plans, they're all listed there, places that
21   he can go to. Time and time again I sit upon and ask
22   for a list. He has done that. He hasn't come to say,
23   "You know what, when I go out, I'll join this group."
24   Well, he's done his research by providing the places
25   that he would like to go, because he knows that is a

76

1    continuous problem. This is something that is going to

2    continue the rest of his life addressing, so he's

3    preparing himself with a realized plan. I don't think

4    that's lacking in here. It's in that packet. It's in

5    there. I don't know if you missed it, but if you go

6    back when you're deliberating and look at it, it's in

7    there. He has contacted several, several -- even when

8    I met him during the intake we had sent out letters.

9    And we know sometimes these people do not reply

10    immediately. It is something that he's going to have

11    to keep doing, but I don't think that he's just head

12    back and said, "The last plan, I seemed to firm it up."

13    He's done that. He's done the best of his ability, the

14    best he can. So I don't think that in that regard that

15    he hasn't made any effort, and I hope that the Panel

16    considers that. And if he's not found suitable today

17    and a denial of more than one year is assessed, then I

18    ask the Panel to please state circumstances that have

19    changed to justify a longer time. Thank you.

20    **PRESIDING COMMISSIONER ENG:** Okay, Mr. Snider,

21    would you like make a final statement to the Panel?

22    **INMATE SNIDER:** Yes, ma'am. I realize the

23    crime that I committed at one point in time, I can

24    always look back and say I should have done things

25    differently. I did state that alcohol played a problem

77

1   in that.  I stated more than six times, it will never

2   happen again.  Alcohol is no more even effect in my

3   lifetime.  I'm sorry for what I did to Jim and Terry.

4   I know the circumstances that led up to it.  I know

5   there is no justification for it, not for taking a

6   human life.  That's the worst thing anybody can do.

7   You can't give it back to the person.  They have no

8   chance to live their life out again.  I wish I could.

9   I can't.  Thank you.

10          **PRESIDING COMMISSIONER ENG:**  We'll now recess

11   for deliberations.  The time is 10:41.

12                      **R E C E S S**

13                      --o0o--

14

15

16

78

```
1              CALIFORNIA BOARD OF PAROLE HEARINGS
2                      D E C I S I O N
3         DEPUTY COMMISSIONER ESTRADA:  We're on.
4         PRESIDING COMMISSIONER ENG:  Thank you.  The
5    time is 10:55.  All parties that were present prior to
6    our recess for deliberations have since returned.  In
7    the matter of James Snider, CDC number D38950, the
8    Panel has reviewed all the information received from
9    the public and relied on the following circumstances in
10   concluding that the prisoner are not suitable for
11   parole and would pose an unreasonable risk of danger to
12   society or a threat to public safety if released from
13   prison.  One of the many factors that this Panel did
14   consider does go back to the commitment offense itself.
15   We found that the offense was carried out in a very,
16   very cruel, very callous manner.  There was definitely
17   an element of trust between Mr. Snider and these
18   victims.  After all, he had a history of a 15-year
19   friendship with the deceased.  In the commitment
20   offense, we had multiple victims that were involved in
21   this.  It happened, the whole family.  His good friend,
22   James Brauninger, ended up losing his life in the same
23   incident.  Their family dog ended up losing his life,
24   and then Mr. Brauninger's wife, Teresa, ended up being
25   JAMES SNIDER   D-38950    DECISION PAGE 1    8/17/07
```

79

1    seriously wounded, all in this same incident.  It
2    really was carried out in a manner that shows a total
3    disregard for not just human suffering but also human
4    life, and after this shooting in this Motel 6, Mr.
5    Snider took off in the victim's vehicle.  The motive
6    for this crime, this Panel discussed it during our
7    deliberations, and based on what we read, we really
8    have no idea what the motive was for these people being
9    attacked the way they were, and for Mr. Brauninger to
10   lose his life, except for what the prisoner had stated,
11   that it had to do with we believe pride.  But it really
12   is, in any event, very trivial in relation to the
13   results of this offense, and again, these conclusions
14   are drawn from the statement of facts; wherein on I
15   believe it was the early morning hours of 9/8/85, that
16   it was reported that shots had been fired at this Motel
17   6 and that it turned out that Mrs. Brauninger stated
18   that when Mr. Brauninger and Mr. Snider had argued
19   about Mr. Snider's drinking and his behavior, and that
20   Mr. Brauninger told Mr. Snider to pack his belongings
21   and leave, victim, Mrs. Brauninger, stated that Mr.
22   Snider did begin packing and then started shooting at
23   her, the victim and their pet dog, Easter, who was also
24   in the room, and she also stated that Mr. Snider ended
25   **JAMES SNIDER    D-38950    DECISION PAGE 2    8/17/07**

80

1    up leaving the motel in the victim's Dodge pickup truck

2    and he was pulled over in that vehicle.  Regarding this

3    prisoner's prior record, he does have an extensive

4    record of priors, dating back to I believe it was 1973,

5    and it's definitely an escalating pattern of criminal

6    conduct.  He has failed previous grants of probation.

7    He's failed to profit from society's previous attempts

8    to correct his criminality.  Such attempts do include

9    adult probation, county jail, and a prior federal

10   prison term.  Part of his prior criminality includes,

11   we believe it's, I think it was five drunk driving

12   convictions.  There was also a burglary arrest back in

13   Nassau County, New York, which the prisoner ended up

14   pleading guilty to attempted conspiracy, and then a

15   prior to the murder, the Life Crime, he was convicted

16   of a bank robbery in federal court.  He received five

17   years' federal probation and ended up with his first

18   prison term in federal prison, again, just prior to the

19   instant offense.  Regarding institutional behavior,

20   this Panel finds that the prisoner has programmed in a

21   limited manner while incarcerated, and he has not

22   sufficiently participated in beneficial self-help.  His

23   misconduct while incarcerated does include one 128A

24   counseling chrono that dates back to August 1992 for

25   **JAMES SNIDER    D-38950    DECISION PAGE 3    8/17/07**

81

1    being absent from work, and he only has one more
2    serious 115 disciplinary, dating back to January 1989,
3    for a fist fight in his cell. We find that the
4    psychological evaluation by Dr. MacComber is adequate.
5    Regarding parole plans, this prisoner does not have
6    realistic parole plans. He does not have any viable
7    residential plans, nor does he have any acceptable
8    employment plans at this time, and we're not sure about
9    what marketable skills that he would be putting to work
10   on the outside at this point in time. Regarding 3042
11   responses, the Panel does note that the representative
12   from the District Attorney's Office of Santa Barbara
13   County was present and did state their opposition to
14   release. Panel also recognizes that we are in receipt
15   of a letter from the City of Lompoc Police Department,
16   also stating their opposition to parole. The Panel
17   makes the following findings, that this prisoner does
18   need more documented self-help in order to face,
19   discuss, understand and cope with stress and anger in a
20   non-destructive manner. Until progress is made, this
21   prisoner continues to be unpredictable and a threat to
22   others. However, this Panel believes that the prisoner
23   should be commended for his independent Bible studies,
24   obtaining his GED back in 1994, and we do recognize
25   **JAMES SNIDER   D-38950   DECISION PAGE 4   8/17/07**

82

1    that he did receive his vocation in Information

2    Technology, even though that was back in 2001, and we

3    didn't really get into discussing how he has been

4    keeping up or keeping that updated, or if he could have

5    reused that on the outside; but also for his ongoing

6    very positive work reports.  However, these positive

7    aspects of his  behavior do not outweigh the factors of

8    unsuitability.  This is a two-year denial.  In a

9    separate decision, the Hearing Panel finds that it is

10   not reasonable to expect that parole will be granted at

11   a hearing during the following two years.  Specific

12   reasons for this finding are as follows:  We find again

13   that this prisoner committed the offense in a very,

14   very cruel manner.  He violated a trust with an old

15   friend of his; specifically, he chose to arm himself

16   and take the life of his friend, James.  He attempted

17   to take the life of James's wife, Teresa, and he did

18   take the life of their dog.  Again, multiple victims

19   were involved in the same incident, where one ended up

20   being killed.  And again, this showed a total disregard

21   for human suffering and human life, and the motive we

22   find is inexplicable.  Again, this prisoner does have

23   an extensive history of criminality and misconduct that

24   includes five convictions for drunk driving and also

25   **JAMES SNIDER    D-38950    DECISION PAGE 5    8/17/07**

83

1    pled guilty to attempted conspiracy, even though he was
2    arrested for burglary, third degree, which was a felony
3    back in Nassau County, New York, and the fact that he
4    was convicted of bank robbery in federal court and did
5    do a federal prison term. This prisoner has not
6    completed necessary program that's essential to his
7    adjustment, and he needs additional time to gain this
8    programming. It's not to say, sir, that we don't
9    recognize your independent studies, but I'm going to be
10   frank with you. It isn't enough to say, because I pray
11   and I believe in God that that's going to prevent me
12   from ever committing a crime or being a threat to the
13   public or anyone else in the future. I'm going to be
14   honest with you. I would not feel comfortable signing
15   my name to a grant, and hoping and praying that God
16   forbid, anything would happen and you'd return to the
17   bottle and you'd kill somebody else. I wouldn't want
18   to have that on my conscience. The other thing that
19   has this Panel, gives us great, great concern, is we
20   don't believe you have any insight whatsoever into this
21   crime, into what made you do this, and if you did, then
22   you're keeping it pretty well hidden, because you
23   certainly weren't able to discuss it with us. And
24   again, without a Panel really truly understanding and
25   **JAMES SNIDER    D-38950    DECISION PAGE 6    8/17/07**

84

1    being able to discuss your insight into what caused you
2    to do what you did, we have no way of knowing how you
3    can even address whether or not you can even correct
4    that in the future. And again, you're asking this
5    Panel to take a leap of faith. Bottom line is, you are
6    a convicted murderer. If you were sitting in this
7    seat, what would you expect to see and hear? Again, if
8    someone had murdered one of your children, what would
9    you expect to see from their convicted murderer sitting
10   across the table from you? But again, this is
11   something, and this is one of the reasons why we felt
12   that additional time is needed before any Board would
13   find you suitable for parole. You do need additional
14   time, not only to firm up your parole plans and to
15   determine -- and again, you don't have to do any of
16   these things. The choice is your. You made the
17   choices that you made that got you into prison, doing
18   another prison term in California besides the federal
19   one. You made all those choices, all the decisions.
20   Now you have to make the decision about what you really
21   need to do, what you really need to address, if you
22   really want to get a parole date some day, and to
23   really firm up those parole plans; again, having
24   primary, secondary, a lot of different backup plans,
25   **JAMES SNIDER   D-38950   DECISION PAGE 7   8/17/07**

85

1    having solid, solid plans, and what are you going to do
2    in terms of setting up a safety net for yourself in the
3    community.  And we do note that you have been doing
4    that, the other programming, instead of AA, and
5    whatever works for you, as long as it's working.  But
6    again, anything else that you're going to go through
7    can only help you if you can come in and explain to the
8    next panel why you've chosen certain programs and what
9    have you learned?  How you applying anything that
10   you've learned to ensure that you wouldn't revert back.
11   So that's why we felt you do need extra time, and
12   again, we've gone back and we saw all the other
13   previous decisions, and that you still had very rather
14   weak parole plans, and you still have been maintaining
15   in what we felt limited programming in the institution,
16   self-help.  So we do recommend that you remain
17   disciplinary free and that if available that you
18   participate in any and all types of self-help and
19   programming, because whatever you can attend hopefully
20   can give you -- can only be to your benefit.  And you
21   might get something different out of it than what
22   anybody else might, but it can only be a benefit,
23   that's what we feel.  So that basically concludes the
24   reading of the decision.  I wish you luck, sir.  I'm
25   **JAMES SNIDER    D-38950      DECISION PAGE 8    8/17/07**

86

1    going to ask if my fellow Commissioner has anything

2    he'd like to add?

3          **DEPUTY COMMISSIONER ESTRADA:**  Good luck to you,

4    Mr. Snider.

5          **INMATE SNIDER:**    Thank you.

6          **PRESIDING COMMISSIONER ENG:**  Time is 11:07.

7    Thank you.

8                  **A D J O U R N M E N T**

9                        --o0o--

10

11

12

13

14

15

16

17

18

19

20

21   **PAROLE DENIED TWO YEARS**

22   **THIS DECISION WILL BE FINAL ON:**   **DEC 1 5 2007**

23   **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

24   **DATE, THE DECISION IS MODIFIED.**

25   **JAMES SNIDER   D-38950    DECISION PAGE 9    8/17/07**

# EXHIBIT B

INMATE COPY

**MENTAL HEALTH EVALUATION FOR**
**THE BOARD OF PRISON HEARINGS**
**August, 2006 Lifer Calendar**

**CORRECTIONAL TRAINING FACILITY SOLEDAD**
**JUNE, 2006**

| | |
|---|---|
| **NAME:** | **SNIDER, JAMES** |
| **CDC#:** | **D-38950** |
| **DOB:** | **2/2/50** |
| **OFFENSE:** | **PC 187 MURDER, SECOND DEGREE, PLUS ATTEMPTED MURDER CONSEQUTIVELY** |
| **DATE OF OFFENSE:** | **9/8/85** |
| **SENTENCE:** | **15 YEARS TO LIFE, PLUS 9 YEARS** |
| **MEPD:** | **3/28/01** |
| **EVALUATION DATE:** | **6/27/06** |

## I.    IDENTIFYING INFORMATION:

Mr. James Snider is a 56 year old, first term, divorced, Caucasian male convicted in Santa Barbara County. He is a Christian. He has served 20 years in custody.

### SOURCES OF INFORMATION:

This evaluation is based upon a single two hour interview, plus review of the central and medical files.

The psychological evaluation, dated 10/20/00, by Dr. Bakeman, Psychologist at CTF-Soledad, contains a Psychosocial Assessment. This information was reviewed with the inmate and is still current and valid. As a result, this information will not be repeated at this time.

B

SNIDER, JAMES
D-38950
6/27/06
PAGE 2

## CLINICAL ASSESSMENT

### XII.    CURRENT MENTAL STATUS/TREATMENT NEEDS

Mr. Snider related during the interview in a serious, sober, earnest, open and
cooperative manner. His mental status was within normal limits. There was no
evidence of any mental or emotional problems. Intellectually, he was functioning
in the high average ranges. His memory was intact. His judgment was intact.
His insight and self-awareness were very good.

Mr. Snider openly admitted that he had a serious alcohol abuse problem at the
time of the commitment offense. His state of extreme intoxication was directly
related to his actions in the commitment offense. He has attended Alcoholics
Anonymous over the years. He continues to participate in a rehabilitation 12-step
program sponsored by the "Overcomers Outreach." This is a 12-step program
that is based upon the Bible and involves Bible study. He practices this program
on a regular basis. He has remained clean and sober for 17 years. This is a
commendable achievement, because there are drugs and alcohol available in the
institutional environment if a person wants to use them. He has a very firm
commitment to total sobriety. He stated that he is totally committed to the
instruction and doctrines of God's Word, the Bible, which requires a Christian to
maintain a sober life. Maintaining a state of sobriety is essential to his Christian
walk, Christian growth and obedience to God's Word. The Bible teaches that
wine or alcohol is a mocker and strong drink is raging, and whosoever is deceived
thereby is not wise. Alcohol use is not part of the Christian life. His
determination to remain clean and sober is convincing and genuine. Due to his
years of sobriety, and due to his strong commitment to his rehabilitation program,
alcohol abuse is certainly not a current problem in his life. Therefore, this label is
not appropriate at this time.

Mr. Snider has completed Vocational Data Processing. He also has employable
skills in the area of plumbing, a trade in which he worked in the institution for
two years. He also has skills as a painter and glazier. Also, in the community, he
worked as a technical writer for 15 years.

### CURRENT DIAGNOSTIC IMPRESSION

Axis I:       No mental disorder
Axis II:      No personality disorder
Axis III:     No physical disorder
Axis IV:      Life term incarceration
Axis V:       Current GAF: 95

SNIDER, JAMES
D-38950
6/27/06
PAGE 3

### XIII.  REVIEW OF LIFE CRIME

Mr. Snider accepts full responsibility for the commitment offense. He stated that both the victim and himself had been drinking at that time. He stated that they got involved in a verbal argument that escalated, due to their intoxicated condition. He stated that their argument became totally out of control. In the midst of this argument, he stated that he shot the victim and the victim's wife. He also shot the dog when the dog attacked him. He said that he takes full responsibility for his actions. He stated that this was all his fault. He should have handled it differently. He stated that, "There is no justification for what I did. I took a human life and there is no excuse for that."

The causal factors in this offense were his condition of extreme intoxication on alcohol at the time. This condition had a negative effect upon his judgment, understanding of events, and inhibitions, as well as impulse control. Mr. Snider knows how destructive use of alcohol can be. He has developed very strong values against any use of alcohol. His feelings of remorse and sorrow about this event, and the fact that he caused the death of the victim, as well as injury to his wife, appear to be quite sincere and genuine. He stated that if he has to spend the rest of his life in prison, he is willing to do this, because of the enormity of what he did.

### XIV.  ASSESSMENT OF DANGEROUSNESS

A.  In considering potential for dangerous behavior in the institution, Mr. Snider has remained free from any disciplinaries since 1989. He has never been involved in institutional riots, possession of weapons, assaults on others or other aggressive activities since that time. He stated that at that time, he gave his life to Christ and his life changed dramatically in a positive way. At this point in time, compared to other inmates, potential for dangerous behavior is definitely below average.

B.  In considering potential for dangerous behavior when released to the community, Mr. Snider does have a pre-conviction history of driving under the influence of alcohol, as well as two acts of crime, one a burglary and one a robbery, while under the influence of alcohol. He stated that he was an entirely different person at that time in his life before he accepted Christ as Savior and began living a Christian life. At this point in time, he has aged over the years, grown in maturity, self-control, insight and awareness and greater understanding. He is determined to please God by his good behavior and to get along with his fellow men, not doing injury to anyone, but only being a blessing to them. In order to determine current

SNIDER, JAMES
D-38950
6/27/06
PAGE 4

risk level on parole, the Level of Service Inventory-Revised was administered. This is an actuarial measure that assesses criminal history (in this case significant), substance abuse history, current attitudes, and achievements in prison in order to determine current risk level on parole. He obtained a score of 6.6 cumulative frequency for prison inmates. This score means that if 100 men were released on parole, he would be expected to do better on parole than 93.4 of them. This risk level is primarily based upon his criminal arrest record. However, this actuarial measure does not account for the maturity and social awareness that comes with age. These factors would decrease his risk level below the figures noted above. As a result, he poses no more risk to society than the average citizen in the community. In fact, based upon his maturity, strongly held Christian values and commitment to lead a life that is honoring to God and man, his risk level is undoubtedly lower than the average citizen in the community.

C. There are no significant risk factors at this time.

## XV.  CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS

There are no mental or emotional problems in this case that would interfere with routine release planning. Mr. Snider has vocational skills that will enable him to secure and maintain employment in the community upon his release. Mr. Snider has a very strong work ethic. He has worked throughout his lifetime, and he will continue to work when he is released on parole. He has written to several halfway houses and Christian programs for residence and employment in the San Diego community, where he has lived most of his life. The prognosis for successful adjustment in the community is excellent.

M. Macomber, Ph.D.
Correctional Psychologist
Correctional Training Facility, Soledad

B. Zika, Ph.D.
Senior Psychologist
Correctional Training Facility, Soledad

# EXHIBIT C

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
MAY 2000 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
OCTOBER 20, 2000

This is a psychological evaluation for the Board of Prison
Terms on inmate James Snider, CDC# D-38950. This report
consisted of an interview of the inmate and a review of his
Central file and medical record. This interview was
conducted solely for the purpose of this report and was
performed on 10/20/00.

### PSYCHOSOCIAL ASSESSMENT

I.   **IDENTIFYING INFORMATION:**

Inmate Snider is a 50-year-old, single, Caucasian male.
His date of birth is 02/02/50. His religious
affiliation is Protestant. He had no obvious unusual
physical characteristics. He denied using any
nicknames or aliases.

II.  **DEVELOPMENTAL HISTORY:**

He denied any significant childhood medical history or
history of cruelty to animals. He denied any
significant childhood history of physical or sexual
abuse as either a perpetrator or a victim.

III. **EDUCATIONAL HISTORY:**

Inmate Snider has a GED and he is currently studying
vocational data processing.

IV.  **FAMILY HISTORY:**

He said there was no significant legal or criminal
history in his family. He said his relationship with
all family members is good.

SNIDER      D-38950      CTF-CENTRAL      10/20/00      gmj      E

SNIDER, JAMES
CDC NUMBER:  D-38950
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO


V.    <u>PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION</u>:

Inmate Snider is a heterosexual male who denied any
history of high-risk sexual behavior or sexual
aggression.

VI.   <u>MARITAL HISTORY</u>:

Inmate Snider has been married twice, in 1967 and again
in 1975.  Both marriages ended in divorce.  He has
three children and has a good relationship with all of
them.

VII.  <u>MILITARY HISTORY</u>:

He denied any military history.

VIII. <u>EMPLOYMENT AND INCOME HISTORY</u>:

Inmate Snider was a technical writer for aircraft for
15 years.  He has also been in a drafting class and has
worked in plumbing, as a painter, and as a glazier.  He
is currently in vocational data processing.

IX.   <u>SUBSTANCE ABUSE HISTORY</u>:

Inmate Snider acknowledges having had a problem with
alcohol.  He has not been in any treatment programs on
the outside, but he does attend Alcoholics Anonymous
here at the prison.  He does not feel that alcohol is a
problem for him now.

X.    <u>PSYCHIATRIC AND MEDICAL HISTORY</u>:

Inmate Snider denied any significant psychiatric or
medical history.  He has no history of seizures or
other neurological conditions.  He is not currently
taking any medication.

XI.   <u>PLANS IF GRANTED RELEASE</u>:

If granted release, he plans to stay with a family in
Garden Grove, California.  He has been offered a job as
a welder in that area.


SNIDER      D-38950      CTF-CENTRAL      10/20/00      gmj

SNIDER, JAMES
CDC NUMBER:  D-38950
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

## CLINICAL ASSESSMENT

### XII.  CURRENT MENTAL STATUS/TREATMENT NEEDS:

Inmate Snider was appropriately dressed and groomed,
normal in appearance, and fully cooperative during the
interview.  His posture and gait were normal.  His
speech was normal.  His mood and affect were normal.
His flow of thought was normal with no hallucinations
nor delusions noted.  He is able to understand,
remember and carry out simple instructions.  He is able
to relate normally to other people.  His insight and
judgment appeared to be sound.

### CURRENT DIAGNOSTIC IMPRESSIONS  (DSM-IV):

| | |
|---|---|
| AXIS I: | Alcohol Abuse, Episodic, in remission. |
| AXIS II: | V71.09 - No Contributory Personality Disorder nor Intellectual Disorder. |
| AXIS III: | No Contributory Physical Disorder. |
| AXIS IV: | Incarceration. |
| AXIS V: | GAF = 95. |

### XIII. REVIEW OF LIFE CRIME:

Inmate Snider stated, "If I had it to do over, I would
not pick up a gun again."  He expressed remorse for
what happened and his remorse appeared to be genuine.

### XIV.  ASSESSMENT OF DANGEROUSNESS:

This inmate has had a very good record within the
Department of Corrections, having received no CDC-115
violations since 1989.  If released to the community,
he should continue the same behavior.  His potential
for violence is presently far below that of the average
inmate when compared to this Level II inmate
population.

### XV.  CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

Inmate Snider has made some profound changes in his
life. He is a very devoted Christian now.  It is

SNIDER, JAMES
CDC NUMBER:  D-38950
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

      unlikely that he will ever again engage in violence.
His desire now is to be released so that he can become
a useful and productive citizen.

*Bruce Bakeman Ph.D.*

BRUCE M. BAKEMAN, Ph.D.
Clinical Psychologist
Correctional Training Facility, Soledad

BMB/gmj

D:   10/20/00
T:   10/25/00

# EXHIBIT "D"



State of California

School Equivalency Certificate

is to certify that

JAMES L. SNIDER

has met the standards established by the California State Board of Education for successful completion of tests of General Educational Development and is therefore entitled to this high school equivalency certificate.

December 1, 1994

Acting State Superintendent of Public Instruction

President of the California State Board of Education

19941201CC96



# CERTIFICATE OF PARTICIPATION

May all who come hereafter know that

## James Snider

has participated in the

**"Alcoholic Anonymous Program"**

from ___9/1/1999___ to ___12/31/2001___

December 20, 2001
_____
Date

Sponsor
Correctional Training Facility
Soledad, CA

# Certificate of Baptism

This Certifies That

JAMES SNIDER

Upon the Confession of Faith

has been baptized

And is hereby awarded this certificate

by

The Mission of Jesus Christian Church

*Organization*

McFarland, California

*City and State*

on this eleventh day of April 19 1994

Francisco Lopez

Rev. Ana M. Cristobal



# Valley Adult School

awards a

## Certificate of Achievement

IN

## Data Processing Concepts

TO

### James Snider

Certificate Number _____ MP-222 _____

_Marty Ostove_
**Instructor**
Marty DoLove

_E. B. Parham_
**Supervisor of Vocational Instruction**
E. R. Parham

_Mike Moore (a)_
**Supervisor of Education**
Gerald Atchley



# Valley Adult School

awards a

## Certificate of Completion

IN

## Information Technologies

TO

## James Snider

Certificate Number __MP-264__

_Marty DoFree_
__Instructor__
Marty DoLove

Supervisor of Vocational Instruction
E. R. Parham

Supervisor of Education
Gerald Atchley



Valley Adult School

Certificate of Achievement

IN

Business Applications

TO

James Snider

Certificate Number    MP-2232

Instructor
Marty DoLoye

Supervisor of Education
Gerald Atchley

Supervisor of Vocational Instruction
E. R. Parham



# Valley Adult School

awards a

## Certificate of Achievement

IN

## Advanced Business Applications

TO

## James Snider

Certificate Number  MP–263

*Marty Do Love*

Instructor
Marty DoLove

*E. B. Parham*

Supervisor of Vocational Instruction
E. R. Parham

Supervisor of Education
Gerald Atchley

*Void (This Chrono cannot apply to this habeas petition) JLB*

*James C. Snyder*

**NAME and NUMBER:**            SNIDER      D38950      SYW330U            CDC-128-B (Rev. 4/74)

I have known and supervised inmate Snider, D38950, here at CTF-Central Culinary from October 6, 2005, until present. During this period, I observed Snider in display extraordinary efforts while performing his job assignments, and unique behavior and attitude towards his supervisors and fellow inmate workers. Snider's presence on the job site has been assuring and his help and efforts while at work ensures the smooth operation of my busy work area. He has earned a great deal of respect from his peers, as well as the supervisory staff. He has maintained a disciplinary free record, refrained himself from any questionable activity at a correctional setting, and gained a considerable degree of well-deserved trust and integrity. Inmate Snider, in my opinion, is a well-mannered person and does not create any problem for anyone. Inmate Snider should be commended for his behavior and a job well done.

Orig:  Central File
Cc:    Unit I CC-II
       Unit I CC-I                                         L. BURDETT
       Culinary File                                       Food Service Department
       Inmate                                              CTF Central Facility, Ext. # 4808

**DATE: 2/23/08**               **LAUDATORY**                            **GENERAL CHRONO**

**NAME and NUMBER:**            SNIDER      D38950      CYW330U            CDC-128-B (Rev. 4/74)

I hereby, would like to thank you, on behalf of the Central Facility, for your effort and hard work on November 23-24, 2005, to make the Thanks Giving meal an enjoyable experience for your fellow inmates and a smooth operation for the custody and supervising staff.

Orig:  Central File
cc:    Culinary File
       Inmate

                                                          Writes:   S. Arena, SCC
                                                                    CTF-Central

**DATE: 11/26/05**              **LAUDATORY**                            **GENERAL CHRONO**

**NAME and NUMBER**    SNIDER    D38950    **FW330L**

Inmate SNIDER, D38950 assigned to Position #CULPC.209 (DOCA) has worked for this writer directly and indirectly since August 1996. Under my supervision, inmate SNIDER has worked in the CTF-Central Culinary Department, first, as a Leadman in the Lunch Box Department, then on the Utility Crew, and now in the Scullery. Through the years, Inmate SNIDER has demonstrated a high level of initiative, he is judicious in carrying out assignments without direction. Inmate SNIDER has the quality of always knowing what has to be done, and gets it done. He is receptive to new ideas and responds quickly to new instructions, situations, methods and procedures. He benefits from all learning situations. Inmate SNIDER confronts reality with a high degree of emotional maturity, which helps him avoid overreactions. Inmate SNIDER displays a high degree of honesty, loyalty and integrity that enables him to effectively follow departmental policies, rules and procedures. This writer, and the rest of the free Staff find it a pleasure having inmate SNIDER in our Department.

ORIG    :    C-File
cc       :    Unit; CC-I
          :    Culinary File
          :    Inmate

**R. Teczon**
Supervising Correctional Cook II
CTF-Central Facility

**DATE**    3/18/05          **LAUDATORY CHRONO**          **CTF-C**          **GENERAL CHRONO**

**STATE OF CALIFORNIA**

DEPARTMENT OF CORRECTIONS
CDC-128-B (Rev.4/74)

**NAME and NUMBER**    SNIDER, J    D38950    **FW-330L**

You have attended meetings of the Alcoholics Anonymous "A" Group for the 4th Quarter of 2003 (October, November, and December). You provide service to the Group by your attendance. Through this program, you are shown what tools are available to you. By following "The 12 Steps of Recovery" in your life, you will show your willingness to improve yourself.
**You have been a participant at CTF since:** 09-01-1999

**Original : Central File**
**cc: Staff Sponsor**
**: Inmate**

**K.L. Villa**
**AA Staff Sponsor**
**CTF-Central Facility**

**DATE** 12/18/03          **(LAUDATIRY CTF-Central Facility)**          **GENERAL CHRONO**

**NAME SNIDER, J.**          **D38950**          **FW330L**          **CDC-128E**

Mr. SNIDER, this chrono is to document your participation in the Correctional Training Facility Self-Help meeting; Alcoholics Anonymous, held on Wednesday nights at CTF-Central, for the period from October 2001 through December 2001.

It is noted that during this quarter you have been an active member of this group from 9/1/1999. During this period you participated in 13 of 13 meetings held.

Original:  Central File
CC:       Inmate
          Unit CCII
          Community Resources Manager
          AA Staff Sponsor

Cindy Albarran
A.A. Sponsor
Tri-Facility Administration

**DATE:  January 11, 2002**          **LAUDATORY CHRONO**          **CTF-SOLEDAL**

**NAME SNIDER, J**                                    **D38950**        **FW330L**        **CDC-128B**

Mr. SNIDER, D38950, has attended the Wednesday evening Alcoholic's Anonymous group at the Correctional Training Facility – Central for the quarter of July 2002 to September 2002. Mr. SNIDER has shown the ability to understand and comprehend all aspects of the Twelve Steps through his self-improvement techniques and has consistently demonstrated a willingness to cooperate in the smooth atmosphere of the environment.

Original:  Central File
CC:        Inmate
           AA Staff Sponsor

Carolyn Ramos
A.A. Sponsor
Tri-Facility Administration

**DATE: October 9, 2002**              **LAUDATORY CHRONO**                    **CTF-SOLEDAD**

---

**NAME SNIDER, J.**                                   **D38950**        **FW330L**        **CDC-128B**

Mr. SNIDER, D38950, has attended the Wednesday evening Alcoholic's Anonymous group at the Correctional Training Facility – Central for the quarter of April 2002 to July 2002. Mr. SNIDER has shown the ability to understand and comprehend all aspects of the Twelve Steps through his self-improvement techniques and has consistently demonstrated a willingness to cooperate in the smooth atmosphere of the environment.

Original:  Central File
CC:        Inmate
           AA Staff Sponsor

Carolyn Ramos
A.A. Sponsor
Tri-Facility Administration

**DATE:  July 3, 2002**                **LAUDATORY CHRONO**                    **CTF-SOLEDAD**

---

**AME SNIDER, J.**                                   **D38950**        **FW330L**        **CDC-128B**

Mr. SNIDER has attended the Wednesday evening Alcoholic's Anonymous group at the Correctional Training Facility - Central for the quarter ending October, 2001. Mr. SNIDER has shown the ability to relate with the group and to improve himself through involvement with it. He has shown his ability to understand and comprehend all aspects of the Twelve Steps through his self-improvement techniques and has consistently demonstrated a willingness to cooperate in the smooth atmosphere of the AA environment.

C: C-File
   Inmate

Cindy Albarran
Sponsor, CTF-Central A.A.

**ATE: October 2, 2001**               **LAUDATORY CHRONO**                    **CTF-SOLEDAD**

Mr. SNIDER has attended the Wednesday evening Alcoholic's Anonymous group at the Correctional Training Facility - Central for the quarter ending July, 2001. Mr. SNIDER has shown the ability to relate with the group and to improve himself through involvement with it. He has consistently demonstrated a willingness to cooperate in the smooth atmosphere of the AA environment.

Cindy Albarran
Sponsor, CTF-Central A.A.

CC: C-File
    Inmate

**DATE: July 10, 2001**      **LAUDATORY CHRONO**      **CTF-SOLEDAD**

---

| NAME AND NUMBER: | SNIDER, D-38950 | HOUSING: CTF-C, F 330L | CDC-128-C |
|---|---|---|---|

Inmate **SNIDER, D-38950** has completed the requirements for a self-help chrono. There are few opportunities at CTF for self-help. However, some inmates are willing to read self-help books and write reports on what they learned from each.

This exercise is designed to illustrate the inmate's understanding of the concepts and test his motivation for positive change. Inmate **SNIDER, D-38950** should be commended for his effort.

M. Carswell PhD

Orig: C-File
    CC: Inmate
    Medical File
    MH File

**M. CARSWELL, Ph.D.**
Staff Psychologist
Correctional Training Facility-Soledad

Date: April 19, 2001      **SNIDER, D-38950**      MEDICAL-PSYCHIATRIC-DENTAL

---

**NAME SNIDER, J.**      **D38950**      **FW330L**      **CDC-128B**

Mr. SNIDER has attended the Wednesday evening Alcoholic's Anonymous group at the Correctional Training Facility - Central for the quarter ending April, 2001. Mr. SNIDER has shown the ability to relate with the group and to improve himself through involvement with it. He has consistently demonstrated a willingness to cooperate in the smooth atmosphere of the AA environment.

Cindy Albarran (4)
Gladys Washington
Sponsor, CTF-Central A.A.

CC: C-File
    Inmate

**DATE: April 5, 2001**      **LAUDATORY CHRONO**      **CTF-SOLEDAD**

**NAME SNIDER, J.**                                    **D38950**          **FW330L**          **CDC-128B**

Mr. SNIDER has attended the Wednesday evening Alcoholic's Anonymous group at the Correctional Training Facility - Central for the quarter ending December, 2000. Mr. SNIDER has shown the ability to relate with the group and to improve himself through involvement with it. He has consistently demonstrated a willingness to cooperate in the smooth atmosphere of the AA environment.

Gladys Washington
Gladys Washington
Sponsor, CTF-Central A.A.

CC: C-File
    Inmate

**DATE: January 4, 2001**          **LAUDATORY CHRONO**          **CTF-SOLEDAD**

---

**NAME (LAST, FIRST)** **SNIDER, J**          **CDC NUMBER** **D38950**   **CELL/BED** **FW-330L**   **CDC-128B**

Inmate SNIDER, D38950, has been actively participating in the Alcoholics Anonymous meetings at CTF-Central Facility, Soledad, California. He attended meetings on the following dates:
OCTOBER, 12, 19, 26; NOVEMBER, 30*, And DECEMBER, 13 21*, 28*.

It is a pleasure to have him in our program.

**Note:** * Denotes no meeting held. ** Denotes facility lockdown program..
    These meetings are bi-weekly

Original : Central File
  CC  : Alcoholics Anonymous File
      : Inmate

L. Strauss, Staff Sponsor

DATE  : 01/13/00          General Chrono          Institution/Facility CTF-Central

---

**NAME SNIDER, J.**                    **D38950**          **FW330L**          **CDC-128B**

Mr. SNIDER has attended the Wednesday evening Alcoholic's Anonymous group at the Correctional Training Facility - Central for the quarter ending March, 2000. Mr. SNIDER has shown the ability to relate with the group and to improve himself through involvement with it. He has consistently demonstrated a willingness to cooperate in the smooth atmosphere of the AA environment.

Gladys P. Washington
Gladys Washington
Sponsor, CTF-Central A.A.

CC: C-File
    Inmate

**DATE: May 24, 2000**          **LAUDATORY CHRONO**          **CTF-SOLEDAD**

**NAME SNIDER, J.**                                    **D38950**      **FW330L**      **CDC-128B**

Mr. SNIDER has attended the Wednesday evening Alcoholic's Anonymous group at the Correctional Training Facility - Central for the quarter ending October, 2000. Mr. SNIDER has shown the ability to relate with the group and to improve himself through involvement with it. He has consistently demonstrated a willingness to cooperate in the smooth atmosphere of the AA environment.

CC: C-File
    Inmate

Gladys Washington
Sponsor, CTF-Central A.A.

**DATE: October 25, 2000**           **LAUDATORY CHRONO**                      **CTF-SOLEDAD**

---

**NAME SNIDER, J.**                                    **D38950**      **FW330L**      **CDC-128B**

Mr. SNIDER has been a member of the Alcoholics Anonymous Program at the Correctional Training Facility-Central. He has shown the ability to relate with the group and to improve himself through involvement with it. His participation in this program has demonstrated a willingness to cooperate in the smooth atmosphere of the Alcoholics Anonymous environment.

CC: C-File
    Inmate

Gladys Washington
Sponsor, CTF-Central A.A.

**DATE: October 19, 2000**           **LAUDATORY CHRONO**                      **CTF-SOLEDAD**

---

**NAME (LAST, FIRST)**  **SNIDER, J**      **CDC NUMBER**  **D38950**   **CELL/BED**  **FW-330L**   **CDC-128B**

Inmate SNIDER, D38950, has been actively participating in the Alcoholics Anonymous meetings at CTF-Central Facility, Soledad, California. He attended meetings on the following dates:
JANUARY, 11, 25; FEBRUARY, 8, 22, 29, And MARCH, 14, 21, 28.

It is a pleasure to have him in our program.

**Note:** * Denotes no meeting held. ** Denotes facility lockdown program..
These meetings are bi-weekly

Original : Central File
  CC : Alcoholics Anonymous File
      : Inmate

L. Strauss, Staff Sponsor

DATE  : 06/07/00              General Chrono          Institution/Facility CTF-Central

Mr. SNIDER has completed the Business Applications portion of the Information Technologies/Data Processing Curriculum and has earned a grade of "A". He has received a Certificate of Achievement in recognition of this accomplishment. His timely completion of this work has prepared him to continue with the program.

Original:       Central File
CC:            Supervisor's File
               Inmate's Education File
               Inmate

_M. arty De Love_
Marty DoLove
Vocational EDP Instructor

Date:        9/29/00              **(Laudatory)**              **GENERAL CHRONO**

---

NAME: **SNIDER, JAMES**              NUMBER: **D38950**        CELL: **FW-330L**      CDC-128B

Mr. SNIDER has completed the Information Technologies/Data Processing Curriculum and has earned a grade of "A". He has received a Certificate of Completion in recognition of this accomplishment.

Original:      Central File
CC:           Supervisor's File
              Inmate's Education File
              Inmate

_Marty DoLove_
Marty DoLove
Vocational EDP Instructor

Date:        8/9/01              **(Laudatory)**              **GENERAL CHRONO**

---

NAME: **SNIDER, JAMES**              NUMBER: **D38950**        CELL: **FW-330L**      CDC-128B

Mr. SNIDER has completed the Advanced Business Applications portion of the Information Technologies/Data Processing Curriculum and has earned a grade of "A". He has received a Certificate of Achievement in recognition of this accomplishment. His timely completion of this work has prepared him to continue with the program.

Original:      Central File
CC:           Supervisor's File
              Inmate's Education File
              Inmate

_Marty DoLove_
Marty DoLove
Vocational EDP Instructor

Date:        8/14/01              **(Laudatory)**              **GENERAL CHRONO**

SELF-HELP

ANGER MANAGEMENT

## Conquering Uncontrolled Anger

Anger is an extremely powerful emotion. It can destroy lives and tear relationships apart. The word of God offers this advice on how to deal with anger: "Let all bitterness, wrath, anger, clamor and slander be put away from you, along with all malice, and be kind to one another, tender-hearted, forgiving each other, just as God in Christ also has forgiven you." (Ephesians 4:31-32).

When we're right in the middle of tense circumstances, we could easily face the devastating consequences of uncontrolled rage. Over time, inner turmoil and unresolved conflicts will take their toll on a person. But we have a choice. We can let out anger control us, which means we opt to suffer the consequences. Or we can release this debilitating emotion by forgiving those we feel have stirred our bitterness.

How do you respond when you feel angry? Do you blow up and lose control, or are you able to maintain a calm and patient demeanor in provoking situations?

Sadly, many people fail to manage their resentment in a positive fashion. But there are steps you can take to avoid the devastating consequences of anger.

First of all, admit you have an anger problem. You may be irritated with yourself, someone else, or even God. But you will never overcome this negative emotion until you own up to its presence in your life.

Next, identify the source of your hard feelings. Ask yourself, why am I reacting like this? With whom am I upset? What's causing me to behave this way? Once you have figured out where your annoyance comes from, deal with it in a gentle way and quickly. When bitterness is allowed to build up, we become prime targets for anger to get out of control. "Do not let the sun go down on your anger." (Ephesians 4:26).

Finally, we need to forgive whoever is the source of our hurt. When we feel injured, that may seem too difficult, but it is the most important aspect of dealing with anger. How can we fail to pardon someone else when our heavenly Father forgave us by offering his Son as a sacrifice?

Try to identify causes of anger in your life, and bring them before the Lord. Trust that he will empower you to overcome the sources of anger. Anger does not have to control your life. A child of God is empowered by the Holy Spirit to walk in a Christ like manner.

Forgiveness is not something to be applied now and then, it must be a way of life, to be practiced each and every day.

Prepared by,

*James L. Snider*

James L. Snider

James L. Snider D-38950
Box 689   F-330L
Soledad, CA 93960-0689
November 1, 2006

<u>SELF-HELP</u>

My primary self-help is reading and studying the word of God (The Bible) daily and applying it to my life. I am writing the following report on a topic from the Bible that affects all our lives.

<u>THE GREATEST GIFT, I CORINTHIANS, CHAPTER 13</u>

Many songs have been written about love, more than any other topic. It has set on fire, and broken countless hearts. But, the final word on the topic must come from the word of God.

In Chapter 13 of I Corinthians, the Apostle Paul, under the inspiration of the Holy Spirit gives us a beautiful description of love and how to live a life with love as the driving force in our lives. The kind of love Paul is describing is giving, selfless, expect-nothing-in return.

Love suffers for a long time. Our modern "throw-away" society encourages us to get rid of people in our lives who are difficult to get along with, whether they are friends, family, or acquaintances. Yet this attitude is completely opposite to the love described by the Apostle Paul. True love puts up with people who would be easier to give up on.

Love does not envy. If our love is directed toward others, we will rejoice in the blessings they receive rather than desiring those blessings for ourselves. The selfless love God calls us to does not involve pride. It does not parade itself and is not puffed up. In fact, true love does not seek itself. If we truly love others, we will set aside our own plans for the good of another.

Love is not provoked. That is, love is not easily angered or over-sensitive. When we truly love others, we are careful not to be touchy concerning other people's words or actions toward us.

The godly love described in this chapter has nothing to do with evil, but has everything to do with what is right and true. It believes all things and hopes all things. This does not mean that love is blind or naive. When we love, we may see problems and failures in people, but we do not lose faith in what people might become. Love never gives up, knowing that God can change lives for the better.

Finally, love endures all things. Love accepts any hardship or rejection, and builds others up and encourages them. The love described by Paul in this chapter means determining what is best for another person and doing it. This is the kind of love that God shows to us.

Prepared by

*James L. Snider*
James L. Snider

James L. Snider D-38950
Box 689   F-330L
Soledad, CA 93960-0689

December 1, 2006

<u>SELF-HELP</u>

My primary self-help is reading and studying the word of God (the Bible) daily and applying it to my life. I am writing the following report on a topic from the Bible that affects all our lives.

<u>THE CROSS; MATTHEW CHAPTER 27</u>

The cross, the universal symbol of Christianity, has great meaning to God. First of all, through Jesus' death, the Father proclaimed the value of every single human being. He gave his only son that "whoever believes in him shall not perish, but have eternal life" (John 3:16). Second, it meant a great cost. Holy God separated himself from his beloved son while Jesus bore the weight of the world's sin. Third, the redemption of man was accomplished. Jesus' shed blood purchased us from slavery to sin and reconciled us to God. Divine justice was carried out on the cross.

God declared that death is the debt owed for sin, and the sacrifice for sin has to be perfect. We could not pay our own sin debt because we would only die in our sin. For holy God to forgive us, a perfect sacrifice had to be found, the only one who was without sin, willingly took our place and assumed responsibility for our sin debt. All our sin, past, present and future was placed on Christ Jesus, and God's judgment upon us was put upon Jesus.

Rome used the cross as a brutal method for executing criminals. Through Christ sacrifice for us, the message of the cross became one of hope and life for all who believe in Jesus.

The cross meant different things to people. To Pilate, it was the place where an innocent man had died. The Pharisees and Sadducees saw the cross as the way to get rid of a problem, it meant to them that Jesus was finished and no longer a threat. To Mary, the mother of Jesus, knew the perfection of her son's life and his identity as the Son of God. To Jesus' disciples, the cross was the time when their beloved friend and Messiah died.

What happened at the cross? The wrath of God against all sin was revealed. Judgment against sin was carried out. The one-man, virgin born, sinless, Son of God voluntarily offered himself to stand in our place and take upon himself God's judgment for our sin. Jesus took the condemnation and wrath of God that we deserved.

This is the good news. When we receive Jesus as our personal savior, we are no longer under the death sentence, we are proclaimed not guilty because Jesus took our place. This is the mercy of God.

Prepared by,

James L. Snider

James L. Snider D-38950
Box 689   F-330L
Soledad, CA 93960-0689
January 1, 2007

### SELF-HELP

My primary self-help is reading and studying the word of God (The Bible) daily and applying it to my life. I also read and apply "The Twelve Step Program" provided by Overcomers Outreach, to obtain victory over dependencies and addictions through Jesus Christ.

The following is a commentary on Step #5 of the Overcomers program, "Admit to God, to yourself, and to others the exact nature of your character defects."

Confession is the most important part of our prayer life. Confession is defined as telling or making my sins known to God. Confession removes the filth and sin from the life of a person who was addicted to a substance, may it be alcohol or drugs. Confession is a necessary part of life with God, because it develops the positive character quality of honesty. I John 1:8,9: "If we say that we have no sin, we deceive ourselves, and the truth is not in us. If we confess our sins, he is faithful and just to forgive us our sins, and to cleanse us from all unrighteousness."

There is no sin too great or no person too evil for God to forgive. The Bible says that the grace of God is greater than any sin. Romans 5:20 "But where sin abounded, grace abounded much more." The more I see my sinfulness, the more I experience God's abounding grace in forgiving me. Through God's love for us, the debt for ALL sins was paid when Jesus died on the cross.

I believe that our old "Character Defects" is the sin in our lives that we must confess and abstain from. If we believe that Christ Jesus is/was sinless, of which I do, and the purpose of his coming was to remove sin, then whoever abides in Jesus does not habitually sin. We cannot hold on to our old "Character Defects", if we do, our old habitual conduct will not be far behind.

It is a blessing to have another person whom you can confess your faults to. I am fortunate to have two, one is a brother in Christ Jesus and the other is not. James 5:15 "Confess your trespasses to one another, and pray for one another, that you may be healed. The effective, fervent prayer of a righteous man avails much." Proverbs 28:13 "He who covers his sins will not prosper, but whoever confesses and forsakes them will have mercy."

We must not be ashamed to confess a particular sin. Jesus Christ suffered the pain and humiliation of the cross for us, so we must be committed to being right with God, and by doing so we can experience the joy of being a overcomer from our old habitual conduct.

Even after a person gives his life to Jesus Christ, he will still have "Character Defects", but they can be helpful. Humiliation and embarrassment can be painful, but if handled in the right way, they can produce healing and maturity. Hebrews 12:2 "Looking unto Jesus the author and finisher of our faith, who for the joy that was set before him endured the cross, despising the shame, and has set down at the right hand of the throne of God." Jesus was willing to die a shameful death on the cross because of the joy that he knew would be his afterwards. He paid the price for us.

By keeping our eyes focused on Jesus and abstaining from our old habitual sinful conduct, we will be surprised how many of our old "Character Defects" will disappear.

### PRAYER

Heavenly father, in Jesus name, help me to admit the exact nature of my wrongs to you. It is my desire to please you in all ways. Thank you for forgiving me and cleansing me from all my sin. Amen.

Prepared by,

*James L. Snider*
James L. Snider

James L. Snider D-38950
Box 689   F-330L
Soledad, CA 93960-0689
March 1, 2007

## SELF-HELP

My primary self-help is reading and studying the word of God (The Bible) daily and applying it to my life. I also read and apply "The Twelve Step Program" provided by Overcomers Outreach, to obtain victory over dependencies and addictions through Jesus Christ.

The following is a commentary on Step #6 of the Overcomers program, "Are you ready to have God remove all of your character defects?

Forgiveness should be used as an opportunity to begin a new life. It should never be used to justify a continued life of sin. The words of a fool are: "If God forgives everything, then he will forgive me no matter how I live." Granted, you are free through the shed blood of Christ Jesus, but not to do wrong. Live as those who are free to do only God's will at all times.

God forbids only those things which are harmful and dangerous to his creation. A decision to rebel against God is actually a decision to seek a destructive way of life. God has given us his grace, favor that we do not deserve, to live as a free person. Any person is foolish if they use their freedom in Christ to sin against their creator. Romans 6:15 "What then? Shall we sin, because we are not under the law, but under grace? God forbid."

As a Christian, when you sin, you will feel embarrassed and ashamed of your sin. Choose to risk anything rather than to be dishonest. You can be a winner if you refuse to be a quitter. The Holy Spirit will convict you of any sin. This is why you become embarrassed and ashamed of your sin.

It is God's desire that you never fail, but he knows that we are not perfect. Thankfully, he gives us wisdom and strength to not fail. When you do sin we must confess and ask God to forgive us our sin, I John 1:9. We must be wise and retrace the steps by recalling those attitudes and actions which caused us to do wrong. We also need to set our heart and mind on following God's instructions so that we will not make the same mistake again. I Peter 5:6 "Humble yourselves, therefore, under God's mighty hand, that he may lift you up in due time."

## PRAYER

Heavenly Father, in Jesus name, I accept your grace as an opportunity to remove my character defects. Forgive me for rebelling against your instructions. I desire to use my freedom to do your will. Thank you for making it possible for me to get up and try again. Help me dear father, in then name of your precious son Jesus Christ, to retrace my steps so that I will not repeat my failures again. Today I set my will on following your instructions exactly as you have given them in the Bible. Amen.

Prepared by,

*James L. Snider*
James L. Snider

James L. Snider D-38950
Box 689    F-330L
Soledad, CA 93960-0689
May 1, 2007

<u>SELF-HELP</u>

My primary self-help is reading and studying the word of God (The Bible) daily and applying it to my life. I also read and apply "The Twelve Step Program" provided by Overcomers Outreach, to obtain victory over dependencies and addictions through Jesus Christ.

The following is a commentary on Step #7 of the Overcomers program, "Humbly ask God to place positive character qualities in you."

It is a natural tendency to run from those things that irritate us, but God wants to use irritations to build positive character qualities in our lives. We must learn to use and appreciate irritations. Irritations come from people, circumstances and ourselves. If we always try to run away from irritations, God cannot use them to accomplish his plan for us.

If a grain of sand gets in your eye, it can cause irritation, infection or a loss of vision. But, the very same grain of sand in an oyster will produce a pearl. The oyster manages and transforms irritations and brings beneficial and lasting results. So we must see our irritations as benefits to learning God's ways. Romans 8:28, "And we know that all things work together for good to them that love God, to them who are called according to his purpose."

In 2 Corinthians 12:7-10, the apostle Paul asked God three times to remove irritations in his life. Finally Paul understood that God intended this irritation to be a safeguard against pride. 2 Corinthians 12:9, "My grace is sufficient for you, for my strength is made perfect in weakness." Learn to manage and transform irritations, and thank God for his grace which is sufficient for us.

God is concerned about long term character improvements rather than our short term discomforts. Learn to set your mind and heart to forgive and to deal with situations in a non-offensive manner. Ephesians 4:32, "And be you kind to one another, even as God in Christ has forgiven you." Even though God often allows irritations in our lives, many times our irritations are simply a result of careless or foolish actions.

You can overcome any dependency and become the quality person that God created you to be. I Peter 5:10, "But the God of all grace, who has called us into his eternal glory by Christ Jesus, after you have suffered awhile, make you perfect, established, strengthen, settle you." You must understand the difference between trials, testing and temptations. God can use all these in your life, but each has a different source.

Trials are difficulties that are not initiated by God. They are a product of a damaged world filled with sin and corruption. Temptation is directly from satan to entice wrong behaviors or attitudes. Evil thoughts and memories of the pleasures of sin are never from God. James 1:13, "Let no man say I am tempted of God."

Here is a list of positive character qualities: temperance, pure mind, being a giver, communion with God, humility, forgiveness, self control, gentleness, positive thinking, trust, accepting responsibility, patience, obedience and honesty. These are the "pearls" God is developing in your life.

PRAYER

Father, In Jesus name, help me to overlook things I cannot change. Help me to be loving and gentle with others, as you Dear God are with me. Amen.

Prepared by,

*James L. Snider*
James L. Snider

James L. Snider D-38950
Box 689    F-330L
Soledad, CA 93960-0689

June 1, 2007

<u>SELF-HELP</u>

My primary self-help is reading and studying the word of God (The Bible) daily and applying it to my life. I also read and apply 'The Twelve Step program" provided by Overcomers Outreach, to obtain victory over dependencies and addictions through Jesus Christ.

The following is a commentary on Step #8 of the Overcomers Program, <u>"To attain peace within, you must be willing to make things right with those you have hurt."</u>

One of the keys to deliverance is to properly deal withpeople you have hurt by making amends whenever possible. The Bible teaches us to make things right with God and with others.

To attain peace within, you must be willing to make things right with those you have hurt. God intends conviction to lead you away from what is wrong and toward what is right. When you respond to conviction and what is right, you will experience guilt. This you must be careful of as this feeling may produce discouragement and depression.

While on the road to overcoming, your mind may continue to avoid difficult or unpleasant confrontations. WE may feel that it was a long time ago that you harmed a person, but the one we offended probably remembers it well. We must put forth the time and effort to contact the person or persons. No offense is to small to ask for forgiveness. God wants our relationships to be right. We cannot put off asking for forgiveness, the right time is as soon as possible.

<u>PRAYER</u>

Dear Lord Jesus, help me to respond with courage to your conviction and what is right. I desire to avoid a cycle of guilt and depression, and to become an overcomer. I need your help and your strength as I begin the difficult task of making things right with the people that I have hurt. I want to take full responsibility for the condition of my life. I humbly lay aside any and all excuses.

Thank you dear Lord for clearing my memory in order that I may make things right with those I have hurt. Heavenly Father, teach me to respond to others as you would, and I thank you for using my past failures to produce my future success. Thank you for giving me life eternal and for being my friend. Amen

Prepared by,

*James L. Snider*
James L. Snider

James L. Snider D-38950
Box 689   F-330L
Soledad, CA 93960-0689

August 1, 2007

<u>SELF-HELP</u>

My primary self-help is reading and studying the word of God (The Bible) daily and applying it to my life. I also read and apply "The Twelve Step program" provided by Overcomers Outreach, to obtain victory over dependencies and addictions through Jesus Christ.

The following is a commentary on Step #9 of the Overcomers Program, "God expects us to make amends."

God expects the overcomer to make amends. We must make direct amends to people where ever possible, except when doing so would injure them or others. God knows this will lessen the other persons pain and will relieve the guilt, misery and depression we may feel.

We must ask God for his wisdom when contacting those we have harmed.

Forgiving others is a big step to overcoming. Asking forgiveness is difficult, but granting forgiveness and releasing resentment can be even more difficult. God requires us to forgive no matter how large or small the offense.

We must give up the desire to get even and be gentle and ready to forgive. Never hold grudges. Remember, "The Lord God forgave you, so you must forgive others." Colossians 3:13.

Bitterness, immorality and greed are problems that must be dealt with. In most cases, at least one of these caused us to harm someone. Bitterness consists of unforgiveness, deep resentment or hatred. Unresolved bitterness distorts reality and results in poor judgment. God has instructed us to surrender the "right to get even", to love and not hate our enemies. We must carefully search our heart. Do we find any unforgiveness, resentment or hatred against anyone. If so, ask God to remove the bitterness and to cleanse our heart. "Let all bitterness, wrath, anger and clamor be put away from you, with all malice." (Ephesians 4:31).

The key to showing love toward others is to forgive.

Prepared by,

*James L. Snider*
James L. Snider



**Welcome**  **Support**



# Overcomers
# Outreach

A Christ-Centered 12-Step Recovery Program
Addressing All Addictions, Compulsions & Codependents



**Bridging the Gap Between
Traditional 12-Step Support
Groups and Hurting People
In Churches of All**

**Denominations**

*"In this world you will have trouble.
But take heart!
I have OVERCOME the world!"
John 16:33 (NIV)*

*Calendar of Events*

IT'S TRUE!
There is HOPE for people
who struggle with

**People interested in any of these events
can call the office at the 800-310-3001
and we will be happy to send out
brochures.**

- Weekly Support Groups

- This site is going through periodic changes.
  Please refresh (or reload) the pages
  occasionally to see the changes. Thanks!

\*<u>Alcoholism</u>

  \*<u>Drug Addiction</u>

    \*<u>Codependency</u>

      \*<u>Eating disorders</u>

        \*<u>Sexual/Love Addiction</u>

          \*<u>Nicotine Addiction</u>

            \*<u>Compulsive Gambling</u>

              \*<u>Adult Children of Alcoholics</u>

**F**ellowship in Recovery

**R**econciliation to God & His Family

**E**ducation about Chemicals & Addiction

**E**dification through Faith in Christ

**D**edicated Service to Others

**For further information contact:**

**OVERCOMERS OUTREACH**

520 N. Brookhurst, Suite 121
Anaheim, CA 92801
Phone Toll Free: 1-800-310-3001
Phone: (714) 491-3000
Fax: (714) 491-3004
Email: info@overcomersoutreach.org

In CANADA contact at:
Overcomers Canada
E-mail: overcomer@mb.imag.net

*Serenity Prayer*

*God grant me the serenity*
*To accept the things I cannot change,*
*Courage to change the things I can,*
*And Wisdom to know the difference.*

© *Copyright 1999, 2000, 2001 Overcomers Outreach*

2

# 12 STEPS TO FREEDOM

**STEP 1. We admitted we were powerless over the effect of our separation from God--that our lives had become unmanageable.**

I know that nothing good lives in me, that is, in my sinful nature. For I have the desire to do what is good, but I cannot carry it out. (Romans 7:18)

To admit that we are "powerless" and that our lives have become "unmanageable" is a particularly distasteful chore for most of us. It's not macho, but first we must acknowledge that we have a problem--our own self-centered, egocentric, omnipotent human natures.

Powerlessness is the inability to control the use of substances that threaten to destroy our lives, compulsive behavior, one's thoughts, feelings, and behaviors regarding another person. We are powerless to control our lives that have become unmanageable.

The admission of powerlessness and unmanageability is neither a sign of weakness nor a source of shame; it is a recognition reality--a conviction of need for healing and restoration.

**STEP 2. Came to believe that a power greater than ourselves could restore us to sanity.**

"For it is God who works in you to will and to act according to His good purpose" (Philippians 2:13).

Jesus Christ is the only legitimate Higher Power; only He and He alone can restore us to sanity. Coming to believe in His ability and willingness to heal us is the central issue of Step Two.

The powerlessness and unmanageability we finally admit in Step One can only be overcome with the aid of One who is greater than ourselves, and that One is Jesus Christ.

Step Two is sometimes referred to as "the step of faith". Just as faith is an essential component in the steps of salvation, so, too, it is an essential aspect of recovery from addiction.

We have come to believe that there must be a change of mind, from a state of unbelief to a state of belief. We have come to believe that Jesus Christ will restore us to sanity--mentally, emotionally, and spiritually. Now we come to the step where we must act on our faith and demonstrate our trust.

3

**Step 3. Made a decision to turn our will and our lives over to the care of God as we understood Him.**

"Therefore I urge you, brothers, in view of God's mercy, to offer your bodies as living sacrifices, holy and pleasing to God--which our spiritual worship" (Romans 12:1).

An understanding of God is ultimately possible only because God Himself made it possible--and He did for us by revealing himself to us in the flesh and blood personage of Jesus Christ. There is no doorway to salvation other than Jesus Christ.

It is essential that we make a decision to act on what we believe. We make a decision to turn our will and our lives over to the care of god. Recovery is an active process, Literally a change in the direction of one's life. This is the point at which faith becomes action. We allow God to stand at the helm of our lives as Captain of our fate. We embrace the heart of Christian living.

Jesus said, "I tell you the truth, no one can see the kingdom of God unless he is born-again" (John 3:3). The spiritual rebirth described by Jesus precisely the dethroning of the egocentric, omnipotent nature, followed by the enthronement of Jesus Christ as Lord of our lives. The old selfish nature is put to death, and the new man or woman in Jesus rises from the grave, born-again.

We acknowledge Jesus as Lord of our lives and begin the lifelong process of surrender to God. The entire matter boils down to loving God and loving our neighbor as ourselves.

**STEP 4. Made a searching and fearless moral inventory of ourselves.**

"Let us examine our ways and test them, and let us return to the Lord" (Lamentations 3:40)

God begins within us a lifelong process of transformation. Like clay in the hands of a skillful potter, we are gradually molded and shaped by God into vessels suitable for His purposes. This process is called sanctification. The inventory required in Step Four can be used by God to chip away at our character defects and shape us as He would have us to be. The primary difficulty in making "a searching and fearless moral inventory of ourselves" is denial that has helped imprison us in addiction. Denial is an attempt to escape the pain, brokenness, and human limitation that are inherent in the human condition.

While denial is darkness, God has always been in the business of turning darkness into light. Light is illuminating, it brings objects into view, showing them as they are, and exposing the dirt and crud (Galatians 5:19-21).

4

Our responsibility is to make an inventory of all that is revealed by the "Son-light" as He shines into the depths of our being. An inventory is a list of items, both the good and bad, as the light reveals both the fine and the foul in the chambers of our hearts. This moral inventory relates to principles of right and wrong behavior, in accordance with God's law of love, exemplified by the life and teaching of Jesus of Nazareth.

A useful framework of identifying our liabilities is the traditional Seven Cardinal Sins. These sins are: 1) Pride, 2) Covetousness, 3) Lust, 4) Envy, 5)Anger, 6) Gluttony, and 7) Slothfulness.

Also, it necessary to identify those feelings and behaviors most commonly found in Adult Children from homes where addiction-related or other damage including behavior was prevalent. These are listed in the book; "The Twelve Steps for Christians' distributed by RPI Publishing, Inc. These character traits are 1) Isolation, 2) Repressed anger, 3) Approval seeking, 4) Caretaking, 5) Control, 6) Fear of abandonment, 7) Fear of authority figures, 8) Frozen feelings, 9) Low self-esteem, 10) Over-developed sense responsibility, and 11) Repressed sexuality.

In making a Step Four inventory, it is important to identify assets as well as liabilities, leading us out of a sense of low self-esteem and shame. We are to identify ourselves in Christ as new creations, made in the image of God, with spiritual gifts, because of the blood of Jesus Christ.

**STEP 5. Admitted to God, to ourselves, and to another human being the exact nature of our wrong,**

"Therefore confess your sins to each other and pray for each other so that you may be healed" (James 5:16).

Confession of sin to God is the essence of true repentance. Our sins create a barrier of our own making between ourselves and God, but when confessed, the walls come tumbling down.

Confession to God as well as to another human being goes hand and hand. It is an inherently healing act to unload, in the presence of another human being, the burden of guilt that has been part of the lifestyle of addiction. A cleansing process takes place, as a level of openness and honesty is experienced.

**STEP 6. Were entirely ready to have God remove all these defects of character.**
"Humble yourselves before the Lord, and He will lift you up" (James 4:10)

The process of surrender continues. Surrender means that we cease trying to re-create ourselves in the image of God and become willing to be molded and shaped by God into fit vessels for His use.

**STEP 7. Humbly asked Him to remove our shortcomings.**

"If we confess our sins, he is faithful and just to forgive us our sins and purify us from all unrighteousness" (1 John 1:9).

God is able to remove our shortcomings. As humble servants, Through the finished work of Jesus Christ on the cross and the creating of his righteousness to our accounts, we no longer come up short.

**STEP 8. Made a list of all persons we had harmed, and became willing to make amends to them all.**

"Do to others as you would have them do to you" (Luke 6:31).

Whereas Steps Six and Seven dealt with our vertical relationship with God, Steps Eight and Nine deal with our horizontal relationships, that is, our relationships with our fellow human beings. So here, we make a list of all persons we have harmed, and become willing to make amends, allowing God to rid us of all resentments.

**STEP 9. Made direct amends to such people wherever possible, except when to do so would injure them or others.**

"Therefore, if you are offering your gift at the altar and there remember that your brother has something against you, leave your gift there in front of the altar. First go and be reconciled to your brother, then come and offer your gift" (Matthew 5:23-24).

Making amends does not mean merely saying "I'm sorry" for wrongs done or injuries inflected. This is an action step, one in which we demonstrate our changed behavior toward others.

6

**STEP 10. Continued to take personal inventory and, when we were wrong, promptly admitted it.**

"So, if you think you are standing firm, be careful that you don't fall" (1 Corinthians 10:12).

There is an ongoing search-and-destroy mission whose goal is to root out and put to death every manifestation (thoughts, feeling, and actions) of the sinful, egocentric nature that was at the heart of our addiction.

**STEP 11. Sought through prayer and meditation to improve our conscious contact with God as we understood Him, praying only for knowledge of His will for us and the power to carry that out.**

"Let the word of God dwell in you richly" (Colossians 3:16)

For those of us who truly thirst for the presence of God, who desire to draw closer to Him, prayer and meditation will become important parts of our lives. As we draw near to God, through Jesus Christ, our High Priest, He will lead us into all truth, and give us the power to live for Him.

**STEP 12. Having had a spiritual awakening as the result of these steps, we tried to carry this message to others, and to practice these principles in all our affairs.**

"Brothers, if someone is caught in a sin, you who are spiritual should restore him gently. But watch yourself, or you also may be tempted" (Galatians 6:1).

Not only must we practice these principles in our affairs, but we must carry the message to others. As Christians in recovery, we carry one message to those still trapped in addiction. That is, the message of healing and salvation through Jesus Christ. We have a unique opportunity in obeying the command of our Lord to "go and make disciples of all nations" Matthew 28:19).

# EXHIBIT E

James L. Snider D-38950
Box 689   F-330L
Soledad, CA 93960-0689

## PAROLE PLANS

1). Upon my release from prison I plan to reside in a State of California Halfway House for six (6) months or less. (Attached are a list of re-entry programs I have written, and an example of my letter to them).

2). My support plan is:

A). Find a Bible based church to attend close to where I am living.

B). Attend regularly "Overcomers" and "Alcoholics Anonymous (AA)".

C). Associate with people who are serious about their walk with Jesus Christ.

3). My plan for employment:

A). I will work diligently at my job in Bakersfield, provided by George & Edith Lutner. (See attached notarized letter).

B). If I have to go to San Diego, I will contact the nearest office of "Community Connection" and "Labor Ready".

4). When I am self-sufficient, it is my hope to be re-united with my children and grand children.

5). I will successfully re-enter society and establish myself by, (1) being patient, (2) taking one step and one day at a time, (3) obey the laws, and most of all, (4) trust in the Lord my God.

6). I am aware that problems and circumstances will arise. The key to solving problems is not to get frustrated, but use the patience God has instilled in me these past seventeen (17) years.

With this plan I can successfully re-enter society and be a good help to others.

Prepared by

_James L. Snider_
James L. Snider

George and Edith Luther                              July 25, 2007
222 East Harding Ave.
Bakersfield, CA 93308
(661) 399-6327
(661) 619-5551

Board of Parole Hearings
1515 K Street, Suite 600
Sacramento, CA 95814

To whom it may concern,

    We certify that upon the release on parole of James L. Snider, we will do our best
to help and secure gainful employment for James.

We have many friends in the Bakersfield area that own and operate businesses. We
foresee no problem in finding James employment so he can successfully re-enter society.

                      Thank you,
                      Respectfully submitted,


                      George Luther


                      Edith Luther

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _____Kern_____ } ss.

On _July 25, 2007_, before me, _Jane E. Johnson Notary Public._
Date        Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally appeared _George and Edith Luther_,
Name(s) of Signer(s)

☒ personally known to me
☒ proved to me on the basis of satisfactory evidence

[Seal:]
JANE E. JOHNSON
Commission # 1731071
Notary Public - California
Kern County
My Comm. Expires Apr 12, 2011

Place Notary Seal Above

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_Jane E. Johnson_
Signature of Notary Public

----------------------------------- **OPTIONAL** -----------------------------------

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**
Title or Type of Document: _To: Board of Parole Hearings_

Document Date: _7-25-07_     Number of Pages: _1_

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer**
Signer's Name: _____
☒ Individuals
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

© 1997 National Notary Association • 9350 De Soto Ave . P.O. Box 2402 • Chatsworth, CA 91313-2402    Prod. No. 5907    Reorder: Call Toll-Free 1-800-876-6827

# Christian Twelve Steps Resources

Overcomers Incorporated
4235 Mt. Sterling Avenue
Titusville, FL. 32780

(Write for the book "Living Free", on how to start a Christian 12
Step group).

Overcomers Outreach, Inc.
520 N. Brookhurst St. Ste. 121
Anaheim, CA. 92801-1017
(800) 310-3001

(Write for closest Overcomers meeting in your area.

RPI Publishing Inc.
(Twelve Step Outreach)
P.O. Box 44
Curtis, WA. 98538
(800) 873-8384

(Write for Twelve Step books, for personal growth, and for
starting chapel groups)

**Re-Entry Programs**
(I have written)

Turning Point Re-Entry (Bakersfield)
1101 Union Avenue
Box 3601
Bakersfield, CA 93385

Victory Outreach
4235 National Avenue
San Diego, CA 92113
(619) 262-0172

Parole Regional Headwuarters (Region IV)
Re-Entry Coordinator
21015 Pathfinder Rd., Suite 200
Diamond Bar, CA 91765
(909) 468-2398

VOA San Diego
650 11th Avenue
San Diego, CA 92101
Program Manager, Michael Burreece
(619) 234-6218

W & B Re-Entry
1719 National Avenue
San Diego, CA 92113
Program Manager, Randy Prior
(619) 234-6191

Alcoholics Anonymous
Central Office
7075 Mission Gorge Rd.
San Diego, CA 92120

Alcoholics Anonymous
Central Office
930 Truxtun, Suite 110
Bakersfield, CA 93301

Overcomers Outreach
520 N. Brookhurst, Suite 121
Anaheim, CA 92801

James L. Snider D-38950
Box 689    F-330L
California State Prison
Soledad, CA 93960-0689


Turning Point Re-Entry
1101 Union Avenue
Box 3601
Bakersfield, CA 93385


Dear Sir/Madam;

First and foremost I thank you for taking the time to review my request for information. I am writing for assistance in locating a temporary residence for parole purposes in the Bakersfield area.

I am 57 years old and in excellent health. I have been incarcerated for 22 years, serving a sentence of 15 years to life for second degree murder plus 9 years for attempted murder.

I have been a serious Christian for 17 years. I do not use alcohol or narcotics of any kind and I have been sober for 17 years with no desire whatsoever to use alcohol ever again. I participate in the 12 step program of Overcomers Outreach and Alcoholics Anonymous (AA).

I do not have any family in California as my parents have passed away since I have been incarcerated. This area has the best opportunity, for me, to find employment and succeed in re-entering society.

I do meet the eligibility requirements, as per California Department of Corrections and Rehabilitation Community Correctional Re-entry Centers.

My next parole suitability hearing is scheduled for August 17, 2007.

I look forward to your timely response and I wish to thank you again for assisting me with this matter.

Sincerely,


James L. Snider

## OIL COMPANIES

ARS INC.
4042 PATTON WAY
BAKERSFIELD, CAL. 93308-5030
(805) 589-5070
CONTACT: HUMAN RESOURCES

AMERICAN OIL CORPORATION
101 WEST WALNUT STREET
PASADENA, CA. 91103
(818) 405-8888
CONTACT: PERSONNEL DEPT.

ARCO PRODUCTS CO.
1055 WEST 7TH STREET
LOS ANGELES, CA. 90017
(213) 486-3511
CONTACT: HUMAN RESOURCES

ATLANTIC OIL COMPANY
310 EAST COLORADO STREET
GLENDALE, CAL. 91025
(818) 643-5451
CONTACT: DIRECTOR OF PERSONNEL

ATLANTIC RECHFIELD CO.
515 SOUTH FLOWER STREET
LOS ANGELES, CA. 90071
(213) 486-3511
CONTACT: EMPLOYEE RELATION DEPARTMENT

MOBIL OIL PRODUCTION
P.O. BOX 9989
BAKERSFIELD, CA. 93309-9989
(805) 665-3600
CONTACT: GARY HARPER

MOBIL OUL COMPANY 2ND FACILITY
5775 W. PACIFIC COAST HWY.
VENTURAL, CA. 93001-9748
(805) 643-5451

SHELL OIL COMPANY
P.O. BOX 6249
CARSON, CA. 90749-6249
(310) 816-2000
CONTACT: HUMAN RESOURCES

TEXACO REFINING
10 UNIVERSAL CITY PLAZA
UNIVERSAL CITY, CA. 91608
(818) 505-2000
CONTACT: HUMAN RESOURCES

## SMALLER OIL COMPANIES

BAKERSFIELD ENERGY RESOURCES INC.
1001 TOWER WAY SUITE 210
BAKERSFIELD, CA. 93309-1586
(805) 322-2080

CHEVRON USA INC.
5691 FERKINS ROAD
OXNARD, CA. 93033-901
(310) 488-2709

HORIZONTAL DRILLING INC.
2400 W. CARSON STREET
TORRANCE, CA. 90501
(310) 782-0384

PARKER DRILLING INC.
5401 BUSINESS PARK SOUTH STE. 2
BAKERSFIELD, CA. 93309-714
(805) 322-2080

PLAINS RESOURCES INC.
5640 S. FAIRFAX AVE.
LOS ANGELES, CA. 90056-1266
(213) 295-2179

TEXACO PRODUCTION INC.
12001 TAMPA AVE.
NORTHRIDGE, CA. 91326-1208
(818) 368-5330

TOTAL OILFIELD SERVICES INC.
330 INDUSTRIAL WAY
TAFT, CA. 93268-9731
(805) 765-5255

WOLDER ENERGY
901 TOWER WAY
BAKERSFIELD, CA. 93309-1590
(805) 631-8889



**community** **connection**

opening doors... ...to a new future

☐ 140 W. Park Avenue
Suite 100
El Cajon, CA 92020
(619) 440-7316
FAX: (619) 440-8011

☐ 1831 'I' Street
Sacramento, CA 95814
(916) 552-5980
FAX: (916) 442-6232

☐ 1108 E. Waterloo Road
Suite 3
Stockton, CA 95205
(209) 937-0170
FAX: (209) 937-0175

☐ 4080 Centre Street
San Diego, CA 92103

Corporate Office:
(619) 291-4790
FAX (619) 291-4704

Employment Services:
(619) 294-3900
FAX: (619) 294-6570

Substance Abuse Services:
(619) 291-7900
FAX: (619) 291-7098

LOUISE E. FYOCK
Executive Director

October 3, 2003

TO:      Parole Agents and Staff Members
         Parole & Community Services, San Diego County Offices     _Louise_

FROM:    Louise E. Fyock, Executive Director, Community Connection Resource Center

RE:      **Services for Parolees**

With California's economy in turmoil, parolees are often the last to be hired. ***Despite recent funding cutbacks, Community Connection remains dedicated to helping parolees find work and the resources they need to be successful.*** We offer the most comprehensive and effective pre-employment workshop for offenders in San Diego County. Employers still call us to help fill their workforce needs and often recruit right from the workshop. We have redesigned the workshop to include a follow-up Job Club. In Job Club, participants receive job leads, prepare a resume, access electronic job boards, and call employers to set up interviews. Staff members meet with participants individually to help them focus their job search. Attached is a flyer about this valuable service.

**Other Services We Offer for Parolees:** / Probationers

- Community Connection is spearheading the effort to open a community reentry center specifically for parolees in San Diego. A project of the San Diego Reentry Roundtable, the model demonstration program is scheduled to open in City Heights in 2004.

- Freedom 1st, our support group by and for ex-offenders, meets every Friday evening, from 6 pm to 7:30 pm at our Metro offices, 4080 Centre Street, Suite 205, San Diego.

- We provide transitional case management services for parolees participating in the Incarcerated Youth Offender program (IYO). Participants, ages 18-25, sign up in prison and continue receiving support for one year following release.

- Gemini House is a new residential program for men on parole with co-occurring disorders. This beautiful facility in City Heights is now open.

- Freedom House Imperial is expanding to up to 39 treatment beds for women parolees participating in SASCA or P3.

- We offer anger management workshops and court-ordered domestic violence intervention programs for men and women at our City Heights and El Cajon offices. Sessions are available in Spanish, Tagalog, Vietnamese, and English.

**For information on any of our programs or services, call us at 619/294-3900 (Metro area) or 619/440-7316 (East County).**

Funded in part by:   County of San Diego • San Diego Workforce Partnership • California Department of Corrections
• County of Sacramento • Sacramento Employment & Training Agency • Private Foundations and Donations



**Community Connection Resource Center Mission Statement**

We are dedicated to creating healthy and safe communities by breaking the cycle of crime, incarceration and substance abuse by:

- Providing comprehensive reentry and recovery services for prisoners, ex-offenders, and their families;
- Delivering effective and comprehensive services to promote self-sufficiency and personal responsibility for low-income individuals and other challenging populations;
- Developing and implementing substance abuse treatment, gang intervention and crime prevention programs; and,
- Educating the community on criminal justice issues.

**For information on programs in San Diego contact:**

Employment Services
San Diego  619.294.3900
East County  619.440.7316

Substance Abuse Services
619.291.7900

HIV Case Management
619.260.8343

Residential Drug Treatment Program Information
619.531.0452

Domestic Violence Intervention/ Anger Management
619.280.2220

IMO Program
619.280.3955

Corporate Offices
619.291.4790

Offices throughout California:
- San Diego (Hillcrest City Heights, El Cajon)
- Carson (LA County)
- Anaheim
- Riverside
- Fresno
- Sacramento



Community Connection's Job Seeking Skills Workshop and Job Club are designed especially for job seekers who have been in jail or prison, are on probation or parole, or have a conviction that is a barrier to finding work. You'll learn how to deal with the difficult issues, such as:

- Explaining your felony conviction to employers in a positive way
- Dealing with employment gaps on applications
- Talking about your skills and abilities to employers
- Turning institutional assignments into work experience

In Job Club, you'll receive job leads, meet employers, prepare a resume, use the Internet for job search, and work individually with a counselor to help you find a job.

Community Connection Resource Center has helped thousands of ex-offenders to find work.    Learn the proven techniques that will land you the job you want!

### ENROLL NOW!

**San Diego Metro Area      619.294.3900**
**East County      619.440.7316**



Funded in part by:  County of San Diego • California Department of Corrections  • County of Sacramento • Sacramento Employment & Training Agency • Private Foundations and Donations

1

PROOF OF SERVICE BY MAIL

2

(Fed. R. Civ. P.; 28 U.S.C. §1746

3

I, James L. Snider, declare that;

4

I am over 18 years of age and that I am the pro per Petitioner to the hereto attached cause of action, that I reside at CTF-Central, State Prison at Soledad,

5

CA. My complete mailing address is: James L. Snider, D-38950, Box 689    F-330U, California state Prison, Soledad, CA 93960-0689.

6

7

That I deposited in the prison mail box, U.S. Mail, at the above address the attached; PETITION FOR WRIT OF HABEAS CORPUS, in sealed envelopes with postage fully prepaid and affixed by the prison mail room, addressed to the following

8

parties;

9

CLERK OF THE COURT
UNITED STATES DISTRICT COURT

10

NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVE., Box 36060

11

SAN FRANCISCO, CA 94102

12

13

DECLARATION

14

I declare under penalty of perjury that the foregoing is true and correct, executed this _8_ day of _June_ , 2008, at Soledad, California (State Prison).

15

16

James L. Snider

17

18

19

20

21

22

23

24

25

26

27

28

James L. Snider D-38950
P.O. Box 689  F-330u
Soledad, CA  93960-0689

Office of the Clerk
United States District Court
Northern District of California
450 Golden Gate Avenue
San Francisco, CA  94102


Dear Clerk!

    Please find enclosed a writ of habeas corpus
challenging a Parole Suitability Hearing denial, and
I have enclosed an extra face sheet with a
self-addressed stamped envelope for your
convenience. Please file stamp the extra
face sheet and return it to me.

        Thank you.

        Respectfully submitted,

        James L. Snider
        James L. Snider
        6/8/2008
        Date

DUPLICATE

Court Name: U.S. District Court, NDCA
Division: 3
Receipt Number: 34611021089
Cashier ID: sprinka
Transaction Date: 07/09/2008
Payer Name: STATE OF CALIFORNIA
------------------------------------
WRIT OF HABEAS CORPUS
  For: james snider
  Amount:        $5.00
------------------------------------
CHECK
  Check/Money Order Num: 203439993
  Amt Tendered: $5.00
------------------------------------
Total Due:       $5.00
Total Tendered: $5.00
Change Amt:      $0.00

08cv3312mhp-pr


Checks and drafts are accepted
subject to collections and full
credit will only be given when the
check or draft has been accepted by
the financial institution on which
it  was drawn.

James L. Snider D-38950
P.O. Box 689 F330U
Soledad, CA 93960-0689

OFFICE OF THE CLERK
UNITED STATES DISTRICT C.
NORTHERN DISTRICT OF CALIFOR
450 GOLDEN GATE Avenue
SAN FRANCISCO, CA 94102

Confidential
Legal Mail

MHP

(dd)

OFFICE OF THE CLERK
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE Avenue
SAN FRANCISCO, CA 94102



Confidential /
Legal Mail

OFFICE OF THE CLERK
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVE,
                        94102

JAMES L. SNIDER D-38950
P.O. Box 689 F3302
Soledad, CA 93960-0689

(PR)

MHP

Confidential
Legal Mail

Yolande

Chung

Accountant

Specialist