**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JAMES L. SNIDER,                                          No. C 08-3312 MHP (pr)

        Petitioner,                                  **ORDER DENYING HABEAS PETITION**

        v.

BEN CURRY, warden,

        Respondent.

                              /

**INTRODUCTION**

        James L. Snider, an inmate at the Correctional Training Facility in Soledad, filed this *pro se* action seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  This matter is now before the court for consideration of the merits of the *pro se* habeas petition.  For the reasons discussed below, the petition is denied.

**BACKGROUND**

        Snider was convicted of second degree murder with a firearm and attempted murder in the Santa Barbara County Superior Court.  In 1986, he was sentenced to 24 years to life in prison.  His habeas petition challenges an August 17, 2007 decision by the Board of Parole Hearings ("BPH") that found him not suitable for parole.  As of the date of the challenged decision, he had served 21 years in prison.

        The BPH identified the circumstances of the commitment offense, prior criminality, need for further programming, and unrealistic parole plans as the reasons for the decision that Snider's release would pose an unreasonable risk of danger to society.

        Snider sought relief in the California courts.  The Santa Barbara County Superior Court denied his petition for writ of habeas corpus in a reasoned decision.  The California

1 Court of Appeal and California Supreme Court summarily denied his petitions for writ of

2 habeas corpus.

3      Snider then filed his federal petition for a writ of habeas corpus, and alleged that the

4 BPH's decision violated his federal right to due process because it was not supported by

5 sufficient evidence.  The court ordered respondent to show cause why the petition should not

6 be granted.  Respondent filed an answer and Snider filed a traverse.

7 **JURISDICTION AND VENUE**

8      This court has subject matter jurisdiction over this habeas action for relief under 28

9 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged

10 action concerns the execution of the sentence of a prisoner housed at a prison in Monterey

11 County, within this judicial district.  28 U.S.C. §§ 84, 2241(d).

12 **EXHAUSTION**

13      Prisoners in state custody who wish to challenge collaterally in federal habeas

14 proceedings either the fact or length of their confinement are required first to exhaust state

15 judicial remedies, either on direct appeal or through collateral proceedings, by presenting the

16 highest state court available with a fair opportunity to rule on the merits of each and every

17 claim they seek to raise in federal court.  *See* 28 U.S.C. § 2254(b), (c).  The parties do not

18 dispute that state court remedies were exhausted for the claims asserted in the petition.

19 **STANDARD OF REVIEW**

20      This court may entertain a petition for writ of habeas corpus "in behalf of a person in

21 custody pursuant to the judgment of a State court only on the ground that he is in custody in

22 violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

23 The petition may not be granted with respect to any claim that was adjudicated on the merits

24 in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that

25 was contrary to, or involved an unreasonable application of, clearly established Federal law,

26 as determined by the Supreme Court of the United States; or (2) resulted in a decision that

27 was based on an unreasonable determination of the facts in light of the evidence presented in

28 the State court proceeding."  28 U.S.C. § 2254(d); *see Williams (Terry) v. Taylor*, 529 U.S.

2

1  362, 409-13 (2000).   Section 2254(d) applies to a habeas petition from a state prisoner

2  challenging the denial of parole.  *See Hayward v. Marshall*, 603 F.3d 546, 563 (9th Cir.

3  2010) (*en banc*); *Sass v. California Board of Prison Terms*, 461 F.3d 1123, 1126-27 (9th Cir.

4  2006).

5                                                      **DISCUSSION**

6  A.      <u>State Law Standards For Parole For Murderers In California</u>

7         California uses indeterminate sentences for most non-capital murderers, with the term

8  being life imprisonment and parole eligibility after a certain minimum number of years.  A

9  first degree murder conviction yields a minimum term of 25 years to life and a second degree

10  murder conviction yields a minimum term of 15 years to life imprisonment.  *See In re*

11  *Dannenberg*, 34 Cal. 4th 1061, 1078 (Cal. 2005); Cal. Penal Code § 190.

12         A BPH panel meets with an inmate one year before the prisoner's minimum eligible

13  release date "and shall normally set a parole release date. . . . The release date shall be set in

14  a manner that will provide uniform terms for offenses of similar gravity and magnitude in

15  respect to their threat to the public, and that will comply with the sentencing rules that the

16  Judicial Council may issue and any sentencing information relevant to the setting of parole

17  release dates."  Cal. Penal Code § 3041(a).  Significantly, that statute also provides that the

18  panel "shall set a release date unless it determines that the gravity of the current convicted

19  offense or offenses, or the timing and gravity of current or past convicted offense or offenses,

20  is such that consideration of the public safety requires a more lengthy period of incarceration

21  for this individual, and that a parole date, therefore, cannot be fixed at this meeting."  Cal.

22  Penal Code § 3041(b).

23         One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides: "A parole

24  date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c).  The

25  listed circumstances tending to show *unsuitability* for parole are the nature of the

26  commitment offense, i.e., whether the prisoner committed the offense in "an especially

27  heinous, atrocious or cruel manner," previous record of violence, unstable social history,

28  previous sadistic sexual offenses, lengthy history of severe mental problems related to the

1   offense, and negative institutional behavior.  15 Cal. Code Regs. § 2402(c).  A parole date

2   shall be set if the prisoner is found suitable for parole under Section 2402(d).  The listed

3   circumstances tending to show *suitability* for parole are the absence of a juvenile record,

4   stable social history, signs of remorse, a stressful motivation for the crime, the presence of

5   battered woman's syndrome, lack of criminal history, the present age reduces the probability

6   of recidivism, the prisoner has made realistic plans for release or developed marketable

7   skills, and positive institutional behavior.  15 Cal. Code Regs. § 2402(d).  A parole date set

8   under this article "shall be set in a manner that provides uniform terms for offenses of similar

9   gravity and magnitude with respect to the threat to the public."  The regulation also provides

10  that "[t]he panel shall first determine whether the life prisoner is suitable for release on

11  parole.  Regardless of the length of time served, a life prisoner shall be found unsuitable for

12  and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk

13  of danger to society if released from prison." 15 Cal. Code Regs. § 2402(a).  The panel may

14  consider all relevant and reliable information available to it.  15 Cal. Code Regs. § 2402(b).

15      The regulations contain a matrix of suggested base terms for several categories of

16  crimes.  *See* 15 Cal. Code Regs. § 2403.  For example, for second degree murders, the matrix

17  of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years,

18  depending on some of the facts of the crime.  The statutory scheme places individual

19  suitability for parole above a prisoner's expectancy in early setting of a fixed date designed

20  to ensure term uniformity.  *Dannenberg*, 34 Cal. 4th at 1070-71.  Under state law, the matrix

21  is not reached unless and until the prisoner is found suitable for parole.  *Id.* at 1070-71; 15

22  Cal. Code Regs. § 2403(a).

23      The "Penal Code and corresponding regulations establish that the fundamental

24  consideration in parole decisions is public safety . . . [T]he core determination of 'public

25  safety' under the statute and corresponding regulations involves an assessment of an inmate's

26  *current* dangerousness."  *In re Lawrence*, 44 Cal. 4th 1181, 1205 (Cal. 2008)(emphasis in

27  source).  Where "evidence of the inmate's rehabilitation and suitability for parole under the

28  governing statutes and regulations is overwhelming, the only evidence related to unsuitability

4

1   is the gravity of the commitment offense, and that offense is both temporally remote and

2   mitigated by circumstances indicating the conduct is unlikely to recur, the immutable

3   circumstance that the commitment offense involved aggravated conduct does not provide

4   'some evidence' *inevitably* supporting the ultimate decision that the inmate remains a threat

5   to public safety." *Id.* at 1191 (emphasis in source).

6   B.       Federal Habeas Relief On Parole Denial Claims

7            The U. S. Constitution's Due Process Clause does not itself provide state prisoners

8   with a federal right to release on parole. *Hayward v. Marshall*, 603 F.3d 546, 562 (9th Cir.

9   2010) (*en banc*).  The substantive law of a state might create a right to release on parole,

10  however. *See id.* at 555, 559.  Although *Hayward* purported not to reach the question

11  whether a California's substantive law created a federally protected liberty interest, *see id.* at

12  562, later cases from the Ninth Circuit have said or assumed it does.  *See Pearson v. Muntz*,

13  606 F.3d 606, 609 (9th Cir. 2010) ("state-created rights may give rise to liberty interests that

14  may be enforced as a matter of federal law. . . .  By holding that a federal habeas court may

15  review the reasonableness of the state court's application of the California 'some evidence'

16  rule, *Hayward* necessarily held that compliance with the state requirement is mandated by

17  federal law, specifically the Due Process Clause." ); *Cooke v. Solis*, 606 F.3d 1206, 1213 (9th

18  Cir. 2010) ("In *Hayward*, we held that due process challenges to California courts'

19  application of the 'some evidence' requirement are cognizable on federal habeas review

20  under AEDPA"); *id.* ("we must examine the nature and scope of the federally enforceable

21  liberty interest created by California's 'some evidence' requirement"); *see also Pirtle v.*

22  *California Board of Prison Terms*, 611 F.3d 1015, 1020 (9th Cir. 2010) ("'California's

23  parole scheme gives rise to a cognizable liberty interest in release on parole.' *McQuillion v.*

24  *Duncan*, 306 F.3d 895, 902 (9th Cir 2002).  That liberty interest encompasses the state-

25  created requirement that a parole decision must be supported by 'some evidence' of current

26  dangerousness. *Hayward* [603 F.3d at 562-63.]")  *Hayward*'s application and these later

27  cases make it clear that in the Ninth Circuit there is federal habeas relief available under §

28  2254 for California prisoners denied parole without sufficient evidence, although it now

1   appears that the emphasis has shifted from § 2254(d)(1) to § 2254(d)(2).

2        A federal district court reviewing a California parole decision "must determine

3   'whether the California judicial decision approving the governor's [or the Board's] decision

4   rejecting parole was an 'unreasonable application' of the California 'some evidence'

5   requirement, or was 'based on an unreasonable determination of the facts in light of the

6   evidence.'" *Hayward*, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(1)-(2)).  That

7   requirement was summarized in *Hayward* as follows:

8       As a matter of California law, "the paramount consideration for both the Board
    and the Governor under the governing statutes is whether the inmate currently

9       poses a threat to public safety."  There must be "some evidence" of such a
    threat, and an aggravated offense "does not, in every case, provide evidence

10      that the inmate is a current threat to public safety."  The prisoner's aggravated
    offense does not establish current dangerousness "unless the record also

11      establishes that something in the prisoner's pre- or post- incarceration history,
    or his or her current demeanor and mental state" supports the inference of

12      dangerousness. [¶]  Thus, in California, the offense of conviction may be
    considered, but the consideration must address the determining factor, "a

13      current threat to public safety."

14  *Hayward*, 603 F.3d at 562 (footnotes omitted) (quoting *Lawrence*, 44 Cal. 4th. at 1210,

15  1213-14); *see also Cooke*, 606 F.3d at 1216 (describing California's "some evidence"

16  requirement).

17       When a federal court considers a habeas petition directed at a parole decision, the

18  "necessary subsidiary findings" and the "ultimate 'some evidence' findings" by the state

19  courts are factual findings – and thus are reviewed by the federal court under 28 U.S.C. §

20  2254(d)(2) for whether the decision was "based on an unreasonable determination of the

21  facts in light of the evidence."  *Cooke*, 606 F.3d at 1214 (citing *Hayward*, 603 F.3d at 563).

22  C.    Snider's Case

23      1.    His Circumstances

24      Commitment offense: A BPH commissioner described the crime based on a probation

25  officer's report and a June 27, 2006 psychological evaluation as follows.  Snider, James

26  Brauninger, James Brauninger's wife Teresa Brauninger, and the Brauningers' dog Easter

27  lived together temporarily at a Motel 6 in Lompoc.  On September 7, 1985, both Snider and

28  James Brauninger had been drinking heavily, and were involved in a verbal argument that

1  escalated due to their intoxicated condition.  James Brauninger told Snider to pack his

2  belongings and leave.  At that point, Snider shot James Brauninger and Teresa Brauninger.

3  Snider also shot the dog when it attacked him.  A witness reported that Snider subsequently

4  left the motel in James Brauninger's pick-up truck.  A Santa Barbara County sheriff's deputy

5  stopped Snider in the victim's vehicle about four miles away from the motel.  Snider told the

6  police that somebody shot his brother and he was trying to find a hospital.  When police

7  officers entered the motel room where the shooting occurred, they discovered James

8  Brauninger lying lifeless on the floor.  Teresa Brauninger was wounded, and later had

9  surgery for numerous wounds she sustained from the shooting.  Easter the dog died of a

10  gunshot wound.  *See* Resp. Exh. 3 at Exh. A, 8/17/07 BPH hearing reporter's transcript

11  ("RT") 10-16.

12      Pre-Commitment Criminality:  Snider has an extensive adult criminal history.  Snider

13  was convicted on five occasions for drunk driving in 1973, 1974, twice in 1979, and in 1983.

14  RT 18.  In 1980, Snider was arrested for burglary and pled guilty to attempted conspiracy, for

15  which he was sentenced to five years of probation and sixty days in jail.  RT 19, 80.  While

16  still on probation from the 1980 conviction, Snider was convicted of bank robbery in 1984.

17  RT 20.  Snider was under the influence of alcohol and "broke" when he committed the

18  robbery.  *Id*.  Snider was sentenced to five years of probation and served 179 days at the

19  Metro Federal Correctional Center.  *Id.*  Snider committed the murder six months after he

20  served his prison term for the bank robbery, while still on federal probation.  RT 21.

21      Snider started drinking beer every night at the age of 21.  RT 26.  At his peak of

22  alcoholism, he required two six-packs of beer and half a pint of alcohol to become

23  intoxicated.  *Id.*

24      In-Custody Behavior:  Snider had a limited disciplinary history in prison.  He received

25  one CDC-115 violation for fist-fighting in 1989.  RT 34.  In addition, he received one CDC-

26  128 counseling chrono in 1992 for missing work.  *Id*.

27      In-Custody Accomplishments:  Snider earned his GED while incarcerated.  RT 30.

28  He also completed the information technology vocation in 2001.  *Id*.  Snider had worked in

7

1  the prison's kitchen for six years at the time of the hearing and received above average scores

2  from his work supervisors.  RT 30-31.  Snider received one laudatory chrono for his

3  participation in Thanksgiving activities.  RT 34.  Snider has participated in Alcoholics

4  Anonymous, although he was not involved with it at the time of the hearing.  RT 31*; see*

5  Resp. Exh. 3 at Exh. B, 6/27/06 mental health evaluation,  p. 2.  Snider pursues his own self-

6  help program in which he reads the Bible and bimonthly magazines distributed by

7  Overcomers Outreach.  RT 31, 33.  According to Snider, Overcomers Outreach is similar to

8  Alcoholic Anonymous, with a stronger emphasis on Christian beliefs and does not hold

9  meetings in prison.  *Id.*  Overcomers Outreach is strictly based on prayer and applying

10  Biblical passages.  RT 51.  Snider wrote eight reports on what he read in the Overcomers

11  Outreach magazines and the Bible.  RT 32; Resp. Exh. 3 at Exh. D.  Snider does not attend

12  any self-help meetings.  RT 33.  Snider has not completed any anger management classes

13  because he does not believe he has anger.  RT 59.

14      Parole Plans:  Snider did not have a residence arranged for parole.  RT 37.  Snider's

15  preference is to reside at a halfway house for six months upon release; however, Snider has

16  not heard back from the five halfway homes that he wrote to inquiring about post-release

17  residence.  *Id.*  The presiding commissioner suggested that Snider investigate halfway homes

18  that require a fee because of the difficulty of obtaining a residence in free halfway homes.

19  *Id.*  A couple that Snider never met, but corresponded with by mail, offered to help Snider

20  find employment in Bakersfield.  RT 39.  Snider planned to work in construction or on oil

21  rigs in Bakersfield; however, the presiding commissioner informed Snider that at 57 years

22  old he may have difficulties obtaining a job that requires physical labor.  RT 42-46.  Snider

23  also compiled a list of oil rigs in San Diego County where he would try to obtain

24  employment in the event that he is paroled to San Diego County because that is where the

25  commitment offense took place.  RT 47.  Snider planned to find a Bible-based church to

26  attend and regularly attend meetings hosted by Overcomers Outreach and Alcoholics

27  Anonymous.  RT 40, 52.

28      Psychological Evaluation:  Snider's most recent psychiatric evaluation is supportive of

1

release.

2

> [H]e poses no more risk to society than the average citizen in the community. In fact, based upon his maturity, strongly held Christian values and commitment to lead a life that is honoring to God and man, his risk level is undoubtedly lower than the average citizen in the community.

3

4

Resp. Exh. 3 at Exh. B, 6/27/06 mental health evaluation, p. 4. Further, the psychologist

5

concluded that "[h]is determination to remain clean and sober is convincing and genuine . . .,

6

alcohol abuse is certainly not a current problem in his life." Resp. Exh. 3 at Exh. B, 6/27/06

7

mental health evaluation, p. 2. The psychologist also concluded that Snider accepted full

8

responsibility for the crime and that Snider expressed remorse and sorrow about killing his

9

friend. *Id*. at p. 3.

10

2.      BPH's Decision And State Court Review

11

At Snider's hearing, the BPH panel found Snider "not suitable for parole" and denied

12

Snider parole for two years. RT 78, 83. The BPH found that the commitment offense was

13

especially cruel and callous in that there was an element of trust between Snider and the

14

victims, the crime had multiple victims, and Snider subsequently stole the victim's car. RT

15

78-79. The BPH also found that Snider could not identify what triggered him to commit the

16

commitment offense other than "pride," and that this motive was trivial or inexplicable in

17

relation to the murder, attempted murder, and dog killing. RT 79. In addition, the BPH

18

relied on Snider's prior criminality. RT 80. That criminality included five convictions for

19

driving under the influence, a burglary arrest that resulted in a conviction for attempted

20

conspiracy, and a bank robbery conviction. *Id*. The BPH noted that Snider failed to profit

21

from society's previous attempts to correct his criminality, including periods of probation and

22

incarceration. *Id*. The BPH also noted in its decision that Snider has not sufficiently

23

participated in self-help programs while incarcerated and that in the absence of more

24

documented self-help programming to address Snider's alcoholism and anger, Snider remains

25

a threat to others. RT 80-81. Further, the BPH emphasized that Snider does not have

26

"realistic" parole plans as is illustrated by his lack of a viable residence and his lack of

27

employment plans. RT 81. The BPH applauded Snider's Bible studies, GED degree,

28

vocational certificate in information technology, and positive work reports; however, it found

9

1   that these factors do not outweigh the factors of unsuitability.  RT 82.  The BPH

2   commissioner also stated that they did not "believe [Snider has] any insight whatsoever into

3   this crime, into what made [him] do this, and if [he] did, [he is] keeping it pretty well hidden"

4   because he was not able to adequately discuss his motivation for committing the crime with

5   the BPH.  RT 83; *see* RT 60-66.

6          The Santa Barbara County Superior Court upheld the BPH's decision in a reasoned

7   decision.  Resp. Exh. 2.  As the last reasoned decision from a state court, that is the decision

8   to which § 2254(d) applies.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v.*

9   *Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005).  The superior court found that some

10  evidence did support the BPH's conclusion that Snider continues to pose an unreasonable

11  risk of danger to the public based on the circumstances of the commitment offense "beyond

12  those necessary to sustain a second degree murder conviction."  Resp. Exh. 2 at 1.  The

13  superior court also found that some evidence supports the BPH's decision that Snider poses

14  an unreasonable risk of present danger to the public arising from his threat to abuse alcohol

15  on parole.  *Id*. at 2.

16          3.      Analysis Of Parole Habeas Claim

17          The superior court's rejection of the habeas petition was not an unreasonable

18  determination of the facts or an unreasonable application of the California "some evidence"

19  requirement.  *See Cooke,* 606 F.3d at 1216.  The state court found that there was some

20  evidence that Snider's release would pose an unreasonable risk of danger to society based on

21  both the cruel and callous nature of the commitment offense and the possibility that Snider

22  might return to alcohol abuse.  There was some evidence to support each of those findings.

23  Those findings were probative of, and provided reliable evidence of, Snider's current

24  dangerousness.  Even though Snider successfully refrained from consuming alcohol for

25  seventeen years and Snider stated his commitment to refrain from consuming alcohol upon

26  release, the state court reasoned that the combination of his numerous criminal convictions

27  that involved alcohol abuse, his lack of self-help programming courses, and the temptations

28  that he would face upon release absent a concrete parole plan could cause Snider to return to

10

1 alcohol abuse.  Snider's educational achievements, in-prison behavior, self-help efforts, and

2 religious support count in Snider's favor, but they do not compel a finding of suitability.

3 This is not a case where the BPH relied *only* on the aggravated nature of the commitment

4 offense.  Rather, "something in the prisoner's pre- or post-incarceration history, or his or her

5 current demeanor and mental state, indicate[d] that the implications regarding the prisoner's

6 dangerousness that derive from his or her commission of the commitment offense remain[ed]

7 probative to the statutory determination [that Snider was a] continuing threat to public

8 safety." *Lawrence*, 44 Cal. 4th. at 1214.  Here, that "something" was a severe alcoholism

9 problem that had not been sufficiently addressed.  Snider's struggle with alcohol abuse was

10 so severe that it contributed to five DUI convictions and a bank robbery as well as the

11 murder.  Although Snider has adopted Christianity and prayer as a means of self-help,

12 Snider's lack of in-prison programming courses to cope with alcoholism and anger

13 reasonably could be seen to indicate that Snider poses a current danger to society.  Snider's

14 "plan" for abstaining from alcohol had only two components: will power and prayer.  RT 55-

15 58.  Although Overcomers Outreach is supposedly similar to Alcoholics Anonymous, Snider

16 had no sponsor, had no meetings, and did not discuss the 12-steps with anybody.  The

17 commissioners did not object to a self-study plan, but thought that this plan was unrealistic

18 and failed to take account of the stressors in the free world.  RT 85.  His one-page reports

19 from two years out of his 21 years in prison do not sufficiently demonstrate that Snider has

20 the necessary support to refrain from alcohol.  In addition, although Snider did write to

21 halfway homes inquiring about post-release residence, he had not secured a residence as of

22 the date of the parole hearing.  The state court's rejection of his petition was not an

23 unreasonable application of California's "some evidence" requirement and was not based on

24 an unreasonable determination of the facts in light of the evidence.  Snider therefore is not

25 entitled to federal habeas relief.

26

27

28

11

1

**CERTIFICATE OF APPEALABILITY**

2      A certificate of appealability is GRANTED as to the due process claim. *See* 28

3  U.S.C. § 2253(c).  Reasonable jurists could find the district court's assessment of the claim

4  debatable. *See Slack v. McDaniel* , 529 U.S. 473, 484 (2000).  Snider is cautioned that the

5  court's ruling on the certificate of appealability does not relieve him of the obligation to file a

6  timely notice of appeal if he wishes to appeal.

7

**CONCLUSION**

8      The petition for writ of habeas corpus is denied.  The clerk shall enter judgment and

9  close the file.

10      IT IS SO ORDERED.

11  DATED: October 28, 2010

Marilyn Hall Patel
United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28